***FOR PUBLICATION***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| _____ : | | |
| MUNICH REINSURANCE : | | |
| AMERICA, INC., : | | |
| : | | Civil Action No.: 09-6435 (FLW) |
| Plaintiff, : | | |
| : | | **OPINION** |
| v. : | | |
| : | | |
| AMERICAN NATIONAL : | | |
| INSURANCE COMPANY, : | | |
| : | | |
| Defendant. : | | |
| _____ : | | |

**WOLFSON**, **United States District Judge**:

This case involves complex retrocessional agreements between Plaintiff Munich Reinsurance America Inc. ("Munich") and Defendant American National Insurance Company ("ANICO"). Presently before the Court are two motions: Munich's motion for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), on its breach of contract and declaratory judgment claims against ANICO and on ANICO's rescission counterclaim, as well as ANICO's cross-motion for summary judgment. Each of Munich's claims, and the rescission counterclaim, relate to ANICO's refusal to pay certain claims submitted for payment by Munich under the parties' agreements.

Munich seeks partial summary judgment: (a) on ANICO's rescission counterclaim, arguing that ANICO has waived its right to rescind and, alternatively,

1

that its rescission counterclaim should be dismissed on the merits; (b) on ANICO's untimely claim submission defense to Munich's breach of contract claim, arguing that ANICO waived its defense and for judgment on the merits; (c) that, under the agreements, Munich's "retention" is calculated on a "ground up" basis; (d) that claims issued by Everest Re[1] are covered by the agreements; (e) that Munich's "roofer" claims are covered by the agreements; and (f) that Munich's use of bordereaux reporting did not breach the agreements.  In its cross-motion, ANICO seeks summary judgment on its rescission counterclaim and, in the alternative, partial summary judgment on its untimely claim submission defense to payment.

The Court grants in part, and denies in part, Munich's partial motion for summary judgment.  With respect to ANICO's rescission counterclaim, the Court denies Munich's motion on the merits because there exists a genuine issue of material fact.  With respect to ANICO's untimely claim submission defense to payment, the Court grants Munich's motion on the merits.  The Court grants Munich's motion on the retention issue, concluding that retention is calculated on a ground up basis.  With respect to the Everest Re and roofer claims, Munich's motion is denied.  Finally, in light of the aforesaid ruling on the untimely claim submission defense, the Court does not reach Munich's use of bordereaux reporting; hence summary judgment on that

---

[1]     As explained in more detail herein, Everest Re is an entity related to the underlying ceding insurer, Everest National Insurance Company, that filed the claims covered by the retrocessional agreement.

basis is denied.  ANICO's cross-motion on the rescission counterclaim and untimely claim submission defense is denied.

## I.      FACTS AND PROCEDURAL HISTORY

Before delving into the facts of this case, a brief overview of reinsurance and retrocessional insurance is helpful.  Of course, an overview of such complex intersections of insurance law must be taken with a grain a salt.  As an attorney with fifty years of reinsurance practice experience has explained, "[t]he minds that run the insurance and reinsurance industries are very clever, intelligent, and sophisticated, and they have devised almost an infinite number of variations on [the] basic categories [of reinsurance]...." *Interview with Eugene Wollan, Esq., in* Zukerman, T., *Environmental Ins. Litig.: Law and Practice* Appx. 31A at 2 (2012) ("Wollan Interview").  Nevertheless, I provide a basic primer for the purpose of orienting the reader to this obtuse subject.

The Third Circuit, in *Pacific Employers Ins. Co. v. Global Reinsurance Corp. of America*, --- F.3d ----, 2012 WL 3871588, *1 (3d Cir. 2012), describes reinsurance as

> insurance for insurance companies. A reinsurer agrees to indemnify a reinsured for certain payments the latter makes under one or more of its issued policies. In return, the reinsurer receives a share of the underlying premiums. Ceding a portion of an insured risk prevents a single catastrophic loss from hurling the reinsured into insolvency. It also allows the reinsured to invest more capital or to insure more risks.

*Id.* at 5.  In short, "[a] reinsurance contract is essentially a contract of indemnity ...." *Christiania General Ins. Corp. of New York v. Great American Ins. Co.*, 979 F.2d 268, 271 (2d Cir. 1992).

"The reinsurance of reinsurance is called a *retrocession*, and the reinsurers of reinsurers—that is, reinsurers who assume retrocession risk through retrocessional agreements—are called retrocessionaires." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London, subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646*, 584 F.3d 513, 519 (3d Cir. 2009) (emphasis added).  Such retrocession agreements present considerably more complex legal and factual scenarios because "there is another layer of coverage created and another party thrown into the mix." Plitt, et al., 1A COUCH ON INSURANCE § 9:3.

There are two overarching categories of reinsurance and retrocession—treaty and facultative; and the agreement here is the former.  Through treaty reinsurance,

> the reinsurer [or retrocessionaire] agrees to accept an entire block of business from the reinsured. Once a treaty is written, a reinsurer is bound to accept all of the policies under the block of business, including those as yet unwritten. Because a treaty reinsurer accepts an entire block of business, it does not assess the individual risks being reinsured; rather, it evaluates the overall risk pool.

*Pacific Employers*, 2012 WL 3871588, *2.

As with primary insurance, reinsurance comes in several basic types, including proportion and excess of loss policies.  An "excess of loss" policy is one that obligates the retrocessionaire to pay up to its "retention" amount, *i.e.*, the amount of "cover" the retrocessionaire agreed to provide the reinsurer, once the total claim amount has

surpassed a set monetary limit or "layer" that the reinsurer must first pay.  *See Hartford Acc. and Indem. Co. v. Ace American Reinsurance Co.*, 284 Conn. 744, 750 n.5 (2007).[2]  Excess of loss policies come in three forms: "per risk," "annual aggregate" or "per occurrence."  *See* Orpett, et al., 3 LAW AND PRAC. OF INS. COVERAGE LITIG. § 41:10 (2012).  These three methods differ in the manner in which risks "attach" to the reinsurance agreement.  Under a per occurrence policy, like that at issue here, the retrocessionaire's obligation is triggered by a particular incident, such as a personal injury.  *Id.*

Turning now to the details of the retrocessional policy at hand, the following facts are undisputed unless otherwise noted.  In this fact section, I also provide an outline of the parties' agreement.  As there are additional facts that aid my analysis of the particular provisions that must be interpreted, I provide greater factual detail in the body of the Opinion where appropriate.

---

[2]  The Connecticut Supreme Court has succinctly explained this sort of agreement as follows:

> A reinsurance treaty reinsures all policies in a defined block of an insurer's business, such as general liability. Under an excess of loss contract, the insurer retains liability for losses up to a specified threshold, known as the retention. If a loss exceeds the retention, the reinsurer is liable for all or an agreed part of the excess, up to the contractual limit of liability. Excess of loss contracts may consist of multiple layers, in which coverage under the first layer is triggered when the amount of the insurer's loss exceeds the retention, and each subsequent layer is triggered when the loss exhausts the limit of the layer below.

*Id.*

Munich entered into a reinsurance relationship with Everest National Insurance Company ("Everest"), whereby Munich agreed to reinsure Everest's workers compensation insurance program for the period of January 1, 1998 through December 31, 2001 under an excess of loss reinsurance agreement.   The Munich-Everest relationship was governed by an agreement with limits of $750,000 excess of $250,000. This means that Munich had no liability for any claim of less than $250,000—the layer from $0 to $250,000 was Everest's responsibility.   For claims that exceeded $250,000, Munich was liable only for that portion of the claim beyond the initial $250,000 attachment point and up to a limit of $750,000.

Munich purchased excess of loss retrocessional cover, *i.e.,* reinsurance on its reinsurance policy with Everest, for the duration of the Munich-Everest reinsurance agreement.   The retrocessional cover was purchased through an agent—IOA Re—that represented several retrocessionaires.   One of the retrocessionaires IOA Re represented was ANICO.   Munich contends that the retrocessional agreements it entered into with various retrocessionaires each attach at the $500,000 level, such that "on a million dollar claim, Everest would be responsible for the first $250,000, Munich [ ] would be responsible for the next $250,000 and the retrocessionare would be responsible for the final $500,000."   Pl. Stat. Mat. Facts at ¶ 20.

The ANICO-Munich retrocessional agreements at the center of the parties' dispute are for the periods of November 1, 1999 through December 31, 2000 ("the 2000 Retrocessional Agreement"), and January 1, 2001 through December 31, 2001 ("the

6

2001 Retrocessional Agreement"). For purposes of this motion, the parties agree that these two agreements are identical in substance.

Generally, the agreements provide that ANICO will indemnify Munich "for the amount of ultimate net loss . . . which may accrue to [Munich] as a result of loss or losses occurring during the term of [the] Agreement[s] as a result of [Munich's] participating in the [Munich-Everest] Reinsurance Agreement ...." LeBlanc Cert., Exh. 2 ("2001 Retrocessional Agreement"), Art. I(A). Ultimate net loss is defined by the agreements as "only such amounts as are actually paid or payable by [Munich] and [Everest] under the Underlying [Munich-Everest] Agreement ...." *Id.* at Art. VII(A). The agreements further provide that ANICO indemnifies Munich for "each and every accident or occurrence or series of accidents or occurrences arising out of one event ...." *Id.* at Art. VI. In short, ANICO agreed to indemnify Munich for the amount of ultimate net loss accruing under the Munich-Everest workers' compensation reinsurance agreement, on a per occurrence basis.

To be clear, and as suggested above, ANICO is not the only retrocessionaire that agreed to indemnify Munich. ANICO agreed to accept a 75.00% share of the retrocessionaire obligations under the 2000 retrocessional agreement. LeBlanc Cert., Exh. 1 ("2000 Retrocessional Agreement"), Interest and Liabilities Contract.[3] This share of the retrocessionaire obligations is referred to as ANICO's "proportionate"

---

[3]      The other retrocessionaire(s), which are not parties to this suit, agreed to accept a 25.00% share of ANICO's obligations under the 2000 retrocessional agreement. *Id.*

share.  However, ANICO agreed to accept 100% of the retrocessionaire obligations arising under the 2001 retrocessional agreement.  2001 Retrocessional Agreement, Interest and Liabilities Contract.

In terms of notice, Munich agreed to "promptly" advise ANICO of "all claims coming under [their] Agreement on being advised by [Everest] ...."  Once so advised, ANICO "agree[d] to pay [Munich] on demand, [ANICO's] proportion of all losses and/or loss expenses paid by [Munich] arising from the Underlying [Munich-Everest] Agreement ...."  *Id.* at Art. X.

 On December 22, 2009, Munich brought the instant action against ANICO.  In its complaint, Munich alleges that ANICO owes Munich $4,330,578.01 under the retrocessional agreements and that ANICO has refused to pay.  The complaint asserts two breach of contract claims (Count One - the 2000 retrocessional agreement; Count Two - the 2001 retrocessional agreement), and a declaratory judgment claim regarding any future losses under the agreements. ANICO answered and discovery ensued.

On January 3, 2011, following the close of discovery, ANICO moved for leave to file an amended answer asserting several counterclaims against Munich:  fraudulent inducement, breach of the duty of good faith and fair dealing, breach of the duty of utmost good faith owed to a reinsurer, rescission of the retrocession agreements,  and breach of contract.  In moving for leave to file its amended answer, ANICO argued before the Magistrate Judge that, through discovery, it uncovered alleged misrepresentations and omissions by Munich that form the basis of its rescission claim.

8

Now before the Court is Munich's motion for partial summary judgment, on its breach of contract and declaratory judgment claims, and on ANICO's rescission counterclaim.  ANICO cross-moves for summary judgment.

## II.   STANDARD OF REVIEW

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n. 1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *accord* Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  *Kaucher*, 455 F.3d at 423.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

## III.   DISCUSSION

As noted, both parties have moved for summary judgment on issues relating to the viability and interpretation of the retrocessional agreements.  Munich seeks partial summary judgment:  (a) on ANICO's rescission counterclaim, arguing that ANICO has waived its right to rescind and, alternatively, that its rescission counterclaim should be dismissed on the merits; (b) on ANICO's untimely claim submission defense to Munich's breach of contract claim, arguing that ANICO waived its defense and for judgment on the merits; (c) that, under the agreements, Munich's "retention" is calculated on a "ground up" basis; (d) that claims issued by Everest Re are covered by the agreements; (e) that Munich's "roofer" claims are covered by the agreements; and (f) that Munich's use of bordereaux reporting did not breach the agreements.  In its cross-motion, ANICO seeks summary judgment on its rescission counterclaim and, in the alternative, partial summary judgment on its untimely claim submission defense to payment.

Because ANICO's rescission counterclaim is threshold in nature, I analyze that issue first.  Thereafter, I turn to Munich's remaining grounds for partial summary judgment raised by both parties' motions.  In assessing the viability of each claim at issue, I apply New York law as the parties agree that it governs their agreements.

### A.   *Legal Standard*

"A reinsurance contract is governed by the rules of construction applicable to contracts generally."  *Christiania*, 979 F.2d at 274 (citation omitted).  That is, the terms of unambiguous contracts are enforced as written.  An ambiguous contract is one

subject to different, reasonable interpretations.  Where the terms of the contract are ambiguous, "reference to extrinsic evidence provides guidance to the parties' intent." *Id.* (citation omitted).  Extrinsic evidence may include evidence of custom and usage. *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 3 N.Y.3d 577, 590–591, 789 N.Y.S.2d 461, 822 N.E.2d 768, 777 (2004) ("Our precedent establishes that where there is ambiguity in a reinsurance certificate, the surrounding circumstances, including industry custom and practice, should be taken into consideration") (Read, J., dissenting) *cited with approval in Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 130 S.Ct. 1758, 1769 n.6 (2010).

In this connection, "when resort to extrinsic evidence is necessary to shed light on the parties' intent summary judgment ordinarily is not an appropriate remedy, and must be denied unless, viewing the evidence in a light most favorable to the nonmovant and resolving all doubts in its favor, no reasonable trier of fact could find against the movant." *Christiania*, 979 F.2d at 274 (internal citations omitted).

B.    *Rescission*

A substantial portion of the parties' briefing focuses on ANICO's rescission counterclaim, which was added to this suit by way of an amended counterclaim after discovery was concluded.  The parties dispute whether ANICO has waived its right to pursue the rescission counterclaim by raising it so late and Munich argues that, even if ANICO has not waived its right to rescind, it is not entitled to rescind as a matter of law.  As both parties seek summary judgment on this issue, I address their motions simultaneously.  But, first, I recount the pertinent facts.

11

Lisa Hoekstra served as the IOA Re underwriter for the retrocession agreements. Oct. 18, 2010 Hoekstra Dep. at 19:2-7. During the formation of the Retrocession Contracts, Munich conveyed to Hoekstra "information about what Everest . . . was intending to write." Oct. 21, 2011 Hoekstra Dep. at 231:21 - 232:2. The parties do not dispute that Everest provided Munich with data relevant to the underwriting process. Pl. Stat. of Facts, at ¶¶ 27, 31; Def. Resp. Stat. of Facts, ¶¶ 27, 31; Oct. 21, 2011 Hoekstra Dep., at 162:12-24. And, neither ANICO nor IOA Re contend that Munich withheld any information that Everest provided to Munich. Nov. 29, 2011 Circuit Dep. at 239:10-20; Oct. 25, 2011 Schouweiler Dep. at 135:23-136:4. However, the parties disagree about the sufficiency of the information Munich did provide to ANICO.

Before signing the retrocession agreements, both Munich and IOA Re calculated potential losses and liabilities inherent in the Underlying Agreement between Munich and Everest. Verhaegen Dep., at 116:1-10. Specifically, they calculated "loss ratios" and "loss costs" using different internal "manual" rates.[4] Oct. 21, 2011 Hoekstra Dep. at 24:1-12; Verhaegen Dep. at 118:6-17. When possible, underwriters use historical loss data to formulate an "experience rating projection," based upon the reinsured business's prior losses. Oct. 21, 2011 Hoekstra Dep. at 21:21-22:1. However, when relatively new reinsurance agreements lack sufficient historical loss data, underwriters

---

[4] "Loss cost" refers to the portion of the premium charged that will ultimately constitute a loss, represented as a percentage of the premium rate (*i.e.*, 1.72% loss for a 4.5% premium). "Loss ratio" compares total losses incurred to total premiums charged, represented in a comparative percentage (*i.e.*, 150% loss ratio).

resort to more generalized "actuarial numbers." *Id.* at 23:16-20. Because IOA Re did not have sufficient historical loss data regarding the Underlying Agreement, IOA Re calculated the loss ratio using a "manual rate." *Id.* at 24:1-12. With that rate, and using the data provided by Everest, IOA Re estimated a 1.65% loss ratio. Kline Cert., Appx. II, Vol. III, Ex. 110 at 5.

Munich also performed an internal analysis of potential losses related to the $750,000 in excess of $250,000 layer of the Underlying Agreement. In an intra-company email, Munich employee Edward Pawlowski summarized loss projections on the Underlying Agreement as follows:

> Treaty Rate: 4.5%
> . . .
> Treaty Expected Loss Cost/ELR: 4.95%/110%
> Carve Out Loss Cost: 1.72%/120%
> Net Treaty Loss Cost/ELR: 3.23%/106%"

LeBlanc Cert., Ex. 10.

ANICO contends that Munich withheld its internal calculations from IOA Re, and that the internal calculations would have materially affected the underwriting process undertaken by IOA Re on behalf of ANICO. Specifically, ANICO contends that Munich did not disclose the following information:

> (1) Munich's internal Underwriting Summary Memo showed a "156% incurred loss ratio," and expected "the all-time loss ratio to be above 200% before carve-out cessions;" LeBlanc Cert., Ex. 9;
>
> (2) Munich "project[ed] an incurred loss ratio of 150 percent for 2000" for their $750,000 excess reinsurance of Everest; Verhaegen Dep. at 155:2-8;

13

(3) Munich's guidelines "would require [it] to move [the] deal offshore," because the alleged 150% loss was "unacceptable to" Munich; Pawlowski Dep., at 178:14-23;

(4) Munich employee Edward Pawlowski believed the loss ratios provided to Munich by  Everest National were "dubious;" LeBlanc Cert., Ex. 6; and

(5) Munich still estimated its loss ratios to be 110%, while the carve-out loss cost to the retrocessionaire would be 120%.  LeBlanc Cert., Ex. 10.

Munich acknowledges that it did not provide ANICO with its internal analysis, although it contends it had no obligation to do so.

Accounts differ on whether the internal analysis would have been relevant to the underwriting process.  Munich representative Thierry Verhaegen testified that while a ceding company's expected loss calculations "would [be] good to have . . . a retrocessionaire would do [its] own pricing analysis," and "would not rely on second-hand information."  Verhaegen Dep. at 252:5-23.  IOA Re underwriter Lisa Hoekstra "assumed" that Munich would calculate a loss ratio of its own, but has no recollection of "asking what their loss ratio was."  Oct. 21, 2011 Hoekstra Dep. at 42:24-23:11; 130:5-11.  Nonetheless, Hoekstra also testified that, had she known that Munich "purchased at 1.42 percent," but expected a loss cost of "1.72 percent," she would not have issued coverage at the same price.  *Id.* at 196:24-197:19.  Similarly, Hoekstra testified that she "doubt[ed]" she would have underwritten the Retrocession Contracts in the same way had she known that Munich estimated a "Carve-Out loss cost of 1.72%/120%," or a "Net treaty loss cost/ELR [of] 3.23%/106%."  *Id.* at 198:17-22; 199:3-19.

14

The issues relating to Munich's internal analysis and its failure to disclose that analysis to IOA Re form the cornerstone for ANICO's rescission claim.  Steven Schouweiler, Senior Vice President of Health Operations at ANICO, had "overall responsibility for . . . the Munich Re/American National contracts."  Oct. 26, 2010 Schouweiler Dep. at 6:14-16; Oct. 25, 2011 Schouweiler Dep. at 6:5-9.  In his October 25, 2011 deposition, Schouweiler testified that he became aware that ANICO was considering rescission of the Retrocession Contracts "'a year' or 'two'" before his deposition. Oct. 25, 2011 Schouweiler Dep. at 16:8-15. Indeed, he discussed rescinding the contracts with another ANICO employee, "Mr. Stelling," "a couple of years" before his (Schouweiler's) 2011 deposition. *Id.* at 17:16-22. "[I]n [his] own mind," Schouweiler thought that "lack of disclosure and compliance with the agreement" justified rescission at that time.  *Id.* at 18:13-16.  Thus, according to his deposition testimony, Schouweiler believed rescission might be a remedy available to ANICO sometime during late 2009.

Subsequent to his deposition, Schouweiler avers in a 2012 affidavit that once this suit was filed by Munich and served in January 2010, he then knew "something had gone wrong" and that he would rescind the agreement if he could, at that time. LeBlanc Cert., Ex. 11, Schouweiler Aff. p. 5.[5]  Thereafter, he qualifies the foregoing statement by averring that "[u]ntil all the depositions of Munich's witnesses were

---

[5]      Schouweiler's affidavit does not contain paragraph numbers, thus, I refer to page numbers instead.

completed in late 2010, [he] did not have facts from which [he] could determine whether to file a rescission claim." *Id.*

As noted, ANICO did not initially assert a rescission counterclaim but successfully sought leave to add the counterclaim after the close of discovery. In its January 2011 motion seeking leave to amend before the Magistrate Judge, ANICO argued that, through discovery, it discovered that Munich failed to convey to ANICO historical loss data that was solely in Munich's possession. Specifically, Munich pointed to Pawlowski's testimony that the "expected loss ratios for . . . [the Agreements were] very dubious ....", among other deposition testimony taken near the end of 2010. April 18, 2011 Order at 10. While not ruling on the merits of ANICO's contention, the Magistrate Judge held that ANICO's claim was colorable on its face and, therefore, granted its request for leave to amend. With these facts in mind, I now turn to the merits of the parties' arguments.

     1.    *Waiver of Right to Rescind*

As an initial matter, Munich argues that ANICO's lengthy delay in bringing the rescission counterclaim amounts to a waiver of that claim. Generally,

> [a] reinsured is obliged to disclose to potential reinsurers all "material facts" concerning the original risk, and failure to do so generally entitles the reinsurer to rescission of its contract. But the reinsured ordinarily has no obligation to disclose the terms upon which insurance has been granted where those terms are generally to be found in policies of that nature, for the reinsurer ought to be aware of such standard terms. Where the reinsured has offered extended coverage or an unusual term, however, that is a material fact which, if not disclosed, would render a reinsurance agreement voidable.

*Sumitomo Mar. & Fire Ins. Co.–U.S. Branch v Cologne Reins. Co. of Amer.*, 75 N.Y.2d 295, 303 (1990) (internal citations omitted).  In the reinsurance context, this duty to disclose is rooted in the duty of utmost good faith or *uberrimae fidei.  Allendale Mut. Ins. Co. v. Excess Ins. Co. Ltd.*, 992 F.Supp. 278, 282 (S.D.N.Y. 1998).

Even when this duty is breached, if the reinsurer or retrocessionaire treats the reinsurance or retrocessional agreement as valid for a "considerable time" after discovering the undisclosed facts, and fails to assert its rescission claim "within a reasonable time," the insurer waives its right to seek rescission.  *Sumitomo*, 75 N.Y.2d at 304.  *See also  Prudential Ins. Co. of America v. BMC Industries, Inc.*, 630 F.Supp. 1298, 1300 (S.D.N.Y. 1986) ("A waiver requires the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it.") (quoting *City of New York v. State of New York*, 40 N.Y.2d 659, 669, 357 N.E.2d 988, 389 N.Y.S.2d 332, 340 (1976)).  Indeed, "New York courts have held specifically that '[w]here an insurer accepts premiums after learning of an event allowing for cancellation of the policy, the insurer has waived the right to cancel or rescind." *GuideOne Specialty Mut. Ins. Co. v. Congregation Adas Yereim*, 593 F.Supp.2d 471, 485 (E.D.N.Y. 2009) (collecting cases).  *See also BMC Industries, Inc.*, 630 F.Supp. at 1300 ("waiver will be found where, subsequent to the discovery of the fraud, the party later claiming a right to rescind has continued to accept the benefits of the agreement or

acted in some other fashion inconsistent with exercise of a right to rescind.") (quoting *MacTaggart v. Risucci*, 85 Civ. 0812, slip op. at 3 (S.D.N.Y. October 28, 1985)).[6]

Here, while the parties devote considerable space in their briefs to their waiver arguments, the arguments distill to a single factual dispute: whether ANICO asserted its rescission counterclaim within a reasonable period of time. Pointing to Schouweiler's testimony, Munich suggests that ANICO knew as early as 2009 that it intended to rescind the retrocessional agreements. Yet, according to Munich, ANICO "sat on its rights," made some payments under their agreements, and for those claims that ANICO denied, it never cited Munich's alleged failure to disclose material facts as a basis for denying those claims. While Schouweiler testified in his deposition that he considered rescission as early as late 2009, he later stated in an affidavit that it was not until he became aware, through discovery in late 2010, of (i) Pawlowki's emails indicating a treaty rate of 4.5% and carve out loss cost of 1.72%, and (ii) that Everest's projections (that were provided to Munich and ANICO) were "dubious," that he (Schouweiler) had sufficient facts to assert a rescission counterclaim. Thus, it is Schouweiler's testimony that the rescission counterclaim could not have been brought until late 2010.

Munich has not demonstrated that summary judgment is appropriate on the question of waiver. The record evidence establishes that Schouweiler believed that he could not assert the rescission claim on behalf of ANICO until he became aware of

---

[6]     Courts also refer to this sort of conduct as ratifying a voidable contract. *See BMC Industries, Inc.*, 630 F.Supp. at 300.

Munich's alleged failure to disclose during discovery in late 2010.  Munich has not pointed to any evidence to challenge Schouweiler's testimony on this point, nor has Munich shown that Schouweiler's affidavit testimony clearly contradicts his earlier deposition testimony.[7]  Indeed, his testimony vaguely states that he became aware that ANICO was considering rescission "a year or two" before his Oct. 25, 2011 deposition, and that he discussed rescission with his co-employee "a couple of years" before his deposition.  Viewing this deposition testimony in the light most favorable to ANICO, a reasonable factfinder could view these non-specific, open-ended time frames as consistent with his later assertion that it was not until late 2010 that he had sufficient facts to support a rescission claim.

More importantly, ANICO then moved for leave to amend and add its rescission counterclaim in January of 2011, shortly after the Pawlowski deposition was completed in late 2010.  Furthermore, this is not a case where the retrocessionaire became aware of a failure to disclose and then received premiums or otherwise performed under the contract months after attaining that knowledge.  *Compare GuideOne*, 593 F.Supp.2d at 485 (holding that insurer waived rescission claim by accepting premiums four months after learning of facts comprising rescission claim).  The only payments that ANICO made on Munich's claims were made before Schouweiler contends he became aware of Munich's failure to disclose.[8]   Finally, while one could argue that

---

[7]    As discussed in more detail below, subsequent contradictory testimony could run afoul of the sham affidavit doctrine.

[8]    For this reason, Munich's citation to *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, is inapposite—the non-breaching party in that case continued

Schouweiler's affidavit—in which he states that he was not fully apprised of Munich's failure to disclose until late 2010—albeit not inconsistent with his prior deposition testimony that he considered rescission in 2009, nonetheless, may not be wholly credible. But credibility is the province of the factfinder, not the Court on summary judgment.

Altogether, viewing Schouweiler's testimony in the light most favorable to ANICO, Munich has not established that the record supports, as a matter of law, that ANICO did not pursue rescission within a reasonable time of becoming aware of the facts supporting Munich's alleged failure to disclose. *Accord CNA Reinsurance of London Ltd. v. Home Ins. Co.*, No. 85 CIV. 5681 (JFK) 1990 WL 3231 (S.D.N.Y. Jan. 10, 1990) (denying summary judgment where there existed a genuine issue of material fact as to whether reinsurer's employee knew that ceding insurer was violating express terms of reinsurance agreement). Hence Munich is not entitled to summary judgment on ANICO's rescission claim based on a theory of waiver.[9]

### 2.     *Right to Rescind Based on Failure to Disclose*

Having concluded that summary judgment in favor of Munich is inappropriate on the basis of waiver, I now turn to the merits of ANICO's rescission counterclaim. As explained above, "[t]he relationship between a reinsurer and a reinsured is one of

---

to receive its share of joint licensing royalties, pursuant to the various joint licensing provisions in the parties' agreements in that case. 103 F.Supp.2d 711, 736 (S.D.N.Y. 2000). Munich has not pointed to similar conduct by ANICO in this case.

[9]     To be clear, only Munich's motion addresses the waiver argument; ANICO does not cross-move for summary judgment on the waiver issue.

utmost good faith, requiring the reinsured to disclose to the reinsurer all facts that materially affect the risk of which it is aware and of which the reinsurer itself has no reason to be aware." *Christiania*, 979 F.2d at 278 (citing *Sumitomo*, 75 N.Y.2d at 303). The Second Circuit's decision in *Christiania* succinctly explains the black letter law applicable to rescission claims:

> A fact is material so as to void *ab initio* an insurance contract if, had it been revealed, the insurer or reinsurer would either not have issued the policy or would have only at a higher premium. Materiality is ordinarily a question of fact, the standard for disclosure being whether a reasonable insured should have believed the fact was something the insurer would consider material. Of course, materiality must be assessed as of the time the contract was entered into. The issue [then] is whether, [armed with undisclosed information], [the retrocessionaire] would have acted differently, and, if so, whether [the reinsurer] should have been aware that such listing would have affected [the retrocessionaire's] decision.

979 F.2d at 278 (italics in original).

Here, then, the inquiry is two-part: (1) whether ANICO reasonabley would have considered the undisclosed information material; and (2) whether Munich should have known that ANICO would consider the information material. These are generally questions of fact. *Id.* Only "[c]lear and substantially uncontradicted" evidence of materiality presents a question of law. *Allendale*, 992 F.Supp. at 282.

Munich's central argument is that it fulfilled its duty to ANICO by providing IOA Re with the underwriting package that it (Munich) had received; in Munich's view, that it and IOA Re independently came to different pricing for different sets of risks merely reflects that each party used its own proprietary risk calculation methods—it

does not establish that Munich failed to disclose material information to ANICO.  *See* Munich Opp. Br. at 5-6.  Moreover, Munich argues, both Munich and IOA Re reached the same risk percentage on $500,000 excess of $500,000 layer.  In Munich's view, this confirms that there was no additional information that it failed to disclose.   T h i s evidence could be viewed as suggesting to a reasonable factfinder that ANICO would not have considered Munich's internal loss calculations material.  But the question on summary judgment is not what ANICO would have considered with the benefit of hindsight—the question is whether ANICO would have actually considered the information material *at the time of contracting.  See Christiania*, 979 F.2d at 279 ("[M]ateriality must be assessed as of the time the contract was entered into.").  Even assuming that this evidence *could* support the inference that ANICO did not view the undisclosed information as material at the time of contracting, it does not compel that conclusion, which is what would be required for Munich to be entitled to summary judgment.  *See id.* (holding that a genuine issue of material fact was created by underwriter's testimony that, if undisclosed information was brought to his attention, he would have inquired further and would have, likely, underwritten the policy only at a higher premium).

Munich further argues that ANICO's reliance on Pawlowski's September 29, 2000 "dubious" email, that was disclosed in discovery in late 2010, is misplaced because Lisa Hoekstra testified that she reached the same underwriting conclusions that Pawlowski did even without the benefit of his negative view of Everest's expected loss ratios.  Contrary to Munich's contention, the email could be read to support ANICO's

contention that Munich intentionally withheld material information from ANICO.

Consider the following colloquy in Pawlowski's deposition:

> Q:   [In your email] you indicate that Everest['s] expected loss ratios for the book of business is very dubious .... [a]nd that was your opinion at the time?
>
> A:   Yes.
>
> Q:   Did you share that with [ANICO]?
>
> A:   No.

Nov. 19, 2010 Pawlowski Dep. 171:1-23.  This testimony could be interpreted  by the trier of fact to support the inference that Munich withheld information it believed was material.

Finally, Munich argues that Hoekstra acknowledged at her deposition that, when underwriting the retrocessional agreement, she, like Pawlowski, concluded that there was not enough file history from which to develop a loss ratio and that, instead, she was forced to use a manual rating.  *See* Pl. Resp. Stat. Mat. Facts, ¶ 16.  Even assuming that this is an accurate characterization of Hoekstra's testimony, it does not satisfy either prong of the *Christiania* two-part inquiry.  It does not establish as a matter of law that ANICO would not have considered the information material at the time of contracting, nor does it establish that Munich did not know that ANICO would consider the information material.  As the preceding discussion makes clear, each party presents competing versions of the facts relating to the materiality of Munich's internal rate calculations, both versions of which find some support in the record.

Importantly, the record also includes competing expert reports and testimony as to whether Munich's calculations were material and whether it was objectively reasonable for ANICO to expect that Munich would disclose the rates. For example, Munich's expert, Lydia B. Kam Lyew states in her expert report that it is customary in the reinsurance industry for a company to safeguard its proprietary data, *see* Waterman Dep. at 386:3-6 (recounting Lyew's testimony), suggesting that it was objectively unreasonable for ANICO to expect Munich to disclose its internal calculations. *See also* O'Neill Cert., Exh. B ("Lyew Report") at 9 ("[E]veryone involved in a reinsurance transaction understands that each company will perform its analysis and evaluations of a transaction utilizing the proprietary models and will not be relying on the analysis of others.") She, further, avers that it is customary for each reinsurer to engage in contemporaneous underwriting and each reaches its own, independent assessment of the risk presented by a given contract. *Id.* According to Lyew, because companies employ their own underlying assumptions, they may arrive at different results even when using similar methodologies for assessing risk. Thus, she deduces, "companies do not typically share information of this type because the results are company specific and are not particularly relevant to the evaluation each company is performing for itself." *Id.* at 10. Most notably, Lyew further concludes that ANICO and Munich had access to the same underlying data from Everest and, therefore, that ANICO had all the information it needed to properly evaluate the risk relevant to its layer of excess coverage. *Id.* at 17-18, 20.

Conversely, ANICO's expert, Richard Waterman, testified that a separate provision in the agreements—the Sunset commutation provision—mandates that even proprietary data and its underlying assumptions be shared with the retrocessionaire, Waterman Dep. at 386:20-388:4, thereby making ANICO's expectation of disclosure reasonable.  In Waterman's  view, and based on his experience in the reinsurance industry, Munich's knowledge that the "4 1/2 percent [rate] was not going to produce an underwriting profit [was] the kind of information you share with reinsurers." *Id.* at 390:16-21.  He explains "it's the first principle belief in reinsurance . . . that if you have a rate of 4 1/2 percent that you know is going to produce a loss to your reinsurer, no matter what share they take, you know that the rate you're offering is a loss to them, you have to share that information with your retrocessionaire, the reinsurer. That's just a basic fundamental premise ....".  *Id.* at 391:9-18.

As this condensed version of the experts' opinions makes clear, there is competing expert testimony relating to the reasonableness of ANICO's belief that it would have considered Munich's underlying assumptions and internal rate calculations material at the time of contracting.  And, the experts' disagreements are relevant because they speak to whether Hoekstra's and ANICO's belief that the undisclosed data was material reflects industry custom and is objectively supportable, as New York case law demands. *See American Home Assur. Co. v. Fremont Indem. Co.*, 745 F.Supp. 974, 977 (S.D.N.Y. 1990) ("[T]he standard by which materiality is judged [is] an objective one.").

25

As noted above, "when resort to extrinsic evidence is necessary to shed light on the parties' intent summary judgment ordinarily is not an appropriate remedy, and must be denied unless, viewing the evidence in a light most favorable to the nonmovant and resolving all doubts in its favor, no reasonable trier of fact could find against the movant." *Christiania*, 979 F.2d at 274 (internal citations omitted). Here, there are competing expert reports and contradictory testimony regarding the materiality of the undisclosed information; thus, I conclude that summary judgment is inappropriate for either party. *Accord American Home Assur. Co. v. Fremont Indem. Co.*, 745 F.Supp. at 977 (denying summary judgment where competing testimony regarding materiality presented, and where it was not clear as a matter of law whether underwriter's belief that loss projections were material was objectively supportable). Accordingly, both Munich's motion and ANICO's cross-motion on the merits of the rescission counterclaim are denied.

C.    *Untimely Claims Submissions Defense*

Having concluded that summary judgment is not appropriate on ANICO's rescission counterclaim, I now turn to ANICO's untimely claims submissions defense. In its amended answer, ANICO asserts as its Second Affirmative Defense that Munich

> has not satisfied conditions precedent to seeking damages from [ANICO] herein or to seeking payment for claims under the Retrocession Agreements as it has not satisfied the conditions precedent of Articles I, X and XVI of the Retrocession Agreement. [ANICO] is relieved of any liability for the payment of claims which were in violation of these conditions precedent, including those claims submitted untimely or submitted with inadequate information.

26

Amended Answer, ¶ 47.  In other words, ANICO argues that it may deny payment of certain claims that were submitted by Munich in an untimely fashion because, under its interpretation of the agreement, immediate notice is a condition precedent to payment.  Munich disagrees, arguing that the parties' agreements make clear that untimely notification does not affect its right to receive payment under the agreements. For simplicity's sake, I refer to this defense as the "untimely notice defense" in the ensuing discussion.

As noted, if the language of the parties' agreement is clear on its face, the Court must enforce it as written.  Only if a contract is ambiguous, *i.e.*, "written so imperfectly that it is susceptible to more than one reasonable interpretation," *Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011), may the Court deny summary judgment and "leave it to a fact-finder to decide its meaning."  *Pacific Employers*, *supra* at *6 (citing *Amusement Bus. Underwriters v. Am. Int'l Grp., Inc.*, 66 N.Y.2d 878, 498 N.Y.S.2d 760, 489 N.E.2d 729, 732 (1985)).

ANICO's untimely notice defense hinges on Article X of the 2000 and 2001 retrocessional agreements:

> A.   The Company [(Munich)] agrees to advise the Reinsurer [(ANICO)] promptly of all claims coming under this Agreement on being advised by the Original Ceding Company, and to furnish the Reinsurer with such particulars and estimates regarding same as are in the possession of the Company. *An omission on the part of the Company to advise the Reinsurer of any loss shall not be held to prejudice the Company's rights hereunder.*
>
> B.   In addition, the following categories of claims shall be reported to the Reinsurer immediately, regardless of any

questions of liability of the Company or coverage under this Agreement:

> 1. Any accident reserved at 50% of the reinsured attachment point;
> 2. Any accident involving a brain injury;
> 3. Any accident resulting in burns over 25% or more of the body; or
> 4. Any spinal cord injury.

> C. The Reinsurer agrees to pay the Company on demand, the Reinsurer's proportion of all losses and/or loss expenses paid by the Company arising from the Underlying Agreement, including any and all expenses incurred directly by the Company in the litigation, defense and settlement of claims made against the Company by the Original Ceding Company under the Underlying Agreement, excluding, however, all office expenses of the Company and the salaries and expenses of its employees.

2000 Agreement at Endorsement No. 1 (emphasis added). Hereafter, I refer to the claims specified in subsection B as "category B claims."

The claims at issue in this case are category B claims, specifically, those that fall under subsection B.1 of Article X—accidents that Munich reserved at 50% of the reinsured attachment point. As the above-quoted language makes clear, claims falling within this category "shall be reported to the Reinsurer immediately ...." According to ANICO, Munich received notice of these claims from the original ceding insurer at various dates over the course of several years, from August 2003 through April 2010, with notice for most of the claims being provided in 2006 through 2008. *See* LeBlanc Cert., Exh. 1 (chart of untimely claims). Once Munich received that notice, it reserved at 50% of the reinsured attachment point, typically, around three months after receiving notice. So, Munich reserved at 50% for the bulk of the claims in 2006

28

through 2008.  However, according to ANICO, Munich did not report many of these claims to ANICO until August 8, 2008, which, in ANICO's view, does not comply with the agreement's dictate that Munich notify ANICO of these types of claims "immediately."[10]

More to the point, ANICO argues that Munich's failure to immediately notify it of these claims absolves ANICO of its responsibility to pay the claims.  ANICO acknowledges that subsection A unequivocally states that "[a]n omission on the part of the Company [(Munich)] to advise the Reinsurer [(ANICO)] of any loss shall *not* be held to prejudice the Company's rights hereunder."  2000 Agreement at Endorsement No. 1 (emphasis added).  It is ANICO's position that, since subsection B does not contain similar language, the agreement dictates that immediate notice is a condition precedent to payment for claims that fall within the categories specified in subsection B.  Munich disagrees with ANICO's interpretation of Article X, arguing instead that nothing in Article X creates a condition precedent for any category of claims.

---

[10]  The Court notes that ANICO's notice chart states that Munich notified it of claims on August 8, 2008 for which Munich had not yet ever received notice.  For example, the chart states that Munich received notice of the Childers claim from the original ceding insurer on April 12, 2010.  Thereafter, the chart states that Munich notified ANICO of this claim on August 8, 2008.  The Court cannot discern from the chart whether this is a typographical error, or whether Munich gave ANICO advance notice of a claim that it believed would subsequently be reported to it by the original ceding insurer.  Indeed, ANICO acknowledges in its reply brief on its motion that there are other typographical errors in the chart.  In any event, as I conclude that Article X.B does not create a condition precedent to payment, I need not resolve this factual quandry.

In my view, reading the plain language of Article X as a whole, it is clear that Munich's failure to timely advise ANICO of any claim is not a condition precedent that affects Munich's right to receive payment.  Subsection A directs Munich to advise ANICO "promptly of *all* claims *coming under this Agreement* [up]on being advised by the Original Ceding Company . . .  An omission on the part of the Company to advise the Reinsurer of *any* loss shall not be held to prejudice the Company's rights hereunder."  2000 Agreement at Endorsement No. 1 (emphasis added).  By using the terms "any" and "all," subsection A expressly covers each and every claim covered by the parties' agreement—including category B claims.

Indeed, subsection B makes clear that its terms apply "in addition" to, not in lieu of, those of subsection A:

> *In addition, the following categories of claims* shall be reported to the Reinsurer *immediately*, *regardless of any questions of . . .  coverage under this Agreement* ....

*Id.* (emphasis added).  By incorporating this additional requirement for category B claims, the drafters did not intend for subsection B to trump the general language of subsection A.  Rather, the drafters supplemented subsection A's language with a special notice requirement (of immediate notice), just for category B claims.

Even assuming that the subsection A "shall not be held to prejudice the Company's rights" language did not apply to category B claims, there is no language in subsection B indicating that it creates a condition precedent to payment. The Third Circuit's recent decision in *Pacific Employees*, in which it interpreted a prompt

payment provision in a reinsurance agreement governed by New York law, is instructive on this point.[11]

The language at issue in *Pacific Employers*, found in Paragraph D of the parties' agreement in that case, provided: "As a condition precedent, [Plaintiff] shall promptly provide [Defendant] with a definitive statement of loss on any claim or occurrence reported to [Plaintiff] and brought under this Certificate which involves a death, serious injury or lawsuit." 2012 WL 3871588 at *7. The circuit concluded, without difficulty, that Paragraph D's express language created a condition precedent, particularly when read in light of other language in the parties' agreement that the defendant "does hereby reinsure" the plaintiff "subject to the terms, conditions, and limits of liability set forth herein." *Id.* at *11.

Instructive, here, is the following portion of the circuit's reasoning:

> When reading the first sentence of Paragraph D in context, it becomes even clearer that the consequences for failing to comply with it must be different in kind than the consequences for failing to comply with other provisions in the Certificate. *No other provision in the Certificate uses "condition precedent" language.* For example, Paragraph D's second provision makes no mention of a "condition precedent," and simply provides that "[PEIC] shall also notify [Global] promptly of any claim or occurrence where [PEIC] has created a loss reserve equal to (50) percent of [PEIC's] retention." Thus, *while Paragraph D's first sentence creates a condition precedent to coverage, the second (like all other provisions in the Certificate) is an ordinary*

---

[11]    Since *Pacific Employers* was issued while the Court was drafting this Opinion, the Court directed the parties to file supplemental briefing on the case. The Court has considered that briefing in ruling on the parties' motions.

> *contractual covenant the breach of which may entitle Global*
> *to damages but does not automatically forfeit coverage.*

*Id.* (emphasis added).

The language at issue in this case mirrors that rejected by the Third Circuit as creating a condition precedent to payment. The circuit interpreted the language that "[PEIC] shall also notify [Global] promptly of any claim or occurrence where [PEIC] has created a loss reserve equal to (50) percent of [PEIC's] retention" as failing to create such a condition because it did not expressly state as much. *Id.* So too, here, there is no "as a condition precedent" or similar language in the parties' agreement.[12] This means that the prompt payment provision in this case is "an ordinary contractual covenant the breach of which may entitle [ANICO] to damages but does not automatically forfeit coverage." *Id.*

ANICO argues that *Pacific Employees* actually supports its construction, because the retrocessional agreements contain generic language stating that the agreement is "in consideration of the mutual covenants hereinafter contained and upon the conditions hereinafter set forth." 2000 Agreement at 1. However, ANICO's argument falls wide of the mark because, although the agreements do include such language, they are nonetheless missing the far more critical condition precedent-creating language upon which the Third Circuit hinged its interpretation. Language

---

[12]   I do not, and need not, conclude that retrocessional agreements must contain the magic words "as a condition precedent" in order to create such a condition to payment. Because the agreements here do not contain any clear statements of an intent to condition payment upon the timing of Munich's claims submissions, I merely hold that the contracts before me do not create a condition precedent.

generally stating that the agreement is "in consideration of the mutual covenants hereinafter contained and upon the conditions hereinafter set forth" does not, alone, amount to clear language demonstrating the parties' intent to make a breach a condition precedent to payment. *Compare Pacific Employers*, *supra* at *13 (noting that, under New York law, the contract must "use the words 'condition precedent' or . . . other words indicating an intent to create a condition precedent.").

ANICO further argues that Munich's interpretation would permit it to present a claim at any time, and absolve Munich of any delay in providing notice. That is not accurate. As the circuit recognized, covenants that do not include express "condition precedent" language are still enforceable under breach of contract principles; a ceding insurer's failure to comply may cost that insurer damages attributable to its delay, though it will not forfeit the insurer's coverage. *Pacific Employers*, *supra* at *11. The circuit explained in *Pacific Employers* that prompt notice provisions— particularly, like here—tied to the ceding insurer's setting of a 50% claim reserve, are designed to allow the reinsurer to forecast and prepare for future losses. When a ceding insurer fails to comply with a prompt notice provision, the reinsurer may incur economic damages that it could have otherwise avoided. It is these sort of damages that appear to be contemplated by *Pacific Employers*, and that could, potentially, be available to ANICO here. For these reasons, I conclude that the prompt and immediate notice language in Article X of the parties' agreements here does not operate to create a condition precedent.

ANICO appears to argue, in the alternative, that it may deny payment even where there is no express language creating a condition precedent, as long as it can demonstrate prejudice.  The Third Circuit addressed this issue in *Pacific Employers* as well.

> For a reinsurer to be relieved from its indemnification obligations because of the reinsured's failure to provide timely notice, absent an express provision in the contract making prompt notice a condition precedent, it must show prejudice resulted from the delay.

*Pacific Employers*, 2012 WL 3871588, at *13 (quoting *Christiania*, 979 F.2d at 274 (emphasis omitted)).

ANICO has not pointed to sufficient record evidence in support of its contention that it has suffered prejudice.  In its opposition to Munich's motion for partial summary judgment, ANICO acknowledges Schouweiler's testimony that ANICO did not maintain reserve or loss information, nor did it perform any calculation with respect to damages incurred due to Munich's late reporting.  ANICO does not challenge Munich's characterization of Schouweiler's testimony in its brief; it argues, instead, that "[w]hether or not [ANICO] maintained specific loss or reserve information . . . , the failure of [Munich] to report claims as it was required to do so changed the mix of total reserve or loss information which was maintained by IOA Re and upon which [ANICO] relied ...."  ANICO Opp. at 21.  Moreover, ANICO argues that it was prejudiced by the untimely notice because, in June 2003, it commuted Munich's claims and, had it received timely notice of the disputed claims, it may not have entered into the commutation.  *See* Schouweiler Afft., pp. 3-4 ("The reporting of these additional claims

34

would have had a material effect on the decision I made to commute the reinsurance agreement with [Munich].").[13]  In support of these factual contentions, ANICO cites Schouweiler's 2012 affidavit that followed his earlier deposition testimony cited by Munich.

But ANICO cannot create a genuine issue of material fact by pointing to inconsistent testimony given by Schouweiler on separate occasions.  For example, Schouweiler testified in his deposition that ANICO did not maintain specific loss information, *see* October 25, 2011 Schouweiler Dep. 45:24-46:14, yet he provides specific loss information in his affidavit:  "As of March 31, 2003, when financial calculations were made by IOA Re concerning potential commutation, the outstanding loss reserve relative to the [agreements] was only $500,000."  Schouweiler Afft., p. 4. He, further, agreed in his deposition that "there was no allocation of the commutation to . . . any one underlying contract" between Munich and ANICO,  October 25, 2011 Schouweiler Dep. 91:6-9, and that, at the time of commutation, he did not expect IOA Re to be performing any commutation analysis of each underlying contract, *id.* at 92:16-20.  Yet, in his affidavit he unequivocally states that "there should have been at

---

[13]      "A commutation is a settlement agreement reached between a reinsured and a reinsurer by which the reinsurance obligation is terminated by an agreement by the reinsurer to pay funds at present value that are not yet due under the reinsurance agreement. Similar to a policy buy-back with an insured, a commutation allows the reinsured to receive cash now to invest for the payment of claims that will come due in the future."  Larry P. Schiffer, Esq., *To Commute or Not To Commute, that Is the Question*,  http://www.irmi.com/expert/articles/2003/schiffer07.aspx  (last visited September 18, 2012).

least twice as many claims reported to IOA Re . . . by the time [of] commutation ....”

Schouweiler Afft., p. 4.

It is axiomatic that a party may not create a genuine issue of material fact by contradicting his own testimony.  Per the sham affidavit doctrine, district courts are instructed to disregard affidavits that conflict with a party's prior deposition testimony. *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251 (3d Cir. 2007).

> A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant. [I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.

*Id.* at 253 (internal citations omitted).  Only where there is "independent evidence to bolster the contradictory testimony," should the court consider the affidavit. *Nationwide Mut. Ins. Co. v. Shaw*, --- Fed.Appx. ----, 2012 WL 3156865, *7 (3rd Cir. Aug. 6, 2012).

Here, ANICO has not pointed to any independent evidence to support the contradictory aspects[14] of Schouweiler's testimony, and it is clear that the affidavit was

---

[14]     By referring to "the contradictory aspects of Schouweiler's testimony," I am acknowledging that some of the testimony in his affidavit does not contradict his prior deposition testimony. For example, in response to several questions at his deposition, Schouweiler testified that he "did not know" or "did not recall." Those instances in his subsequent affidavit in which he states that he now recalls an answer are, therefore, technically not inconsistent with his deposition testimony. Nevertheless, the above-referenced instances in the body of this Opinion differ in that they involved affirmative statements that his later affidavit sought to alter, amend, or qualify.

offered to defeat summary judgment.[15]   Nor has ANICO explained away the discrepancies, a factor that courts consider when determining whether the sham affidavit doctrine should apply. *See, e.g., Morgan v. Communication Workers of America, AFL-CIO, Dist. 1*, Civil Action No. 08-cv-249 (FLW), 2009 WL 749546, *10 (D.N.J. Mar. 17, 2009).  Thus, ANICO has failed to carry its burden of demonstrating prejudice and, accordingly, Munich's motion for summary judgment on ANICO's untimely notice defense is granted and ANICO's cross-motion on this same issue is denied.[16]

### D.   *Retention*

The parties' retention dispute centers on the definition of the term "ultimate net loss" set forth in the agreements.  As noted, the agreements generally provide that ANICO will indemnify Munich "for the amount of *ultimate net loss* . . . which may accrue to [Munich] as a result of loss or losses occurring during the term of [the] Agreement[s] as a result of [Munich's] participating in the [Munich-Everest]

---

[15]   Although the affidavit was attached to ANICO's moving papers on its cross-motion for summary judgment, its motion was filed after Munich's motion for partial summary judgment and it addresses issues outlined in Munich's motion. Thus, I construe ANICO's attachment of the Schouweiler Affidavit to its cross-motion papers as also in furtherance of its opposition to Munich's motion.

[16]   To be clear, I am not ruling upon whether Munich failed to timely report claims under the retrocessional agreements because I conclude that ANICO is not entitled to deny payment on that basis.  For this same reason, I also do not address whether Munich's bordereaux reporting satisfied the agreements' notice provisions, nor do I address Munich's argument that ANICO waived the untimely notice defense.  I, further, note that my ruling does not foreclose ANICO from pursuing monetary relief against Munich for untimely submissions of claims if it indeed suffered damages as a result of the delayed submissions.  *See Pacific Employers, supra* at *11.

37

Reinsurance Agreement ....” 2001 Retrocessional Agreement, Art. I(A) (emphasis added).  The agreements, further, specifically address when ANICO becomes obligated to indemnify Munich for Munich's ultimate net loss:

### <u>ARTICLE IV - RETENTION AND LIMIT</u>

> [ANICO] shall not be liable for any loss hereunder until [Munich's] ultimate net loss, each loss occurrence exceeds $500,000. [ANICO] shall then be liable hereunder for the amount of ultimate net loss in excess of $500,000, each loss occurrence subject to a limit of liability to [ANICO] of $500,000, each loss occurrence, and further subject to a maximum aggregate recovery hereunder of $20,000,000 in any one agreement year.

*Id.*, Art. IV.

Article VII of the agreements specifically defines the term "ultimate net loss":

> A.     The term "ultimate net loss" as used herein shall be understood to mean only such amounts as are actually paid or payable by [Munich] and [Everest] under the [Munich-Everest] Agreement, in the settlement of claims or satisfaction of judgments, including court costs, prejudgment interest and any other liabilities covered under the [Munich-Everest] Agreement for business covered hereunder.

> B.     All salvages, recoveries, payments, and reversals or reductions of verdicts or judgments, recovered or received subsequent to a loss settlement under this Agreement, including amounts recoverable under other reinsurance (whether collected or not) which inures to the benefit of this Agreement, shall be applied as if recovered or received prior to the loss settlement, and shall be deducted from the actual losses sustained to arrive at the amount of the ultimate net loss.

*Id.*, Art. VII.

38

Relying heavily on the reference to both Munich and Everest in Article VII, Munich argues that, once Everest and Munich collectively pay $500,000 toward a settlement or judgment on a covered workers' compensation claim, ANICO is required to pay on its $500,000 excess policy.  This means, under Munich's interpretation, that Munich is required to pay (or be required to pay by virtue of a judgment or settlement) only $250,000 before ANICO's excess obligation comes into effect.  In addition to Article VII's language, Munich relies on the deposition testimony of Lisa Hoekstra, the IOA Re underwriter, who underwrote the parties' agreements.   She testified at her deposition that her intent in underwriting the agreements was that both Everest's and Munich's losses would count toward the $500,000 limit.

Contrary to Munich's interpretation of the policy language, ANICO argues that Munich alone must pay or be required to pay $500,000 before ANICO is obligated on the excess policy.[17]  ANICO finds support for its interpretation in Article IV which refers solely to Munich's ultimate net loss.  In addition, ANICO argues that several of the claims Munich submitted were premised on a $500,000 loss incurred solely by Munich.  *See* LeBlanc Cert., Exh. 3, Washburn Afft.  Munich's key response to ANICO's interpretation is that it would lead to an absurd result; because Munich is liable for a total of $750,000, and Munich will indemnify up to $500,000 per claim, if ANICO's

_____

[17]     Munich refers to its preferred method of calculation (Munich and Everest losses combined) as "ground up" basis, and refers to ANICO's preferred method as "net retained" basis.  While neither of these terms are found in the agreements themselves, the terms are used by various deponents and by the parties in their briefs in this case. I refer to the terms here where necessary or helpful to elucidate the parties' arguments.

coverage did not attach until Munich spent $500,000, as a practical matter, Munich could never recover more than $250,000 from ANICO.  Munich argues that this result is inconsistent with Article IV, which provides that Munich purchased up to $500,000 in coverage.

As this argument can be difficult to follow, consider the following charts that represent the practical effect of the parties' proposed interpretations on a $1 million workers' compensation claim:

|  | Munich's Proposed Interpretation | ANICO's Proposed Interpretation |
|---|---|---|
| $0 - $250,000 | Everest pays | Everest pays |
| $250,000 - $500,000 | Munich pays | Munich pays |
| *$500,000 - $750,000* | *ANICO pays* | *Munich pays* |
| $750,000 - $1 million | ANICO pays | ANICO pays |

As this comparison illustrates, the key difference between the parties' proposed interpretations relates to which entity pays the $500,000 - $750,000 layer.  Under ANICO's interpretation, Munich bears that burden because it is only when Munich pays $500,000 from its own pocket that ANICO's obligation attaches.  The problem with this interpretation is that the retrocessional agreements clearly provide for $500,000 in retrocessional coverage.  *See* 2001 Retrocessional Agreement, Art. IV.

Thus, adopting ANICO's interpretation would ensure that ANICO "will never pay more than $250,000 per claim" since Munich alone is responsible for the $250,000 - $500,000 and $500,000 - $750,000 layers.   Pl. Stat. Mat. Facts, ¶ 114; Def. Resp. Stat. Mat. Facts, ¶ 114 ("Agree").   In Munich's view, this undermines the central purpose of the retrocessional agreements, which is to provide Munich with $500,000 worth of cover.

Ultimate net loss is a term of art.   "Excess insurance policies generally provide indemnification coverage for 'ultimate net loss," defining that loss to encompass the total amount the insured, or any company acting as his insurer, becomes obligated to pay as personal injury or property damages.   *A.W. Chesterton Co. v. Massachusetts Insurers Insolvency Fund*, 838 N.E.2d 1237, 1256 n.15 (Mass. 2005).   In short, it is "the amount that the insurer owes the insured."   *SR Intern. Business Ins. Co., Ltd. v. Allianz Ins. Co.*, 343 Fed.Appx. 629, 633 (2d Cir. 2009).

Although ultimate net loss is a term of art with a commonly accepted meaning, courts nonetheless focus their analyses on the language of the policy at issue to ascertain the term's meaning in a particular case.   *See, e.g., In re Enron Corp.*, Civ. Action No. H-01-3624, 2006 WL 1663383, *6-7 (S.D.Tex. Jun. 12, 2006) (construing "ultimate net loss" to exclude defense costs that have not yet been "incurred," in accordance with specific provisions in policy); *Fischer v. Excess Ins. Co. of America*, 115 F.2d 755, 756-57 (8th Cir. 1940) (when construing "ultimate net loss", rejecting appellant's reliance on contract language from other cases that differed from the contract language at issue in that case).   *See also Fidelity & Deposit Co. v. Pink*, 302 U.S. 224, 230 (1937) ("We do not question the general rules concerning liability of

reinsurers . . . but the liability under any written contract must be determined upon consideration of the words employed, read in the light of attending circumstances.") *superceded by statute on other grounds as stated in Skandia Am. Reins. Corp. v. Schenck*, 441 F.Supp. 715, 725 (S.D.N.Y. 1977).

Turning to the policy language here, there are several provisions that are difficult to reconcile. In this connection, the Court notes that the agreements are not artfully drafted. It has been commented:

> Many reinsurance contracts are cut-and-paste jobs, where some relatively low-level, clerical person in an intermediary's office will go through a file and pick out the boilerplate clauses that look as if they ought to apply in this particular contract, and put them in. Very often, you end up with contracts that are internally inconsistent.

Wollan Interview at 12. In citing this comment, I do not necessarily find that the parties here engaged in such short-sighted efforts when drafting and negotiating their agreement, but I mention it to highlight the fact that the contradictory language of the parties' agreement here is, unfortunately, not uncommon in the field of reinsurance.

Article IV, the retention provision, refers solely to Munich's losses by stating that ANICO "shall not be liable for any loss hereunder until [Munich's] ultimate net loss . . .exceeds $500,000." Similarly, Article X provides that ANICO

> agrees to pay [Munich] on demand, [ANICO's] proportion of all losses and/or loss expenses *paid by [Munich]* arising from the Underlying Agreement, including any and all expenses *incurred directly by [Munich]* in the litigation, defense and settlement of claims made against *[Munich]* by *[Everest]*....

42

2001 Retrocessional Agreement, Article X (C) (emphasis added).  If these were the sole provisions addressing ultimate net loss, I would conclude that the agreement unambiguously supports ANICO's interpretation; only Munich's losses are incorporated in this expression of the ultimate net loss calculus.

However, Article VII's reference to both Everest's and Munich's losses makes such a ruling untenable.  The purpose of Article VII is to define the term ultimate net loss, and Article VII does that by referencing Everest's losses *in addition to* Munich's. As noted, Article VII provides:  "'ultimate net loss' as used herein shall be understood to mean only such amounts as are actually paid or payable by [Munich] *and* [Everest] ...."

ANICO makes the facially appealing argument that if the drafters intended to include Everest's losses, they most likely would have also referenced Everest in Article IV.  It is conceivable that both Articles IV and VII could be harmonized by construing Article VII's reference to "Everest" as invoking the losses that Munich, itself, is obligated to pay as Everest's reinsurer.  As Munich correctly argues, however, ANICO's interpretation would have the practical effect of limiting Munich's cover to only $250,000.  That result would, in turn, conflict with Article IV which expressly states that ANICO provides $500,000 in excess coverage and would undermine the purpose of the agreement—for ANICO to provide $500,000 worth of excess coverage to Munich. This renders ANICO's proposed interpretation unreasonable since New York courts seek to give meaning to all provisions of a contract, *New York State Thruway Auth. V. KTA-Tator Eng. Svcs., P.C.*, 78 A.D.3d. 1566, 1567, 913 N.Y.S.2d 438, 438 (N.Y.A.D.

2010), and disfavor interpretations that lead to absurd results, *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415, 903 N.Y.S.2d 346 (2010) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."). *See also SR Intern.*, 343 Fed.Appx. at 633 (rejecting party's "tortured" interpretation on summary judgment where party's interpretation would " lead to an absurd result" by reducing the insurer's ultimate net loss).

Indeed, it has been consistently repeated by courts interpreting New York contract law that absurd results should be avoided, particularly when they undermine the purpose of the parties' agreement.

> [In the] interpretation of insurance contracts ... words should be given the meanings ordinarily ascribed to them and absurd results should be avoided .... the meaning of particular language found in insurance policies should be examined "in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes."

*World Trade Center Props., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003) (quotation marks omitted) *overruled in part on other grounds by Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006). *See also Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 596 n. 9 (2d Cir. 2007) ("canons of construction forbid contractual interpretations that lead to absurd results"); *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005); *Vector Capital Corp. v. Ness Techs. Inc.*, No. 11–cv–6259, 2012 U.S. Dist. LEXIS 36847, at *8–9 (S.D.N.Y. Mar. 16, 2012) (under New York law, "a court should not interpret a contract in a manner that would be

44

absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties") (internal quotation marks omitted); *Bank of N.Y. Trust, N.A. v. Franklin Advisers, Inc.*, 674 F.Supp.2d 458, 463–64 (S.D.N.Y. 2009) ("[A]n interpretation that gives a reasonable and effective meaning to all of a contract is generally preferred to one that leaves a part unreasonable or of no effect.").

In determining whether a contract is ambiguous, the Second Circuit has explained: "[a] word or phrase is ambiguous when it is capable of more than a single meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 572 (2d Cir. 1991) (internal quotation marks and citations omitted). Here, despite the initial facial appeal of ANICO's proposed interpretation, I conclude that it is not one that reflects an objectively reasonable interpretation of the parties' agreements. This leaves Munich's proposed interpretation—that both Everest's and Munich's losses count toward the ultimate net loss calculation—as the only viable interpretation that harmonizes all relevant provisions. Accordingly, I conclude that summary judgment in Munich's favor is appropriate.

Moreover, even if I concluded that the ultimate net loss provisions were ambiguous, New York case law makes clear that, "[t]o the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted [where] the ambiguities may be resolved through extrinsic evidence that is itself

capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).

Such a case is presented here.  IOA Re underwriter Lisa Hoekstra testified that, when she underwrote the loan, she intended that the Everest losses be included in the ultimate net loss calculation.  She states in her deposition that

> Q:   . . . After you reviewed the file, did you remember that the treaty retention point was intended to be calculated on a ground-up basis?
>
> A:   Yes.
>
> Q:   And so that meant that . . . when [Munich and Everest] collectively had paid a total of $500,000 on a claim, everything above that was [ANICO's] responsibility?
>
> A:   Yes.
>
> *              *              *
>
> Q:   Okay.  And that's the understanding you had when you placed the treaty, right?
>
> A:   Yes.

Oct. 18, 2010 Hoekstra Dep. at 18:22-19:1.

Although Hoekstra is not ANICO's 30(b)(6) designee, she is nonetheless a fact witness whose testimony supports Munich's interpretation that Everest losses be included.  ANICO does not dispute Hoekstra's testimony, nor does it present any

evidence to contradict it.[18]   In addition, ANICO's own expert—Richard Waterman—testified that Everest losses were included in the ultimate net loss calculus.  He stated in his deposition that "in the ultimate net loss provisions in the contract, it refers to the retention of Everest as being part of the ultimate net loss," hence the retrocessional agreements' "$500,000 retention was on a ground-up basis." Feb. 18, 2012 Waterman Dep. 87:6-15.  Waterman qualifies this statement by noting that "[m]y opinion as an expert is that the contract is worded very poorly and is ambiguous and could be misconstrued . . . I, as an expert in the industry, found it to be very unusual and could see how people could interpret [the ultimate net loss language] differently." *Id.* at 86:10-24.  This qualification, however, does not vitiate his conclusion that the agreement included Everest's losses in the ultimate net loss calculus.[19]  The only record evidence that ANICO cites to is Munich's reporting, for a

---

[18]      Rather, ANICO merely states in its Responsive Statement of Material Facts to Munich's motion that it "disagrees" that "such testimony, from a fact witness, means that the attachment point does in fact apply on a ground up basis." Def. Resp. Stat. Mat. Facts, ¶ 108.  ANICO, further, contends in its responsive statement that Hoekstra was not the only underwriter involved in the underwriting of the retrocessional agreements, yet ANICO did not point to testimony from any other underwriter to contradict Hoekstra's recollection of her intent.

[19]      To be clear, I do not treat Waterman's testimony as an admission of a party opponent.  Several courts that have considered whether the deposition testimony of an expert employed by a party was an admission under Federal Rule of Evidence 801(d)(2) have concluded that "[s]ince an expert witness is not subject to the control of the party opponent with respect to consultation and testimony he or she is hired to give, the expert witness cannot be deemed an agent" whose testimony can be treated as an admission. *Kirk v. Raymark Industries, Inc.*, 61 F.3d 147, 164 (3d Cir. 1995). *See also Smith v. U.S.*, No. 3:95-cv-445, 2012 WL 1453570 (S.D.Oh Apr. 26, 2012) (following *Kirk*);  *Koch v. Koch Industries, Inc.*, 37 F.Supp.2d 1231 (D.Kan. 1998), *affirmed in part and reversed in part on other grounds*, 203 F.3d 1202 (10th Cir.); *Condus v. Howard Sav. Bank*, 986 F.Supp. 914, 915-17 (D.N.J. 1997). *Compare Lear*

time, of some of its claims on a net retained basis, *i.e.,* based solely upon Munich's expenditures.  But this evidence does not demonstrate Munich's or ANICO's intent at the time of contracting—the pertinent question that must be answered for the Court to resolve the contractual ambiguity.[20]  Accordingly, even viewing all the evidence in the light most favorable to ANICO, there is no genuine issue of material fact as to the parties' intent.  Rather, all the evidence points to one inescapable conclusion: that the parties intended for Everest's losses to be included in the ultimate net loss determination.

Because I would conclude that the extrinsic evidence conclusively establishes the parties' intent, even if the ultimate net loss language were ambiguous, I would not reach the question of whether the rule of *contra proferentem* (construing the policy against the drafter) should apply here, as ANICO argues it should.  New York case law

---

*Automotive Dearborn, Inc. v. Johnson Controls, Inc.*, 789 F.Supp.2d 777, 785-86 (D.Mich.2011) (following *Kirk* and noting that Rule 801(d)(2) may be used to admit *facts* presented by party to expert as opposed to expert's *opinion* based upon those facts).  *But see Collins v. Wayne Corp.*, 621 F.2d 777 (5th Cir. 1980) (holding that deposition testimony of an expert employed by a bus manufacturer to investigate an accident was an admission under 801(d)(2)).  My ruling rests on ANICO's failure to create a genuine issue of material fact by pointing to record evidence contradicting Hoekstra's testimony.  I discuss Waterman's testimony to highlight the lack of record evidence contradicting Hoekstra's statements.

[20]     For this reason, the deposition testimony of Jeffrey Circuit, IOA Re's Executive Vice President of Marking and Rule 30(b)(6) designee, is also unhelpful to ANICO.  Circuit testified at his deposition that he reads documents in the IOA Re underwriting file as indicating that the type of retention is *not* ground up. Circuit Nov. 29, 2011 Dep. 219:24-220:7.  However, Hoekstra expressly rejected Circuit's interpretation, stating at her deposition that Circuit's reading "is not the way I intended [the contract to be interpreted] when it was underwritten." Hoekstra Oct. 18, 2010 Dep. 82:22-24.  More to the point, ANICO has not pointed to any deposition testimony by Circuit about ANICO's or IOA Re's intent at the time of contracting.

describes contract interpretation as a three-part analysis: "First, the district court must determine if the policy's terms are reasonably susceptible to multiple interpretations and therefore ambiguous as a matter of law. Second, the court must determine if there was a genuine issue of material fact as to whether extrinsic evidence resolves the ambiguity. Finally, *if extrinsic evidence cannot resolve the ambiguity*, the district court must apply the rule of contra proferentem and construe the agreement against the insurer." *Stern v. Cigna Group Ins.,* No. 07-0772-cv, 2008 WL 4950067, * 1 (2d Cir. Nov. 20, 2008) (emphasis added); *see also id.* at 2 (noting that *contra proferentem* is a "principle[ ] of last resort, to be invoked [only] when efforts to fathom the parties' intent have proved fruitless.") (quoting *Record Club of Am., Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1271 (2d Cir. 1989)).  Here, where the contract language is susceptible to only one reasonable interpretation, and where the extrinsic evidence supports only one construction, there is no basis for the Court to apply the *contra proferentem* principle.  Therefore, for the foregoing reasons, I conclude that summary judgment in Munich's favor on the construction of the retention provision is appropriate.

    E.    *Everest Re Claims*

Three of the claims presented by Munich to ANICO for indemnification were allegedly issued by an Everest affiliate, Everest Re.  ANICO contends that it is not obligated to pay these claims because the retrocessional agreements cover only those claims issued by Everest.  Munich moves for partial summary judgment on this claim.

Article I of the agreements specifies which claims are covered:

ARTICLE I - Business Covered

A.      The Reinsurer hereby agrees to indemnify the
Company for the amount of ultimate net loss as herein
provided and specified which may accrue to the Company as
a result of loss or losses occurring during the term of this
Agreement as a result of its participation in the following
Reinsurance Agreement . . .

B.      The Reinsurance Agreement listed above (hereinafter
referred to as the "Underlying Agreement") is between the
Company and *the following insurance company or group*
(hereinafter referred to as the Original Ceding Company.):

EVEREST National Insurance Company

Phoenix, Arizona

(as identified in the Underlying Agreement)

2001 Agreement, Art. I (A)-(B) (emphasis added).

The gist of ANICO's argument is that, because Article I specifically defines the

Original Ceding Company as "EVEREST National Insurance Company," it is obligated

only to pay claims to that entity and not to any related entities.  Moreover, ANICO

argues, Article VIII of the agreements specifically excluded "[r]einsurance assumed by

the Original Ceding Company." Contrary to this position, Munich argues that Article

I's reference to "the following insurance company or group" encompasses any

companies related to Everest and that, to adopt ANICO's interpretation, would turn

"group" into unnecessary surplusage.

Summary judgment in Munich's favor is inappropriate because the plain

language of the agreements does not unequivocally support Munich's proposed

construction.  As ANICO correctly argues, Article VIII expressly excludes reinsurance

50

claims: "This agreement does not apply to and specifically excludes . . . [r]einsurance assumed by the Original Ceding Company ...." 2001 Retrocessional Agreement, Art. VIII (7).  In responding to this argument, Munich does not dispute that Everest Re is a reinsurer.  Rather, it merely deflects Article VIII by arguing that ANICO "does not proffer any evidence that the claims it now seeks to exclude fall within that exclusion." Munich Reply at 14.  Yet, the mere title of Everest's affiliate—Everest Re—strongly suggests that it is a reinsurer.[21]  As Munich has not presented any evidence that Everest Re is not a reinsurer, the plain language of the parties' agreements dictates that its motion for partial summary judgment be denied.[22]  Furthermore, construing the agreements in this way does not render the "group" language superfluous. Insurers may take the form of an individual company or a group, such as "Argonaut Insurance Group, Inc.," *Small v. Arch Capital Group, Ltd.*, 85 A.D.3d 625, 627 (N.Y.A.D. Jun. 23, 2011), or syndicates in the Lloyd's of London insurance market, *see Global Reinsurance Corporation-U.S. Branch v. Equitas Ltd.*, 20 Misc.3d 1115(A), 867 N.Y.S.2d 16, 2008 WL 2676805 (N.Y. Sup. Jul. 3, 2008) (describing syndicates as a

---

[21]    *See American Home Assur. Co. v. Everest Reinsurance Co.*, 936 N.Y.S.2d 20, 20-21 (N.Y.A.D. 2011) (describing Everest Re as a reinsurer).

[22]    Munich, further, argues that "ANICO's prior conduct in paying an Everest Re claim without reservation establishes the exclusion is inapposite."  Munich Reply at 14-15.  I disagree.  It is inappropriate for a court to consider extrinsic evidence, such as Munich's conduct, where the plain language of the parties' agreement is clear.  To the extent that Munich is attempting to raise another waiver claim, its one-paragraph reference to ANICO's prior conduct is so underdeveloped that the Court cannot engage in a proper analysis of such an argument.

"group").   Article I makes clear that the ceding insurer here is a single company—Everest.

F.    *Roofer Claims*

Several of the claims challenged by ANICO are "roofer" claims.  In the 1999 Munich-Everest reinsurance program, which is the subject of the 2000 Retrocessional Agreement at issue in this case, Everest agreed to non-renew any existing roofing contractors.  In Hoekstra's file—the IOA Re underwriter—there is a document titled "Everest National Insurance Company 1999 Workers Compensation Excess of Loss Program, Specific Retrocession of American Re-Insurance Company," *i.e.*, Munich.  Kline Cert. App. II, Exh. 110 at 5852.  I refer to this document as the "Everest Program" document.  It appears that this document served as a sort of prospectus to potential retrocessionaires, but this is not clear from the face of the document itself.[23]

This document includes a section entitled "Refinement Process" that describes Everest's book of business.  Pertinent here is the following language

> *it was decided to non-renew any existing roofing contractors and temporary or leasing agencies.*  These classes were never a significant portion of the book but contributed a disproportionate share of losses.  It should be noted that these were always subject to specific and more stringent underwriting/risk selection criteria.  Even so, these classes are better left to those companies who specialize in them.

*Id.* at 5854 (emphasis added).

_____

[23]    In its Statement of Material Facts, Munich refers to this document as Everest's "underwriting submission."  Pl. Stat. Mat. Facts at ¶ 119.

Based on this language, ANICO now seeks to deny coverage for employees injured while working on a roof.  Munich challenges the denial, arguing that nothing in the plain language of the retrocessional agreements excluded "roofer" claims and, furthermore, the denied policies were not issued to "roofing contractors" but to general contractors whose employees happened to be working on a roof at the time of injury.[24]

Munich is not entitled to summary judgment on the roofer claims.  As an initial matter, the Court notes that while there is no roofer exclusion in the retrocessional or reinsurance agreements, the parties have proceeded as if one exists.  Indeed, Munich does not dispute that a roofer exclusion exists, but instead challenges ANICO's interpretation of the scope of the roofer exclusion.  Specifically, Munich argues that ANICO's Assistant Vice President of Group and MGU Operations, and Rule 30(b)(6) designee on underwriting issues, Michael Paetz, conceded that the roofer exclusion did not bar a claim involving someone employed by a general contractor who happened to fall off a roof.[25]

Munich points to the following excerpt from Paetz's deposition testimony:

---

[24]   Review of the record reveals that the Robin Bond claim was indeed filed by a general contractor on behalf of a roofing subcontractor that did not carry insurance.  *See* LeBlanc Cert., Exh. 4 (email from Lisa Hoekstra to Arthur Giacobbe dated October 23, 2003).

[25]   The Court notes that there additional facts relating to the roofer claims asserted in Munich's Statement of Material Facts.  However, Munich did not argue the relevance of these facts in its briefing.  For example, while Munich states in its Statement of Material Facts that IOA Re paid a claim submitted on behalf of a construction worker who fell off of a roof, Munich does not argue that ANICO's payment constitutes a waiver of its right to deny payment under the roofer exclusion.  In my view, this fact does not alter the result here, and neither do the remaining facts asserted in the Statement of Material Facts.

Q:     [I]f someone who worked for some other company, not a roofing company, happened to fall off a roof, would you regard that as an excluded roofer claim?

A:     The question would have to be what was the person doing on the roof and if it was in relation to his or her employment, you know, why was that person on the roof. . . . There are companies that might not have roofer in their name that might be construction companies that might have people doing roofing type of business.  Beyond that I don't know what to tell you exactly.

Q:     Okay.  From an underwriting perspective, if in the context of worker's compensation insurance if roofing business is supposed to be excluded, do you understand that to mean the insuring of roofing companies, employers that are roofers?

A      I would.

Paetz Dep. 36:10-37:4.

Contrary to Munich's argument, this testimony does not amount to a concession. Paetz testified that the question of whether a claim should be denied is fact-sensitive: "The question would have to be what was the person doing on the roof and if it was in relation to his or her employment, you know, why was that person on the roof. . . . " *Id.* at 36:14-17.  He, further, suggested that a company that is not a roofing contractor but is one that "might have people doing roofing type of business" could fall within the roofer exclusion.  *Id.* at 36:19-21.  Thus, rather than supporting Munich's interpretation of the roofer exclusion, Paetz's testimony supports ANICO's view that it is not obligated to indemnify Munich on a general contractor claim filed on behalf of a roofing subcontractor that did not carry insurance.

54

Moreover, even if Paetz's testimony substantively supported Munich's interpretation of the roofer exclusion, it is clear from the context surrounding Paetz's statement that he is not discussing the roofer exclusion language found in the Everest Program document—which he, apparently, did not review—but is expressing his opinion on roofer exclusions generally.

> Q:   Now, you said there was an issue with respect to coverages excluded.  What's your understanding of that issue?
>
> A:   Specifically roofer claims were not to be covered under the contract.
>
> Q:   And who told you that?
>
> A:   Walt [Dorosz][26] and Cathy [Washburn][27].
>
> *                    *                    *
>
> Q:   Did they show you anything that substantiated this position?
>
> A:   No.
>
> Q:   Did they tell you what a roofer claim was or how they determined what a roofer claim was?
>
> A:   They didn't tell me.  I would assume that it was on people who would be involved in roofing.
>
> *                    *                    *
>
> Q:   . . . And, so, a roofer would be a roofing company, right?

---

[26]   Chief Operating Officer of IOA Re.

[27]   Senior Auditor at IOA Re.

A:      That's how I would interpret it.

Paetz Dep. 35:8-36:9.  Accordingly, Paetz's testimony does not serve as a concession that the roofer exclusion found in the Everest Program document must be interpreted to apply only to roofing contractors and, consequently, there are genuine issues of material fact as to the scope of the roofer exclusion.  Munich's motion for summary judgment on the roofer exclusion is denied.

## IV.   CONCLUSION

For the foregoing reasons, the Court grants in part, and denies in part, Munich's partial motion for summary judgment.   With respect to ANICO's rescission counterclaim, the Court denies Munich's motion on the merits because there exists a genuine issue of material fact.  With respect to ANICO's untimely claim submission defense to payment, the Court grants Munich's motion on the merits.  The Court grants Munich's motion on the retention issue, concluding that retention is calculated on a ground up basis.  With respect to the Everest Re and "roofer" claims, Munich's motion is denied.  Finally, in light of the aforesaid ruling on the untimely claim submission defense, the Court does not reach Munich's use of bordereaux reporting; hence summary judgment on that basis is denied.  ANICO's cross-motion is denied in its entirety.


Dated:       September 28, 2012            /s/ Freda L. Wolfson
                                          Freda L. Wolfson, U.S.D.J.