***NOT FOR PUBLICATION***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                :

MUNICH REINSURANCE          :
AMERICA, INC.,                   :

                         :               Civil Action No.: 09-6435 (FLW)
              Plaintiff,     :

                         :                   **OPINION**
       v.                    :

                         :

AMERICAN NATIONAL        :
INSURANCE COMPANY,       :

                         :

            Defendant.    :
_____ :

**WOLFSON, United States District Judge:**

In the instant motion for reconsideration, Defendant American National Insurance Company ("ANICO") asks the Court to reconsider two aspects of the Court's September 28, 2012 ruling, which were both in favor of Plaintiff Munich Reinsurance America Inc. ("Munich"). ANICO contends: (a) that the Court failed to fully consider the applicability of Article XVI of the parties' 2000 and 2001 agreements in connection with ANICO's cross-motion for summary judgment on its untimely claim submission defense; and (b) with respect to Article X of the parties' agreements, that the Court erred in granting summary judgment on ANICO's prejudice defense to Munich's untimely claim submissions.

With respect to Article X, the Court grants ANICO's motion for reconsideration of the Court's ruling on the prejudice defense, yet affirms its prior grant of summary judgment to Munich on that defense. With respect to Article XVI, the Court grants ANICO's motion for

reconsideration of Article XVI, and vacates its grant of summary judgment to Munich on the untimely claim submission defense regarding the 2000 and 2001 claims submitted after December 31, 2007 and December 31, 2008, respectively.  With regard to the 2000 claims, the Court now grants summary judgment to ANICO.  With regard to the 2001 claims, the Court denies summary judgment on both parties' motions, finding that there is a genuine issue of material fact that precludes summary judgment for either party.

I.      **BACKGROUND**

My September 28, 2012 decision includes a detailed factual and procedural history, and hence I recount here only that background related to this ruling.  The retrocessional agreements at issue are based upon Munich's reinsurance relationship with Everest National Insurance Company ("Everest").    Munich reinsures Everest's workers compensation insurance program under an excess of loss reinsurance treaty that covers claims dated January 1, 1998 through December 31, 2001.  Seeking to ameliorate some of its risk under the Munich-Everest agreement, Munich entered into retrocessional treaties with ANICO.  The ANICO-Munich retrocessional agreements are for the periods of November 1, 1999 through December 31, 2000 ("the 2000 Agreement"), and January 1, 2001 through December 31, 2001 ( "the 2001 Agreement").  For purposes of this motion, the parties agree that these two agreements are identical in substance.

Generally, these agreements provide that ANICO will indemnify Munich for losses Munich sustains under the Munich-Everest reinsurance agreement as long as Munich gives ANICO notice of those claims in the manner directed by the Munich-ANICO agreements.  See LeBlanc Cert., Exh. 2 ("2001 Agreement"), Art. I(A).  Article X of the agreements directs Munich to provide ANICO with notice of all workers' compensation claims Munich receives from Everest and, for which, Munich intends to seek retrocessional cover from ANICO:

> A.      The Company [Munich] agrees to advise the Reinsurer [ANICO] promptly of all claims coming under this Agreement on being advised by [Everest], and to furnish the Reinsurer with such particulars and estimates regarding same as are in the possession of the Company.  An omission on the part of the Company to advise the Reinsurer of any loss shall not be held to prejudice the Company's rights hereunder.
>
> B.      In addition, the following categories of claims shall be reported to the Reinsurer immediately, regardless of any questions of liability of the Company or coverage under this Agreement:
>
> > 1.      Any accident reserved at 50% of the reinsured attachment point;
> > 2.      Any accident involving a brain injury;
> > 3.      Any accident resulting in burns over 25% or more of the body; or
> > 4.      Any spinal cord injury.
>
> C.      The Reinsurer agrees to pay the Company on demand, the Reinsurer's proportion of all losses and/or loss expenses paid by the Company arising from the Underlying Agreement, including any and all expenses incurred directly by the Company in the litigation, defense and settlement of claims made against the Company by the Original Ceding Company under the Underlying Agreement, excluding, however, all office expenses of the Company and the salaries and expenses of its employees.

2000 Agreement at Endorsement No. 1.

I explained, in my September 28, 2012 decision, how subsection A of Article X operates:

> Subsection A directs Munich to advise ANICO "promptly of all claims coming under this Agreement [up]on being advised by the Original Ceding Company …"  By using the terms "any" and "all," subsection A expressly covers each and every claim covered by the parties' agreement—including category B claims.

Slip Op. at 30 (emphasis added).

Thereafter, I explained the additional temporal requirement of immediacy applicable to claims falling within subsection B:

> [S]ubsection B makes clear that its terms apply "in addition" to, not in lieu of, those of subsection A:
>
>> *In addition, the following categories of claims* shall be reported to the Reinsurer *immediately, regardless of any questions of … coverage under this Agreement ….*
>
> By incorporating this additional requirement for category B claims, . . . the drafters supplemented subsection A's language with a special notice requirement (of immediate notice), just for category B claims.

Id. (internal citations omitted).

Finally, subsection C of Article X addresses ANICO's obligation to pay the claims for which Munich properly provided notice under subsections A or B, respectively.  Per the plain text of subsection C, ANICO "agrees to pay the Company on demand, the Reinsurer's proportion of all losses and/or loss expenses paid by the Company arising from the Underlying Agreement …."  2000 Agreement at Endorsement No. 1.

Separate and apart from the Article X notice requirements, Article XVI directs Munich to advise ANICO of all claims within seven years following the expiration of each agreement. See id., Art. XVI. Article XVI states, in pertinent part,

## ARTICLE XVI – COMMUTATION

> A.        Seven years after the expiry of this Agreement, the Company shall advise the Reinsurer of all claims for said annual period, [sic] not finally settled which are likely to result in a claim under this Agreement. No liability shall attach hereunder for any claim or claims not reported to the Reinsurer within this seven year period.

2001 Agreement at 5. As the plain text of this article makes clear, ANICO is not obligated to pay those claims not noticed within this seven-year period, which the parties refer to as the "sunset" period. Indeed, according to ANICO, several of Munich's claims were not noticed in this seven year period.[1]

The text of the Article XVI notice requirement differs from Article X in two material respects. For one, Article XVI is not limited to those claims "coming under this Agreement," as Article X provides. Rather, Article XVI applies to all claims "likely to result in a claim under this Agreement." In this way, Article XVI covers those claims that are not yet reportable under Article X. Second, Article X directs Munich to provide "particulars and estimates" in connection with the claims notices mandated therein, whereas Article XVI does not.

Munich initially brought the instant action against ANICO in December 2009, claiming that ANICO failed to pay all monies due under the retrocessional agreements. Munich's Complaint asserts two breach of contract claims—one relating to each

---

[1]        More details regarding these claims are included in my analysis infra.

retrocessional agreement—and a declaratory judgment claim regarding any future losses under the agreements.  In its amended answer, ANICO asserted several counterclaims against Munich:  fraudulent inducement, breach of the duty of good faith and fair dealing, breach of the duty of utmost good faith owed to a reinsurer, rescission of the retrocession agreements, and breach of contract.

As noted, Munich moved for partial summary judgment on its claims and ANICO cross-moved for summary judgment on certain of its defenses and counterclaims.  I granted in part and denied in part Munich's motions and denied ANICO's cross-motion in its entirety.  Pertinent here, I granted Munich's motion for summary judgment on ANICO's untimely claim submission affirmative defense based upon Article X of the agreements and, consequently, denied ANICO's cross-motion on that same defense.   ANICO seeks reconsideration of this ruling, arguing that it presented sufficient evidence of prejudice to withstand summary judgment.  Furthermore, ANICO argues that I did not fully consider the applicability of Article XVI of the parties' agreements to its untimely claim submission defense to certain of the claims.  The parties have submitted briefing, including responding to specific inquiries from the Court, and have also presented oral argument. [2]

## II.    STANDARD OF REVIEW

Local Rule 7.1(i) allows parties to seek reconsideration by the Court of matters "which [it] believes the Court has overlooked" when it ruled on the initial motion.  L. Civ. R.

---

[2]    In reviewing the parties' papers and preparing for oral argument, the Court notes that it expended significant time reading through entire deposition transcripts because the parties failed to attach indexes to the depositions and the depositions were not electronically searchable.

7.1(i). The burden on the moving party, however, is quite high. The movant must demonstrate either: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct [a] clear error of law or prevent manifest injustice." Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010). The Court will grant such a motion only if the matters overlooked might reasonably have resulted in a different conclusion. Bowers v. Nat'l Collegiate Athletic Assoc., 130 F.Supp.2d 610, 613 (D.N.J.2001) rev'd on other grounds by 475 F.3d 524 (3d Cir. 2007).

To be sure, the reconsideration vehicle may not be used by parties to "restate arguments that the court has already considered." Lawrence v. Emigrant Mortg. Co., Civil Action No. 11-3569, 2012 WL 5199228, *2 (D.N.J., Oct. 18, 2012). Nor may be it used "to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." NL Indus., Inc. v. Comm. Union Ins. Co., 935 F.Supp. 513, 516 (D.N.J. 1996). In other words, "[a] motion for reconsideration should not provide the parties with an opportunity for a second bite at the apple." Tishcio v. Bontex, Inc., 16 F.Supp.2d 511, 532 (D.N.J. 1998) (internal citation omitted). Instead, "a difference of opinion with the court's decision should be dealt with through the normal appellate process." Dubler v. Hangsterfer's Laboratories, Civil Action No. 09-5144, 2012 WL 1332569, *2 (D.N.J., Apr. 17, 2012) (citing Bowers v. Nat'l Collegiate Athletic Ass'n, 130 F.Supp.2d 610, 612 (D.N.J. 2001)).

## III. DISCUSSION

In my September 28, 2012 decision, I devoted ten pages to discussion of ANICO's untimely claim submission defense. I began by acknowledging that this defense is rooted in ANICO's Second Affirmative Defense that Munich

> has not satisfied conditions precedent to seeking damages from [ANICO] herein or to seeking payment for claims under the Retrocession Agreements as it has not satisfied the conditions precedent of Articles I, X and XVI of the Retrocession Agreement. [ANICO] is relieved of any liability for the payment of claims which were in violation of these conditions precedent, including those claims submitted untimely or submitted with inadequate information.

Amended Answer, ¶ 47.  In short, I noted, ANICO argued that it may deny payment of certain claims that were submitted by Munich in an untimely fashion because, under ANICO's interpretation of the agreements, such notice is a condition precedent to payment.

"Under New York law, when a reinsurance contract expressly requires a reinsured to provide its reinsurer with prompt notice of a claim or occurrence as a condition precedent to coverage and the reinsured fails to do so, that failure excuses the reinsurer from its duty to perform, regardless whether the reinsurer suffered prejudice as a result of the late notice." Pacific Employers Ins. Co. v. Global Reinsurance Corp. of America, 693 F.3d 417, 421 (3d Cir. 2012) (applying New York law).  Where, in contrast, the reinsurance agreement does not expressly make prompt notice a condition precedent to coverage, the reinsurer (or retrocessionnaire) "must show prejudice resulted from the delay." Id. at 433 (quoting Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co., 979 F.2d 268, 274 (2d Cir. 1992)).

Against this legal backdrop, I interpreted ANICO's untimely notice defense to hinge upon Article X of the 2000 and 2001 retrocessional agreements.  After reviewing the language and structure of Article X in detail, and considering the Third Circuit's then-recent decision in Pacific Employers, supra, which interpreted a similar reinsurance provision under New York law, I concluded that Article X did not create a condition precedent to payment.  Having found that Article X did not create a condition precedent, I further

concluded that ANICO had to demonstrate that it was prejudiced by the untimely notice in order to withstand summary judgment on its untimely claim defense.

Still focusing on Article X, I then concluded that ANICO failed to point to sufficient record evidence in support of its contention that it had suffered prejudice. The evidence presented by ANICO was based upon the testimony of Steven Schouweiler, Senior Vice President of Health Operations at ANICO, who had "overall responsibility for . . . the Munich Re/American National contracts." Oct. 26, 2010 Schouweiler Dep. at 6:14-16; Oct. 25, 2011 Schouweiler Dep. at 6:5-9. Specifically, ANICO argued that it was prejudiced by Munich's untimely claim notices because, in June 2003, it entered into a commutation[3] with its own retrocedent, Max Re, and that, had it received timely notice of Munich's potential claims under the Munich-ANICO agreements, it may not have entered into the commutation with its retrocedent. *See* Schouweiler Afft., pp. 3-4 ("The reporting of these additional claims would have had a material effect on the decision I made to commute the reinsurance agreement with Max Re."). However, in making this argument, ANICO relied on a 2012 affidavit by Schouweiler that I viewed as contradicting his earlier deposition testimony. Applying the

---

[3]      I explained that "[a] commutation is a settlement agreement reached between a reinsured and a reinsurer by which the reinsurance obligation is terminated by an agreement by the reinsurer to pay funds at present value that are not yet due under the reinsurance agreement. Similar to a policy buy-back with an insured, a commutation allows the reinsured to receive cash now to invest for the payment of claims that will come due in the future." Larry P. Schiffer, Esq., *To Commute or Not To Commute, that Is the Question*, http://www.irmi.com/expert/articles/2003/schiffer07.aspx (last visited September 18, 2012). This describes commutations in their simplest form—a commutation may also be "partial, leaving some long-term obligations in effect, and it may be a contract for a series of fixed future payments rather than a present lump sum." Staring, Graydon S., <u>Law of Reinsurance</u> § 14:6 (2012). In either case, the central purpose of the agreement is to "terminate[ ] the liabilities for indemnities on the one hand and premiums on the other ...." <u>Id.</u>

sham affidavit doctrine, I rejected Schouweiler's 2012 testimony and, thus, found that ANICO has not presented sufficient evidence of prejudice to preserve that defense for trial. In making this ruling, I explained that I expressed no opinion whether Munich's claim notices were actually untimely under the retrocessional agreements.

In addition, Munich had argued that certain claims appearing in an August 8, 2008 spreadsheet submitted via email were timely noticed because the spreadsheet entries would have constituted sufficient notice under the agreements. Munich contended that these email notices constituted bordereau reporting—a form of claim reporting customarily used in the reinsurance industry. ANICO challenged Munich's reliance on the emailed reports, arguing that the reports were inadequate. Because I concluded that timely notice was not a condition precedent to payment under Article X, I did not address whether the email notices would have constituted sufficient notice. But in framing Munich's bordereau-reporting argument in this way, the opinion created the impression that the bordereau-reporting argument relates to Article X when, in fact, it relates to Article XVI instead. This error is one of the bases for ANICO's motion for reconsideration.

As noted, ANICO urges the Court to reconsider two aspects of its ruling. First, ANICO argues that the Court failed to fully consider the applicability of Article XVI of the parties' agreements in connection with ANICO's cross-motion for summary judgment on its untimely claim submission defense. Second, with respect to Article X of the parties' agreements, ANICO argues that the Court erred in granting summary judgment on ANICO's prejudice defense. I address this latter contention first.

A.    *Article X Prejudice Defense*

At the outset, I note that the section of ANICO's reconsideration brief addressing prejudice fails to satisfy the reconsideration standard.  Rather that discussing how its motion satisfies the reconsideration standard, ANICO proceeds directly to its argument on the merits. Substantively, ANICO argues that those aspects of Schouweiler's testimony that appear contradictory at first blush can be reconciled through a closer look at his deposition testimony as compared with his 2012 affidavit.  By structuring its argument in this way, ANICO has not pointed to an "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct [a] clear error of law or prevent manifest injustice." Lazaridis, 591 F.3d at 669.  Moreover, in its briefing on the initial motions, ANICO did <u>not</u> point to the deposition testimony to which it now directs the Court in its reconsideration briefing.  As Local Rule 7.1 case law makes clear, reconsideration may not be used "to raise arguments or present evidence that could have been raised prior to the entry of judgment." NL Indus., 935 F.Supp. at 516.  See also Tishcio v. Bontex, Inc., 16 F.Supp.2d 511, 532 (D.N.J. 1998) ("[a] motion for reconsideration should not provide the parties with an opportunity for a second bite at the apple.") (internal citation omitted).  On this basis alone, ANICO's motion could be denied.

Nevertheless, for the sake of completeness, and because I did not reach the substance of the prejudice argument in my prior ruling in light of my reliance on the sham affidavit doctrine, I will reconsider my decision and address ANICO's prejudice proofs.  This means that I will consider Steven Schouweiler's affidavit along with his deposition testimony and other relevant evidence of record.

As noted, ANICO's central prejudice argument is that, with knowledge of Munich's untimely claims, Steven Schouweiler would have not have commuted the Max Re treaty, which decision would have afforded ANICO a greater economic benefit than the commutation itself.  The evidence that ANICO presents in support of this argument follows.

           1.    *Prejudice Defense Background Facts*

Schouweiler was the only ANICO employee involved in the Max Re retrocession.  October 2011 Sch. Dep. 47:14-19.  The retrocessional treaty between ANICO and Max Re was "finite," which means that it is a type of quota share reinsurance that transfers risk up to a defined amount and then transfers back risk to the ceding insurer.  See id. at 56:20 - 58:16.[4]  Evincing the Max Re treaty is a cover note (also referred to by the parties as a "cover slip" or "placement slip"), that defines the terms of the reinsurance.  See id. at 59:7-15.  Cover notes often list the summary details of the risk and premium under a treaty.  See Compagnie des Bauxites de Guinea v. Insurance Co. of North America, 651 F.2d 877, 879 (3d Cir. 1981).  The New York Supreme Court decision of Sumitomo Marine & Fire Ins. Co., Ltd.-U.S. Branch v. Cologne Reinsurance Co. of America, describes the role of cover slips in reinsurance contracts:

> Typically, the details of the risk proposed to be ceded by the reinsured are circulated to possible reinsurers, who in turn indicate their willingness to accept some portion of the risk, and to be bound by their agreement to do so. In the London market . . . this was traditionally accomplished by the ceding company or its broker preparing a slip with brief details of the risk to be placed; the slip was then taken to prospective

---

[4]      "Max Re . . . provides traditional, finite, and alternative risk transfer reinsurance of long-tailed liabilities to insurance and financial services companies."  Max Re A.M. Best Rating, Klein Cert. II, Exh. 97.

> reinsurers who, if prepared to accept, initialed it, indicating the proportion of the risk they wanted. Under normal circumstances, the initialing of the slip constituted a binding agreement. . . . Delivery of the original insurance policy to the reinsurer and issuance by the latter of a formal certificate of reinsurance may not occur until much later, and indeed are technically unnecessary for a binding agreement.

75 N.Y.2d 295, 301-02 (1990) (quoting Butler & Merkin, Reinsurance Law, at A5.1-02) (emphasis added).

Schouweiler asserts that, when he, on ANICO's behalf, entered into the retrocessional agreement with Max Re, the cover slip he negotiated was followed by a more formal written agreement (hereinafter, "the final agreement").  October 2011 Schouweiler Dep. 59:7-17.  However, he acknowledged at his October 2011 deposition that he was the sole person who stored ANICO's copy of the final agreement, that he could not locate the final agreement in his files, and that he had not seen the final agreement recently.  Id. at 59:17-61:5.  He further noted that, while he had "a memory of it . . . [w]hether [his memory was] correct or not [wa]s another question after 12 years ...." since last seeing the final agreement.  Id. 60:5-12.  In terms of his efforts in locating a copy of the final agreement, Schouweiler testified that, to his knowledge, no one else at ANICO searched for a copy and that he was otherwise unsuccessful in locating a copy himself.  Id. at 60:13-23.  Thus, and quite appropriately, Schouweiler refers to the final agreement in his deposition as "the phantom agreement."  Id. at 111:16.

To be clear, while the term "cover slip" may evoke images of a one or two-page document marked by its brevity, in fact, the Max Re cover slip is fifteen pages long, and is content heavy, addressing such topics as, for example, the types of business covered by the

treaty, treatment of allocated loss adjustment expenses, claim reserve amount, aggregate loss limit, and material breaches of underwriting guidelines.  See generally Max Re Cover Slip, Klein Afft. II, Exh. 63B ("Cover Slip").  The slip even specifies the nine types of reports that ANICO must remit to Max Re every thirty days while the agreement is in effect.  See id. at 14.

Important here, the cover slip explicitly addresses commutation and contains the financial formula applicable to any such commutation.  Id. at 11.  The formula provides:

> Commutation . . . will result in a Commutation payment due to the Reinsured equal to 95% of the following:
>
> - Section A - B Net Reinsurance Premiums credited to the CRA, plus
> - Section - F Net Reinsurance Premiums paid to the Reinsurer, minus
> - Reinsurer's margin subject to a minimum margin of $1,900,000, minus
> - Claims paid from the CRA[5], minus
> - Claims paid by the Reinsurer.

Id.  Stated more simply, the cover slip's commutation formula was:  [premiums paid by ANICO to Max Re] - [commissions and fees retained by Max Re] - [claims already paid by Max Re] = commutation amount.  Whelan Dep. 70:7-13.

In addition to explicitly providing for commutation, the cover slip speaks to the layers of risk assumed by ANICO and places caps on Max Re's risk.  In a section titled Aggregate Loss Corridor, the slip provides:  "[ANICO] shall retain . . . Claims otherwise recoverable hereunder equal to the amount between 95% and 108.5% of the Net Reinsurance Premium . . . received by [Max Re] for Section F."  Cover Slip at 10.  In the section titled Aggregate Loss

---

[5]     CRA refers to the Claim Reserve Account, a Max Re account funded by ANICO's monthly premiums and, from which, claims payable to ANICO were to be paid.  Id. at 9.

Limit, the slip limits Max Re's exposure to 95% of the Net Reinsurance Premium for Sections C, D,E, and F combined." Id.  Both of these provisions apply to the Munich worker's compensation claims, which claims fall within the section F coverage category. See id. at 8 ("F.  Accident and Health Reinsurance Limit"); October 2011 Schouweiler Dep. 67:22-67:1 (agreeing that "the special risk business . . . was within section F of the coverage being provided").[6]

At his October 2011 deposition, Schouweiler testified that his recollection of the terms of the final, written agreement differ from that of the cover slip.  He recalled that the final agreement "provided for a corridor risk to the reinsurer that attached at some point something on the order of 110 to 115%."  October 2011 Schouweiler Dep. 62:7-11.  In terms of ANICO's risk, he recalled that ANICO "would retain some level of risk . . . beyond, I think, this says 95% or 99%, something like that, up to generally 110 or 112 or 115%, depending on the structure of the program; and then the reinsurer would have come in at that upper level and would have come back in for something generally on the order of 5 or 10 additional percent and then the risk would have reverted back to [ANICO]."  Id. at 62:16-63:4.  However, when asked whether he recalled "what the specific retained level of risk was for ANICO," he responded, "I do not."  Id. at 63:11-14.

Upon further questioning, Schouweiler admitted that he executed the cover slip and that he read it before signing.  Id. at 64:1-18.  Ironically, in contemporaneously forwarding a copy of the executed cover slip to Greg Whelan, the Comptroller at IOA Re, and requesting

---

[6]     The parties agree that worker's compensation claims are categorized as special risk business.

that Whelan disburse funds to consummate the agreement, Schouweiler referred to the "executed version" of the cover slip as "the Max Re <u>treaty</u>." Cover Slip at 1 (emphasis added).

Nevertheless, at his deposition, Schouweiler persisted that the cover slip is distinct from the final agreement. He recalled having a discussion with a broker, in which he indicated that the terms of the deal, as expressed in the cover slip, needed to be altered. October 2011 Schouweiler Dep. at 64:23-65:7. But, he could not recall whether that conversation was before or after he signed the cover slip. <u>Id.</u> Furthermore, Schouweiler acknowledged that the terms found in the cover slip were honored by the parties. By way of example, the ceding commission money was paid under the terms of the cover slip.[7]

More importantly, Schouweiler agreed, in his deposition, that once Max Re and ANICO decided to commute their treaty, the parties utilized the commutation formula found in the cover slip. <u>Id.</u> at 69:12-22; 81:11-15. He further noted, with respect to the commutation process, that both the timing of the commutation and his decision to commute were influenced by his belief—contrary to the terms of the cover slip—that potential future losses under the Munich treaty could have affected the commutation amount. <u>Id.</u> at 75:5-16 (agreeing that "the actual commutation value included both IBNR and outstanding case reserves," and that Munich's late notices affected "the calculation and the timing of the commutation").[8] However, when confronted with the plain language of the cover slip formula, and with an email by Greg Whelan, IOA Re's Comptroller, who actually calculated the

---

[7]     While Munich's counsel refers to the "contract" in this section of the transcript, it is clear from context that he is referring to the cover slip. <u>See</u> <u>id.</u> at 67:6-8.

[8]     In this excerpt of his testimony, Schouweiler uses the term "IBNR" to refer to one category of potential future losses. IBNR stands for claims incurred but not reported. <u>See</u> <u>id.</u> at 76:25-77:1.

commutation value without reference to future losses, Schouweiler conceded at his deposition that the formula did not take into account such losses.  Id. at 76:1-81:15.  With respect to any economic losses suffered by ANICO on account of the untimely claims, Schouweiler admitted, at his deposition, that he could not quantify ANICO's losses.  October 2010 Schouweiler Dep. 115:6-10; 116:9-15; 117:5-18.

Following his deposition, Schouweiler executed an affidavit and ANICO presented that affidavit in connection with the then-pending motions for summary judgment.  In his affidavit, Schouweiler adds that, if he had been presented with Munich's untimely claim submissions at the time he was deciding whether to commute the Max Re treaty it would have affected his decision to commute.  Schouweiler Afft. at 4 ("The reporting of the[ ] additional claims would have had a material effect on the decision I made to commute the reinsurance agreement with Max Re.").  Operating under the impression that the final agreement terms provided ANICO greater insurance protection than that set forth in the cover slip, Schouweiler attempts to explain why it would have been more advantageous for ANICO to forego commutation:

> [I]t is my understanding that if [ANICO] had not . . . commuted with Max Re, and as losses exceeded the claim accounts and [ANICO]/IOA RE's [sic] retained risk, then Max Re would have been responsible, up to its limit, for losses in excess of the net premium it received.  For instance, 8.5% of the net premium related to the special risk treaty business would have been equal to approximately $1,056,854.

Id. at 3.  That his argument is premised on the terms of the final "phantom" agreement is clear from his affidavit testimony, wherein he states, explicitly, "my recollection of the final

17

reinsurance agreement with Max Re concerning this additional band of risk in excess of 100% of net premiums appears to differ from the placement slip." Id.

With respect to the data Schouweiler relied upon in making his decision to commute the Max Re treaty in 2003, Schouweiler avers that IOA Re "maintained records with respect to individual [Munich] claims, including individual claim paid losses and reserve information," and that "[t]his information was then provided to [ANICO], along with information related to other reinsurance agreements, as an aggregate number, including an amount for outstanding loss reserve," which, in March of 2003, "was only $500,000." Id. at 3. According to him, "[a]t the time these financial calculations were made by IOA Re, IOA Re was aware of only 4 or 5 claims related to the Treaties." Id.  He implies that Munich's failure to provide IOA Re with timely notice of all claims deflated IOA Re's calculations, and that the underreported claims "would have had a material effect on the decision [he] made to commute the reinsurance agreement with Max Re." Id.

In my September 2012 decision, I rejected certain aspects of Schouwelier's affidavit testimony.  I reasoned:

> Schouweiler testified in his deposition that ANICO did not maintain specific loss information, see October 25, 2011 Schouweiler Dep. 45:24–46:14, yet he provides specific loss information in his affidavit: "As of March 31, 2003, when financial calculations were made by IOA Re concerning potential commutation, the outstanding loss reserve relative to the [agreements] was only $500,000." Schouweiler Afft., p. 4.

September 28th Opinion, Slip Op. at 35-36.[9]

---

[9]      I also rejected Schwouweiler's  testimony that there should have been at least twice as many claims reported to IOA Re ... by the time [of] commutation....,"finding that statement in conflict with his earlier deposition testimony that "there was no allocation of the

Thereafter, I explained that, where an affidavit is offered solely for the purpose of defeating summary judgment, and that affidavit testimony conflicts with the party's prior deposition testimony, "it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate." Id. (quoting Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007)).  I further noted that, in ruling on the sham affidavit doctrine, courts consider whether the party has explained away the discrepancies, which ANICO did not do in its briefing.  Lastly, I noted that the only exception to the sham affidavit doctrine is that a court should consider the affidavit where there is independent evidence to bolster the contradictory testimony.  Id.  Since ANICO did not point to any such evidence, I applied the doctrine, granted summary judgment to Munich, and denied ANICO's cross-motion.

        2.    *Analysis*

The parties agree that, under New York law, to demonstrate prejudice from untimely filed claims a retrocessionnaire, like ANICO, "bears the burden of showing that it suffered tangible economic injury ...."  Unigard Sec. Ins. Co., Inc. v. North River Ins. Co., 4 F.3d 1049, 1069 (2d Cir. 1993); Folksamerica Reinsurance Co. v. Republic Ins. Co., Civil Action No. 03 Civ. 0402 (HB), 2003 WL 22852737, *9 (S.D.N.Y. 2003) ("Any relevant prejudice as a result of late notice must take the form of tangible economic injury.") vacated on other grounds by 182 Fed.Appx. 63 (2nd Cir. May 26, 2006).  Cf.  CIH Intern. Holdings, LLC v. BT United

---

commutation to ... any one underlying contract" between Munich and ANICO, and that, at the time of commutation,   [Schouweiler] did not expect IOA Re to be performing any commutation analysis of each underlying contract."   Slip Op. at 36 (internal citations omitted).

States, LLC, 821 F.Supp.2d 604, 612 (S.D.N.Y. 2011) ("Under New York law, to plead prejudice for purposes of a breach of contract claim, a plaintiff 'bears the burden of showing that it suffered tangible economic injury' as a result of the alleged breach.") (citing Unigard, 4 F.3d at 1069).

At oral argument, ANICO's counsel made clear that ANICO's sole argument with respect to tangible economic loss hinges on Schouweiler's statement in his affidavit regarding the additional 8.5% insurance protection to which he believes that ANICO would have been entitled under the "phantom" agreement.  However, at oral argument, ANICO's counsel conceded that many of the logical inferences necessary to support Schouweiler's averments are not found in the record.

To accept Schouweiler's position that ANICO would have been entitled to the additional band of coverage, the factfinder would have to credit his testimony that the "phantom" agreement, in fact, exists.  But no reasonable factfinder could credit this testimony because, as Schouweiler candidly acknowledges, the terms of the "phantom" agreement flatly contradict the terms of the cover slip, no one (other than he) at ANICO has seen this agreement, and he cannot produce a copy of it from his own files.  Moreover, there appears to have been no attempt to locate or obtain a copy of the final agreement from Max Re, nor has ANICO produced even an unsigned copy or a prior draft of this agreement.[10] There also exists no email chain or correspondence discussing such a separate written agreement.  In the face of a cover slip that contains terms contradicting the purported final

---

[10]     ANICO's counsel acknowledged at oral argument that no such evidence is in the record.

agreement, and considering (i) that Schouweiler himself referred to the slip as the "treaty" in his letter forwarding the executed copy to his co-workers, (ii) that no other representative of Max Re or ANICO has testified as to the existence of such an agreement, and (iii) that no other documentary evidence referencing such an agreement has been produced, no reasonable factfinder could conclude, based upon Schouweiler's testimony standing alone, that there was a final written agreement which included the favorable 8.5% coverage terms upon which ANICO bases its theory of economic loss.

The problem for ANICO on this motion, in not having shown the existence of these favorable treaty terms, is compounded by the generally speculative nature of Schouweiler's testimony.  ANICO would have the factfinder believe that, had Schouweiler been advised of the untimely claims prior to deciding whether to commute the Max Re treaty, he would have considered the effect of those claims on the commutation, and then, having considered that effect, he would have chosen not to commute the Max Re treaty altogether.

As to this latter contention—that Schouweiler would have cancelled the entire commutation—ANICO points to Schouweiler's testimony, in his deposition, that, with notice of the untimely claims, he would have foregone commutation of the Max Re treaty as a whole. October 2011 Schouweiler Dep. 113:2-7.  At oral argument, the Court expressed its skepticism of this testimony, as the Max Re commutation involved over 1,500 treaties and it seems unlikely that Schouweiler would have foregone the commutation of that large number—the entire book of business with Max Re—on account of the two Munich treaties.[11]  In response, ANICO's counsel posited that the reason Schouweiler would have

---

[11]     ANICO's counsel agreed, at oral argument, that the commutation cancelled out an

cancelled the commutation altogether is that claims covered by the Munich treaties, i.e., worker's compensation, special risk claims with long tails, are inherently more risky than the other types of claims included in the commutation; the long-tail claims have the potential for much greater exposure.   However, the Court's review of Schouweiler's deposition testimony and affidavit does not reveal that Schouweiler made any such distinction between the Munich treaties, which cover long-tail claims, and other commuted treaties that do not cover long-tail claims, and neither did ANICO's counsel point to any such testimony in the record.

As to ANICO's former contention—that Schouweiler would have considered the effect of the untimely claims in connection with his decision to pursue commutation—ANICO has not pointed to testimony to support this contention either.   Nowhere in Schouweiler's deposition testimony or affidavit does he state that, at the time of the 2003 commutation, he considered the number of claims that had been submitted by Munich.   While he suggests in his affidavit that IOA Re maintained claim-specific data in its recordkeeping system, and that IOA Re provided the data in aggregated form to ANICO, Schouweiler Afft. at 3, he never states that he actually reviewed the claim-specific data or understood, in 2003, how many claims had been submitted by Munich at that point in time.[12]   ANICO's counsel conceded as much

---

entire year's book of business.

[12]   For example, Schouweiler states in his deposition that he reviewed an aggregated "paid" report that combined "all the special risk business written by IOA Re on behalf of ANICO during [the treaty] year"—not claim data related specifically to the 2000 and 2001 Munich treaties.   October 2011 Schouweiler Dep. 82:17-85:12.   Schouweiler, further, states that, while he looked at an underwriting report that reflected outstanding reserves and IBNR, that report was also aggregated to include all of the special risk business written by IOA Re. Id.

at oral argument.  If ANICO cannot demonstrate that Schouweiler actually took into account the number of claims submitted in 2003 when he made the decision to commute, then there certainly is no basis for the factfinder to conclude that notice of the untimely claims would have altered his decision to commute.  Accordingly, it also cannot be a basis to defeat summary judgment.  Schouweiler's statement in his affidavit that the claims would have made a difference is wholly conclusory and not entitled to any weight.  "[S]peculation and conjecture," of this sort, "cannot create a material factual dispute." South Camden Citizens in Action v. New Jersey Dept. of Enviromental Protection, Civil Action No. 01-702 (FLW), 2006 WL 1097498, *20 (D.N.J. Mar. 31, 2006).  See also Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.") (internal quotation marks omitted) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Finally, even if Schouweiler's testimony regarding the existence of a final agreement's terms could be credited, under the best evidence rule, his testimony could not be admitted at trial to prove the agreement's terms.  The best evidence rule, found in Federal Rule of Evidence 1001-1002, requires that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required ...."[13]  Fed.R.Evid.R.

---

[13]     The only caveat to this rule is that, pursuant to Federal Rule of Evidence 1004, an original document is not required if:

> (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith;

1002.  See also Acumed LLC v. Advanced Surgical Services, 561 F.3d 199, 222 (3d Cir. 2009);

United States v. Miller, 248 Fed.Appx. 426, 429 (3d Cir. 2007) ("[A] party [must] produce

original documents if a witness testifies to the actual content of a writing.").  Furthermore,

only evidence admissible at trial may create a genuine of issue of material fact on summary

judgment.  See Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to support or oppose a

motion must ... set out facts that would be admissible in evidence ...."); Bristol v. Settle, 457

Fed.Appx. 202, 204 (3d Cir. 2012).   Here, that ANICO cannot produce a final, written

agreement renders its reliance on the terms of that agreement to defeat Munich's motion for

summary judgment, or to prove its own motion for summary judgment, on its prejudice

defense, problematic.  See New York ex rel. Spitzer v. Saint Francis Hosp., 94 F.Supp.2d 423,

428 (S.D.N.Y. 2000) (striking paragraph in affidavit offered for summary judgment in which

affiant attested to the contents of correspondence not in the record).

     Accordingly,  for  the  foregoing  reasons,  in  reconsidering  my  grant  of  summary

judgment to Munich on ANICO's prejudice defense, I affirm my prior ruling that summary

---

(b) an original cannot be obtained by any available judicial
process;

(c) the party against whom the original would be offered had
control of the original; was at that time put on notice, by
pleadings or otherwise, that the original would be a subject of
proof at the trial or hearing; and fails to produce it at the trial or
hearing; or

(d) the writing, recording, or photograph is not closely related
to a controlling issue.

Fed.R.Evid. 1004.  See also New York ex rel. Spitzer v. Saint Francis Hosp., 94 F.Supp.2d 423,
428 (S.D.N.Y. 2000).  ANICO has not made a showing as to any of the above exceptions to the
best evidence rule.

judgment is appropriate.  ANICO has not presented sufficient evidence to create a genuine issue of material fact as to whether notice of the untimely claims would have affected Schouweiler's decision to commute, that he would have chosen not to commute, and that, as a result, ANICO would have been in a better economic position.  These attenuated, and unsupported, leaps of logic do not demonstrate a tangible economic loss.  Cf. Black Car Assistance Corp. v. New Jersey, 351 F.Supp.2d 284, 286 (D.N.J. 2004) (stating that the nonmoving party must "point to concrete evidence in the record which supports each essential element of its case.") (citing Celotex, 477 U.S. at 322-23) (emphasis added).  For these reasons, since ANICO has failed to present sufficient evidence from which a factfinder could conclude that ANICO was prejudiced by Munich's late notice under Article X of the parties' agreement, I affirm my prior ruling granting summary judgment to Munich on ANICO's Article X prejudice defense.

      B.    *Article XVI Sunset Provision*

Contrary to my ruling on ANICO's Article X prejudice defense, a different result attends for that aspect of ANICO's reconsideration motion relating to Article XVI of the parties' agreements.  Upon review of my September 28th decision, I conclude that I did not treat ANICO's argument to be that Article XVI—as opposed to, and apart from, Article X—creates its own condition precedent to payment under the parties' agreements.  Based upon the manner in which ANICO briefed this issue, I did not appreciate ANICO to be arguing that there was specific language in Article XVI that creates a condition precedent.  While ANICO's brief states that Article XVI is a condition precedent, that statement was buried in one sentence in the middle of its thirty-nine page moving brief, and ANICO did not engage in any

legal analysis as to <u>why</u> the Court should conclude that Article XVI creates a condition precedent, other than to cite to general contract interpretation principles. [14]  <u>See</u> Def. Br. in Supp. of its Mot. for Summ. Jgmt. at 25.

Nevertheless, because I conclude that ANICO intended for the Court to consider Article XVI as an independent basis for its untimely claim submission defense, I find reconsideration appropriate on this issue.  My failure to discuss Article XVI in my prior ruling could rise to the level of a clear error of law if that article does, in fact, operate as a condition precedent.  Moreover, as noted, Munich's bordereau-style reporting argument relates solely to Article XVI and my prior opinion creates the impression that it applies to Article X instead.  Having concluded that reconsideration is appropriate, I now turn to the law governing interpretation of Article XVI and the facts relating to my analysis.

### 1.      Sunset Deadline Background Facts

As explained in my discussion of Article X of the Munich-ANICO agreements, Munich was obligated to promptly advise ANICO of all claims coming under their agreements.  For certain claims, Munich was obligated to notify ANICO immediately, as follows:

> [T]he following categories of claims shall be reported to the Reinsurer immediately, regardless of any questions of liability of the Company or coverage under this Agreement:
>
> 1.      Any accident reserved at 50% of the reinsured attachment point;

---

[14]      The only legal citation that is even related to condition precedents is ANICO's citation to <u>Oppenheimer Co., Inc. v. Oppenheimer, Appel, Dixon & Co.</u>, 86 N.Y.2d 685, 690, 660 N.E.2d 415, 636 N.Y.S.2d 734 (1995), which ANICO cited for the general proposition that "[a] condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'"

2.      Any accident involving a brain injury;
3.      Any accident resulting in burns over 25% or
        more of the body; or
4.      Any spinal cord injury.

2000 Agreement at Endorsement No. 1, subsection B.  For those claims that did not require immediate notice, Article X directed Munich to "promptly" report those claims.  Id., subsection A.

Early in the treaty administration process, Munich employee Joe Kanuncio was responsible for overseeing Everest's claims and for deciding which of those claims should be reported to ANICO.  Giacobbe Dep. 66:7-75:7.  In 2002, Arthur Giacobbe took over for Kanuncio.  Giacobbe testified at his deposition that, in taking over that position, he did not review the Munich-ANICO agreements; he simply followed in Kanuncio's footsteps.  Id. at 77:9-10; 95:14-96:15; 381:23-382:6.  Giacobbe's practice—like his predecessor—was to report to ANICO only those Everest claims that had reached a $500,000 retention threshold.[15] Id. at 148.  In so doing, Giacobbe failed to comply with the terms of Article X by not reporting claims at 50% of the reinsured attachment point.  Id. at 176:23-180:8.

At one point during Giacobbe's tenure, an employee at IOA Re challenged his reporting procedure.  Specifically, Lisa Hoekstra, an underwriter at IOA Re, sent an email dated October 23, 2003 to Timothy Schmidt, that was then forwarded to Giacobbe.  The email addresses an Everest claim submitted to ANICO for payment:

> This is the second claim (of 2) I've reviewed from Everest/[Munich] that has been reported to us AFTER reserves have gone over the retention.  Most of our insurance contracts

---

[15]     To be clear, when Giacobbe determined that a claim should be reported to ANICO, he forwarded a report to Am Re Brokers' employee, Timothy Schmidt, who then reported the claim to IOA Re.  In this way, Am Re served as an intermediary on Munich's behalf.

> call for loss notice at 50% of attachment. . . . [W]hy such late
> notice in general?  "Precautionary" notices, before they breach
> our attachment, are most appreciated and protect [Munich]
> from the sunset clause.

Klein Cert., Appx. III, Exh. 3.  In addition, on December 17, 2005, Cyndi Charney at IOA Re

emailed Giacobbe to expressly notify him that he should be reporting serious injury claims

at 50% retention.   Giacobbe Dep. 335:18-341:13.   Nonetheless, Giacobbe continued

reporting claims only at the point when the Everest claims reached $500,000 in retention.

See id. at 337:24-338:4; 341:8-13.

In 2007, Munich employee Sam Freda took over for Giacobbe and he, like Giacobbe

and his predecessor, reported only those claims that had reached a $500,000 retention

threshold.  Freda Dep. 101:13-102:15.  However, in August 2008, Freda became aware that

Munich's reporting procedure was flawed and that there were multiple claims under the

2000 and 2001 agreements that should have been reported at 50% of the reinsured

attachment point but were not.   Id. at 96:11-99:24.  Armed with this knowledge, Freda

reviewed the Everest claim files and compiled a spreadsheet of all those claims that should

have been reported.   See id. at 107:8-110:17; 282:6-284:3 (describing his review of those

Everest claims that had not yet reached $500,000 retention but were at 50% of ANICO's

attachment point).  He forwarded this spreadsheet to Timothy Schmidt.[16]

After Schmidt received this spreadsheet, he forwarded it via email to Cathy

Washburn at IOA Re, who received all claim reporting on ANICO's behalf.  Schmidt's cover

email read:

---

[16]     While Freda's testimony does not expressly state that the spreadsheet he compiled
and forwarded to Schmidt is the same spreadsheet that Schmidt emailed to Washburn on
August 8, 2008, Munich counsel's conceded as much at oral argument.

From:            Schmidt Timothy – Princeton-MRAm
Sent:            Friday, August 08, 2008 3:38 PM
To:              Cathy Washburn
Cc:              Frawley James – Princeton-MRAm; Pawlowski Edward – Princeton-MRAm
Subject:         Everest National
Attachments:     EVEREST NATIONAL - WC CLAIMS - Assumed.XLS

Cathy, as we are working out the contract issues I thought it would be a good ideas to send you a listing of Munich Re America's listing of assumed claims from Everest National.

Regards,

Tim

LeBlanc Cert., Exh. 15.

This August 8, 2008 spreadsheet listed all of the claims submitted by Everest to Munich. It included the name of each insured, the date of loss, and the attachment point, however, the spreadsheet did not delineate which of the claims were likely to result in a claim under the retrocessional agreements. In response to Schmidt's email, Cathy Washburn replied on April 11, 2008 that "[t]his listing is not considered adequate notice of loss. Individual notices must be provided for each claimant and should include claimant name, complete claim details, and financial data broken down by medical, indemnity, and expense." Id. To this, Timothy Schmidt responded: "Cathy, we agree. We are working on getting you the necessary back up documentation." Id. Thereafter, Munich followed up with more detailed notices for the particular claims. The more detailed notices were provided beginning on March 25, 2009 and through September 28, 2011.

Around the same time that Freda took over reporting from Giacobbe, in 2007, Freda and Giacobbe conducted an audit of Everest's claim files. They also conducted a follow-up audit in 2008. Id. at 193:13-194:13. Through the audits, it became apparent that Everest had a practice of providing late notice of certain claims to Munich. See id. at 195:6-199:14.

29

### 2.    Rules of Contract Interpretation

As explained <u>supra</u>, the parties' retrocessional agreements are governed by New York law.  Under New York law, "[a] reinsurance contract is governed by the rules of construction applicable to contracts generally."  <u>Christiania General Ins. Corp. of New York v. Great American Ins. Co.</u>, 979 F.2d 268, 274 (2d Cir. 1992) (citation omitted).  That is, the terms of unambiguous contracts are enforced as written.  An ambiguous contract is one subject to different, reasonable interpretations.  Where the terms of the contract are ambiguous, "reference to extrinsic evidence provides guidance to the parties' intent."  <u>Id.</u> (citation omitted).

Extrinsic evidence may include evidence of custom and usage.  <u>Excess Ins. Co. v. Factory Mut. Ins. Co.</u>, 3 N.Y.3d 577, 590–591, 789 N.Y.S.2d 461, 822 N.E.2d 768, 777 (2004) ("Our precedent establishes that where there is ambiguity in a reinsurance certificate, the surrounding circumstances, including industry custom and practice, should be taken into consideration.") (Read, J., dissenting) <u>cited with approval in</u> <u>Stolt-Nielsen S.A. v. AnimalFeeds International Corp.</u>, 130 S.Ct. 1758, 1769 n.6 (2010).  Moreover, "when resort to extrinsic evidence is necessary to shed light on the parties' intent summary judgment ordinarily is not an appropriate remedy, and must be denied unless, viewing the evidence in a light most favorable to the nonmovant and resolving all doubts in its favor, no reasonable trier of fact could find against the movant."  <u>Christiania</u>, 979 F.2d at 274 (internal citations omitted).

### 3.    Analysis

As noted, the pertinent part of Article XVI of both the 2000 and 2001 retrocessional agreements reads as follows:

**ARTICLE XVI – COMMUTATION**

A.      Seven years after the expiry of this Agreement, the Company shall advise the Reinsurer of all claims for said annual period, [sic] not finally settled which are likely to result in a claim under this Agreement.  <u>No liability shall attach hereunder for any claim or claims not reported to the Reinsurer within this seven year period</u>.

2001 Agreement at 5 (emphasis added).  Following subsection A, the remainder of Article XVI sets forth the terms of the commutation process, stating, for example, that either party may request commutation "seven years from the date of occurrence of the claim ...."  <u>Id.</u> at subsection B.  The Article also directs that disputes related to the value of the claims to be commuted be settled by independent third parties in the event Munich and ANICO cannot agree on the value.  <u>Id.</u> at subsection D.

ANICO argues that the "no liability shall attach" language operates as a condition precedent that relieves it from its payment obligations under the retrocessional agreements. According to New York law, "[a] condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." <u>Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.</u>, 86 N.Y.2d 685, 636 N.Y.S.2d 734, 660 N.E.2d 415, 418 (1995) (internal quotation marks omitted). <u>See also</u> <u>MHR Capital Partners LP v. Presstek, Inc.</u>, 12 N.Y.3d 640, 884 N.Y.S.2d 211, 912 N.E.2d 43, 47 (2009) (quoting same).   Failure to fulfill such a condition "excuses performance by the other party whose performance is so conditioned." <u>Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.</u>, 61 N.Y.2d 106, 113, 460 N.E.2d 1077, 1081 (1984).  New York courts recognize certain terms as indicating the presence of a condition precedent: "if", "unless", and "until" are some of the terms that courts interpret as creating a condition.  <u>MHR</u>, 912

31

N.E.2d at 47.  A condition precedent must be distinguished from a mere promise that may specify the timing during which performance is expected but does not operate to relieve the other party of its obligations under the agreement in the event of non-compliance.  <u>See</u> <u>Edelman Arts, Inc. v. Art Intern. (UK) Ltd.</u>, 841 F.Supp.2d 810, 824 (S.D.N.Y. 2012) (applying New York law and distinguishing between a mere timing provision and a condition precedent).

In determining whether a condition precedent exists, courts look for clear and unambiguous language that unmistakably creates a condition to performance.  <u>See</u> <u>id.</u> "Whether contractual language is deemed to be language of condition or language of promise is, as is the case with most matters of interpretation, generally dependent upon the intention of the parties .... [T]he determination whether a contract term is a promise or a condition is a problem of interpretation, so that each case turns on its own facts." <u>Edelman</u>, 841 F.Supp.2d at 824 (quoting  13 Williston on Contracts § 38:13).  <u>See</u> <u>also</u> <u>Greenfield v. Philles</u> <u>Records, Inc.</u>, 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (2002) ("[It is a] fundamental ... precept of contract interpretation ... that agreements are construed in accord with the parties' intent.").  Where the contract language is ambiguous, courts hesitate to interpret the language as a condition precedent.  <u>Oppenheimer</u>, 660 N.E.2d at 418.  <u>See</u> <u>also</u> <u>Ashkenazi v. Kent South Assocs., LLC</u>, 51 A.D.3d 611, 857 N.Y.S.2d 693, 694 (2008) (stating that if contract "language is in any way ambiguous, the law does not favor a construction which creates a condition precedent.").  However, in such an instance, it is appropriate for the court to consider extrinsic evidence to resolve the ambiguity.  <u>Edelman</u>, 841 F.Supp.2d at 826 (discussing New York case law).

Before turning to the language of Article XVI, I first provide context for my interpretation by briefly outlining how the Munich-ANICO agreements are structured as a whole.  As noted, through the agreements, ANICO agrees to indemnify Munich for the original ceding insurer's—Everest's—workers' compensation claims filed within a given year.  See 2001 Agreement at 1.  ANICO, of course, can only indemnify those claims of which it is aware, and hence it is Munich's responsibility to notify ANICO once it receives claim information from Everest.  As explained in my September 28, 2012 Opinion, Article X of the agreements directs Munich to notify ANICO "promptly of all claims coming under this Agreement on being advised by the Original Ceding Company ...."  See 2001 Agreement at 4.  Munich must then furnish ANICO with cost estimates relating to the claims.  Id., Article X.A.  ANICO, in turn, "agrees to pay [Munich] on demand . . . [for Munich's] losses ...."  Id., Article X.C.

Against this backdrop, Article XVI provides an outer limit for the reporting of claims by stating that "no liability shall attach" to any claims not reported within seven years.  These sorts of provisions are referred to in the reinsurance industry as "sunset provisions."  See Appleman on Insurance 2d § 106.8 (describing sunset clauses as "restrict[ing] the time for making claim under . . . reinsurance coverage.")  While they are generally rare, they are more typically found in workers compensation reinsurance policies.  See Pennsylvania Bar Institute (PBI), Reinsurance Principles & Practice:  From the Formation of the Agreement to the Courtroom at 21 (2012).  That reinsurers and retrocessionnaires would find it useful to place a time limit on their exposure is not surprising—occurrence based policies, i.e., claims that are based upon the happening of an event during the policy period, can produce long

33

tails that obligate insurers to pay claims ten to fifteen years after the expiration of the policy.[17]  Their liability is linked to the date of occurrence of the claim as opposed to the date of reporting.

On its face, the sunset provision here is straightforward: it prevents Munich from reporting claims in perpetuam, by excluding from coverage those claims not noticed within seven years following the expiration of each retrocessional agreement.  Article XVI.A also serves the purpose of providing a foundation for commutation.  As noted above, the remainder of Article XVI delineates the process by which either party may seek to commute the agreement.  The likely impetus behind Article XVI is to ensure that both parties have an accurate understanding of ANICO's exposure at the seven-year mark.  Such an accurate appreciation of ANICO's economic liability would undoubtedly inform each party's position on commutation.  Based upon the clear and unmistakable language of Article XVI, I conclude that it creates a condition precedent to payment.[18]

While Article XVI is clear on its face, a point that Munich conceded at oral argument, Munich argues that another provision found in the agreements—Article XIII—is a defense to its failure to comply with Article XVI.  Article XIII reads:

_____

[17]

> For good reasons, ceding companies often want to 'buy out' old policies—because of concern about unknown losses, and/or because of the virtual uncertainty that the policies will in due course pay (for example) asbestos losses.

Allen, Thomas A., Current Hot Topics in Reinsurance Disputes in PBI, Intro to Reinsurance Law (2004).

[18]    Accordingly, ANICO need not prove that it was prejudiced by any claims not submitted within the sunset period in order to deny payment for those claims.

> Any error, omission or oversight in reporting losses or premiums by [Munich] shall in no way invalidate the reinsurance hereunder, provided that such error, omission or oversight shall be corrected promptly after discovery thereof.

2001 Agreement at 5. Referring to it as an "errors and omissions" clause, see Munich Supp. Br. at 1-2, Munich argues that this provision serves as a type of generally-applicable escape valve that allows it to correct any failure to report a claim within the seven-year period.

ANICO attacks Munich's reading of Article XIII on two fronts. First, citing to the deposition testimony of its expert, Linda Barber, ANICO argues that Article XIII was intended to correct "mere inadvertence," and to catch the one claim that "fell through the cracks." Barber Dep. 73-74.[19] Second, ANICO argues that, even if Article XIII could be read to excuse wholesale non-compliance with Article XVI, the time-honored rule that a specific provision overrides a general one dictates that the specific provision of Article XVI trump the more general language of Article XIII. See Muzak Corp v. Hotel Taft Corp., 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 133 N.E.2d 688 (1956) ("[I]f there [is] an inconsistency between a specific provision and a general provision of a contract . . . the specific provision controls.").

Considering both parties' arguments, and the plain language of Article XVI and Article XIII, I find that Article XIII is not as broad as Munich urges. For one, by using the phrase "error, omission or oversight," Article XIII invokes the notion of inadvertent, rather than intentional, errors. Here, the reason underlying Munich's reporting of claims outside of the seven-year window is that its cedent, Everest, did not cede claims to Munich in a timely

---

[19]     Barber references her expert report in her deposition testimony. The Court notes that, while ANICO has pointed to Barber's deposition testimony and provided copies thereof to the Court, no copy of Barber's expert report has been provided. That said, it appears that the substance of her report is fully addressed in her lengthy deposition testimony.

fashion, <u>see</u> Freda Dep. 195:6-11; 196:15-199:14; 199:1-10, and because Munich erroneously did not report claims until they reached the $500,000 retention threshold. <u>See</u> Giacobbe Dep. 93:18-24; 105:7-10; 147-48; 176:23-180:8. <u>See</u> <u>also</u> Freda Dep. 96:11-99:24; 107:8-110:17; 282:6-284:3; 298:16-305:4.[20]  Indeed, with regard to this latter reason, the record reflects that Giacobbe was a recipient of at least two emails that specifically suggested that his practice of not reporting claims until they reached the $500,000 threshold was inconsistent with the terms of the Munich-ANICO agreements, and that Munich should file its notices more promptly in order to protect itself from application of the sunset clause. Certainly, no reasonable factfinder could conclude that it was "inadvertent" error on Giacobbe's part to continue to report claims late following those emails.  In short, based on the record evidence, Munich has not created a genuine issue of material fact as to whether its late reporting was due to an "inadvertent" error.[21]

---

[20]    Munich conceded at oral argument that these reasons caused Munich to report the 2000 claims outside of the sunset period, and to report the 2001 claims near the sunset deadline.

[21]    Munich's expert, Susan Mack, states in her expert report that it was within the standard of care, in 2000 and 2001, for claim examiners not to review the underlying contract governing their notice obligations because, as a matter of pragmatics, "reinsurance claims handlers must prioritize hundreds of claims files," and hence "streamlining review can be important to assure that important tasks . . . can be handled efficiently." Mack Rep. at 10.

Mack's statement does not alter my analysis because the decision to streamline claim handling in this fashion reflects an intentional choice, not an inadvertent error, and cannot be used as an excuse to disregard contractual obligations.  Indeed, nearly 100 years ago, in <u>Atlantic Fruit Co. v. Hamilton Fire Ins. Co.</u>, 251 N.Y. 98, 104 (Ct. App. N.Y. 1929), the New York Court of Appeals held a company accountable for its employees' intentional decision not to align their periodic reporting practices to the governing contract language.  Reasoning that "a willful and persistent failure to make accurate . . . reports" was not an inadvertent or occasional error, <u>id.</u> at 103, the Court further concluded:

Moreover, were I to hold that this sort of conduct by Munich constituted an error encompassed by the Article XIII errors and omissions clause, that finding would nullify the intent of Article XVI.  As noted, Article XVI bars claims not noticed within the sunset period. The purpose underlying this article is, as Munich conceded at oral argument, to cut-off claims wholesale.  Under Munich's proposed interpretation, which posits that non-inadvertent errors fall within the protective ambit of Article XIII, the preclusive effect of Article XVI would be eviscerated.[22]

Even if I were to hold that Article XIII is ambiguous, I would reach the same result because my interpretation that Article XIII applies to inadvertent errors is consistent with industry usage of errors and omissions clauses.  Courts generally consider the usage and customs of an industry in interpreting agreements, and that is especially true for the reinsurance industry with its insular terminology and practices.  See Excess, supra at 590-91. See generally Mellon Bank v. Aetna, 619 F.2d 1001, 1013 (3d Cir. 1980) ("Trade terms,

> By its own showing, [the company] calculated averages in a manner inconsistent with the contract ....  The breach is not excused by saying that it was the act of subordinates in Cuba.  If the plaintiff left to subordinates the supervision of its records and the preparation of data for its reports, it must abide by what they did.

Id. at 106.  So too, here, Munich should not be able to skirt any failure to comply with the agreements' notice provision by suggesting that it is industry practice for its employees not to review the governing contract language.

[22]    Additionally, at oral argument, Munich argued that Article XIII must be read in conjunction with the error and omission language found in Article X of the agreements. Article X provides that "[a]n omission on the part of the Company to advise the Reinsurer of any loss shall not be held to prejudice the Company's rights hereunder."  2001 Agreement, Article X.A.  I do not find Munich's reference to Article X helpful because the quoted language is found within Article X and, therefore, its application is limited to that article.  Article XIII, in contrast, is a stand-alone provision applicable to the entire agreement.

legal terms of art, numbers, common words of accepted usage and terms of a similar nature should be interpreted in accord with their specialized or accepted usage ....")  Historically, errors and omissions clauses were intended to protect ceding insurers from denial of coverage in the event of an inadvertent omission or error in reporting claims via a bordereau report.  See Strain, Reinsurance Contract Wording at 89 (3d ed. 1998).  And, while at the time the 2000 and 2001 agreements were drafted, the terminology had become more sophisticated, and an errors and omissions clause might expressly state that it applied to "inadvertent" errors, nonetheless, throughout the years, such clauses were always intended to apply only to inadvertent errors, whether that limiting term was expressly stated or not.[23]  See id.  See, e.g., Atlantic Fruit Co. v. Hamilton Fire Ins. Co., 251 N.Y. 98, 104 (Ct. App. N.Y. 1929) (interpreting an error or omissions clause to be limited to only inadvertent errors); see also id. at 104-05 (describing early history of errors and omissions clauses in United States' and British courts).

        In sum, because Article XVI operates as a condition precedent, it makes clear that ANICO is obligated to indemnify only those claims that were noticed within seven years following the expiration of the relevant retrocessional agreement.  This means that, for the

---

[23]        In this connection, Munich points to sample contract language developed by the Brokers & Reinsurance Markets Association (BRMA).  While BRMA is a well-respected industry association (it has been granted leave to submit amicus briefs on reinsurance matters to the Supreme Court), the Court does not find the sample contract language cited by Munich helpful in this case.  The draft language appears to have been drafted in 2005, which is several years later than the clauses in the 2000 and 2001 agreements were drafted. See Munich Feb. 22, 2012 Supp. Br., Exh. A.  Reinsurance clauses have undergone changes in the past ten years, thus, reliance on post-2001 clauses is inappropriate.  See PBI, supra at 11 (noting that a contract certainty drafting movement began in the New York reinsurance industry in 2004).

2000 agreement that expired on December 31, 2000, Munich was obligated to notify ANICO by December 31, 2007 of all workers' compensation claims that occurred during the 2000 calendar year.  Munich concedes that the claims under the 2000 agreement were not reported by this sunset deadline, and therefore, summary judgment is granted to ANICO with respect to these claims.  With respect to the 2001 agreement, Munich was obligated to notify ANICO of all 2001 claims by the sunset deadline of December 31, 2008.  Munich contends that it provided notice of those claims via the August 8, 2008 spreadsheet. Accordingly, I now turn to whether Munich's claims under the 2001 agreement were sufficiently noticed by that spreadsheet.

### 2.   *Bordereau Reporting*

This analysis applies only to those claims under the 2001 retrocessional agreement found within the spreadsheet that Am Re Brokers employee Timothy Schmidt attached to an August 8, 2008 email to Cathy Washburn at IOA Re:

| | |
|---|---|
| From: | Schmidt Timothy - Princeton-MRAm |
| Sent: | Friday, August 08, 2008 3:38 PM |
| To: | Cathy Washburn |
| Cc: | Frawley James - Princeton-MRAm; Pawlowski Edward - Princeton-MRAm |
| Subject: | Everest National |
| Attachments: | EVEREST NATIONAL - WC CLAIMS - Assumed.XLS |

Cathy, as we are working out the contract issues I thought it would be a good ideas to send you a listing of Munich Re America's listing of assumed claims from Everest National.

Regards,

Tim

LeBlanc Cert., Exh. 15.  Washburn responded that "[t]his listing is not considered adequate notice of loss.  Individual notices must be provided for each claimant and should include claimant name, complete claim details, and financial data broken down by medical, indemnity,

and expense." Id.  And, Schmidt replied: "Cathy, we agree.  We are working on getting you

the necessary back up documentation." Id.

Munich argues that, although the April 8, 2008 spreadsheet did not specifically

identify those claims by Everest that were likely to result in a claim under the retrocessional

agreements, the spreadsheet was a form of bordereau notice that is an accepted type of

notice in the reinsurance industry.  For the reporting of losses in a reinsurance relationship,

a bordereau report has been defined as follows:

> Furnished periodically by the reinsured, a detailed report of
> reinsurance premiums or reinsurance losses. . . . A loss
> bordereau contains a detailed list of claims and claims expenses
> outstanding and paid by the reinsured during the reporting
> period, reflecting the amount of reinsurance indemnity
> applicable thereto. Bordereau reporting is primarily applicable
> to pro rata reinsurance arrangements and to a large extent has
> been supplanted by summary reporting.

Strain, supra at 747.  According to another source, "[g]enerally, the loss bordereau will

contain risk details such as the insured's name, claimant's name, policy number, claim

number, effective date, date of loss, loss reserve, expense reserve, and any paid losses or

expenses."   Larry P. Schiffer, Patton Boggs, LLP, Reinsurance Terminology Explained:

Bordereau,  http://www.irmi.com/expert/articles/2011/schiffer08-insurance-reinsurance-

law.aspx (August 2011).  This report is often "provided in electronic format and often in a

standardized design.  On a quota share treaty, the loss bordereau is often the only way the

reinsurer will obtain information about the losses being ceded to the treaty unless there are

special reporting requirements for certain risks. . . . [T]he loss bordereau will be the tool

against which the reinsurer will make selections when doing a claims audit." Id.

In  many  instances,  the  reinsurance  contract  will  specify  the  type  of  reporting

40

contemplated—bordereau or otherwise. For example, a contract could specify that a bordereau report is required:

> The Company shall furnish the Reinsurer with the following:
>
> 1.  Bordereau within 30 days after the last day of each month, payable within 60 days after the last day of each month. The bordereau is to include the following items:
>
> A. Name of Insured
> B. Policy Number
> C. Effective/Expiration Dates
> D. Type of Transaction (New, Renewal, Endorsement, or Cancellation)
> E. Policy Limit
> F. Premium
> G. Ceding Commission
> H. Net Premium

Id. Many contracts also provide for shorter, summary reporting of claims. Such a provision might read: "[t]he Company shall render a monthly account within _x_ days after the end of the period. This account shall summarize . . . losses paid, loss adjustment expenses paid, and salvage recovered. The account shall also reflect the balance due by either party." Id. "Where the reinsurance contract does not prescribe detailed bordereau reporting, the reinsurer must audit periodically to test the business being ceded and to ensure compliance with the terms of the reinsurance contract." Id.

Here, the reinsurance agreements do not specify what sort of reporting is required; the Article X notice provision does not address reporting at all, other than to state that notice must be made promptly and, in some cases, immediately, and Article XVI simply provides that Munich must "advise" ANICO of all Everest claims likely to result in a retrocessional claim. ANICO contends that such lack of guidance in the agreements is no impediment to

41

summary judgment in its favor because New York case law rejects the notion that a report, containing hundreds of claims, which fails to designate which claims will be eventually tendered to the retrocessionaire, constitutes sufficient notice. ANICO relies upon Steadfast Ins. Co. v Sentinel Real Estate Corp., 283 A.D.2d 44 (New York Sup. Ct. App. Div. 2001), for this proposition.

In Steadfast, the New York appellate court addressed whether a commercial policy holder's submission of a "loss run" report constituted the requisite notice to its commercial general liability insurer.  This report was a list of all open claims against the insurer.  Id. at 51.  After first determining that the notice provision in the insurance policy in that case, like here, did not specify what sort of notice was required, the court examined extrinsic evidence—including correspondence contemporaneous to the execution of the policy—to conclude that the policy's notice provision was not intended to encompass loss run reports. Id. at 52.[24]  Accordingly, the court concluded that the loss run report did not satisfy the policy's notice provision.  In reaching this conclusion, the court further stated, in dicta, that "[e]ven if it is assumed that the loss run report contained sufficient information about the claim to comply with the Policy's notice condition, the fact that the report lists hundreds of claims, most of which were not going to reach the SIR limit and, therefore, would never

_____

[24]     In this connection, the Court notes that ANICO's contrasting citation to the excess insurance case of  Lexington Ins. Co. v. United Hlth Grp., Civ. Action No. 09 CV 10504-NG, 2011 WL 573609 (D. Mass. Feb 15, 2011), is not helpful.  That case held that a loss report constituted sufficient notice under a contract that specifically allowed for reporting via loss report, unlike the agreements here which fail to designate the type of notice contemplated.  See Lexington Ins. Co. v. United Health Group Inc., Civ. Action No. 09 CV 10504-NG, 2011 WL 1467939, *2-3 (D. Mass. Apr 18, 2011) (amended opinion).  While ANICO suggests that Lexington stands for the proposition that loss reports are acceptable only when specifically referenced in the contract, Lexington does not make such a pronouncement, and thus, I do not find it instructive or persuasive here.

become the insurer's responsibility, makes the report entirely unsuitable to be deemed to satisfy the notice condition." Id.

Implicit in the Steadfast court's decision is the conclusion that the notice provision was ambiguous because it did not specify what sort of notice was required. So too, here, I conclude that Article XVI is ambiguous with respect to both the form of notice required and the precise contents that must be included in the notice. Having concluded that Article XVI is ambiguous, I, like the Steadfast court, turn to extrinsic evidence here to determine whether the email spreadsheet submitted by Munich fits within the sort of reporting that was contemplated by the parties at the time of contracting.

ANICO points to the email correspondence following the submission of the August 8, 2008 spreadsheet as probative of the parties' intent. In its view, that Cathy Washburn informed Timothy Schmidt on April 11, 2008 that the spreadsheet was not considered adequate notice of loss, and that Schmidt responded "we agree," conclusively demonstrates that the parties intended that Article XVI notice would not encompass spreadsheet reporting that did not delineate which claims from the original ceding insurer were likely to result in a claim under the retrocessional agreements.

One could argue that this evidence is not as conclusive as ANICO suggests. Timothy Schmidt's full response was "Cathy, we agree. We are working on getting you the necessary back up documentation." While this statement could be interpreted by a factfinder to mean that Schmidt understood that the August 8th spreadsheet was insufficient, it could also be read to suggest that Schmidt believed that the spreadsheet was sufficient notice under Article XVI but that back up documentation was required before ANICO would pay on the

43

claim.  As noted above, loss bordereau reports are often used as tools by a reinsurer when making selections for a claims audit.[25]  Hence it is plausible that Schmidt viewed Cathy's objection as an audit request.  Indeed, in his deposition, Schmidt testified that individual claim details are not contemplated by the Article XVI notice provision, and that it was his understanding that ANICO could always request a review of claim records per Article XII of the Munich-ANICO agreement.  See Schmidt Dep. 162:2-9.

However, Schmidt also acknowledges that, prior to the August 8, 2008 email, Am Re Brokers generally provided more claim detail in its notices.  Id. at 166:6-11.  In this connection, Munich argues that the claim reporting Schmidt was referencing related solely to general billing cycle reporting under the agreements, i.e., Article X reporting.  According to Munich, while it is true that Munich typically reported on an individual claim basis, none of the prior instances of reporting involved reporting under the sunset clause.

In support of this argument, Munich points to what it considers differing language in the reporting requirements of Articles X and XVI.  Article X provides that Munich "agrees to advise the [ANICO] promptly of all claims coming under this Agreement on being advised by the Original Ceding Company, and to furnish the Reinsurer with such particulars and estimates regarding same as are in the possession of the Company. "  Conversely, Article XVI provides that  "[s]even years after the expiry of this Agreement, the Company shall advise the Reinsurer of all claims for said annual period, [sic] not finally settled which are likely to result in a claim under this Agreement.  No liability shall attach hereunder for any claim or claims not reported to the Reinsurer within this seven year period."  2001 Agreement,

---

[25]      In referring to bordereau reports here, I do not hold that Munich's spreadsheet constituted a bordereau report.

Article XVI (emphasis added).

In Munich's view, that Article XVI uses the term "reported" makes clear that the parties contemplated a more abbreviated form of notice for sunset purposes. Moreover, Munich argues, the purposes underlying Articles X and XVI differ—while individual claim reporting is necessary to provide ANICO with sufficient data to justify payment under Article X, such detailed reporting is not necessary, under Article XVI, to alert ANICO that additional claims may become payable outside of the sunset period.

Comparing Articles X and XVI line by line, there are both similarities and differences between the two provisions. The first line of each provision directs Munich to "advise" ANICO of claims. Compare Article X (stating that "[T]he Company agrees to advise [ANICO] promptly of all claims coming under this Agreement on being advised by the Original Ceding Company ....") with Article XVI ("Seven years after the expiry of this Agreement, the Company shall advise the Reinsurer of all claims for said annual period, [sic] not finally settled which are likely to result in a claim under this Agreement."). However, as noted, the second and third lines of Article X differ from Article XVI in that Article X directs Munich to "furnish the Reinsurer such particulars and estimates regarding same as are in possession of the Company." No such language is found in Article XVI. That Article X requires Munich to submit "particulars and estimates," whereas Article XVI does not, lends support to Munich's argument that the notice contemplated under the two articles is not one and the same.

In addition, Munich points to the expert report and testimony of its expert, Susan Mack, in support of its argument that the August 8, 2008 spreadsheet constitutes the type of

bordereau reporting commonly used in the industry.[26]  Mack states in her expert report that it is common, in the reinsurance field, for ceding insurers to utilize bordereau-style reporting for sunset deadlines.  She opines:

> Because claims subject to reporting pursuant to a Commutation Clause may be in the very early stages of development, bordereau reporting is appropriate.  Particularly with workers' compensation carve-out claims (similar to other "long-tail" claims), where a relatively short period of coverage for the original claim is followed by a lengthy period during which medical expenses and disability costs develop and aggregate, it is nearly impossible to [predict] the precise actual value of the individual workers' compensation carve-out claim once fully developed.  Some claims may develop and some may not.  Further, it may well be the case that little narrative back-up yet exists with respect to the specifics of . . . early stage claims.

Id. at 11.

In this connection, Mack opines that the notice requirements of Articles X and XVI differ.  In her view, bordereau-style reporting is acceptable for Article XVI, though not for Article X:

> You have to view Article X and Article XVI differently for purposes of the sunset clause.  An excess of loss treaty for an individual claim [requires] a certain kind of claim reporting, but Article XVI stands alone. . . . [U]nder Article XVI, for purposes of giving initial notification of loss prior to the sunset date of all claims . . . [bordereau reporting] is sufficient.

See Mack Dep. 271:5-12.  Thus, while she concedes that the industry standard for the reporting contemplated by Article X is individual claim notices, she disputes that this

---

[26]    Mack is a seasoned attorney, with an extensive background and approximately 25 years of experience in reinsurance law.  ANICO has not challenged her qualification as an expert.

industry standard applies with equal force to sunset clauses.  Id. at 272:4-273:13.

With respect to ANICO's argument that the August 8, 2008 spreadsheet is over-inclusive and fails to designate which claims are likely to breach ANICO's layer, Mack concludes that "it is indeed the contemporaneous standard in the insurance and reinsurance industries to provide reporting of *all* possible claims—new or well-developed—that could possibly penetrate the reinsurance coverage of an agreement via the summary format of bordereau."[27]   Mack Report at 11-12 (emphasis in original).  According to Mack, ceding companies typically prepare "a bordereau of all claims that would conceivably come within the sunset clause, give it to the reinsurer or retrocessionnaire, to cover [them]selves with respect to the claims, in some instances even before [they] had individual claim data, and what [the companies] would then do, since [they had gotten] the bordereau in before the date of the sunset bar, is [to] follow up with more particularized claim notifications with respect to each claim."  Mack Dep. 275:15 - 276:3; id. at 276:7-9 ("[T]hat's how everybody I knew did it within the industry at this time.")

ANICO's expert, Barber, takes issue with Mack's reasoning on several fronts.  First, Barber disagrees that bordereau reporting is appropriate for sunset purposes because certain claims may still be in the very early stages of claim development.  In her deposition, Barber testifies that with workers' compensation claims, the reinsurer (in this case, Munich) should have notice of all claims within seven years of expiration of the parties' agreement.  Barber Dep. 224:6-225:9.  In her view, "there's a belief by underwriters that at

---

[27]     It is clear from the context of this statement in Mack's report that, by using the term "contemporaneous," she is referring to the dates of the 2000 and 2001 Munich-ANICO agreements.

that point in time [seven years], [the claim] would be mature enough to find a basis to commute .... The second or third year I'd call very early, but seven years, no." Id. at 225:1-9. This aspect of Barber's testimony directly contradicts Mack's expert opinion that workers' compensation carve-out claims are often followed by a lengthy period during which medical expenses and disability costs develop and aggregate, and that it is not reasonable to expect ceding reinsurers, like Munich, to possess the claim data needed to provide to ANICO what is typically included in an individual claim report under Article X.

Second, Barber challenges Mack's opinion that individual claim reporting is not mandated by Article XVI. To be clear, Barber, agrees with Mack that it is industry practice for a ceding reinsurer to utilize bordereau-style reporting, although such reporting is not used as often in excess of loss contracts like the one here. Id. at 182:1-184:16. [28] While she generally disagrees with Mack on this point, Barber, however, does not expressly address how the language of the agreements makes clear that the form of notice under Article XVI may differ from that under Article X. Rather, she seems to apply Article X to all claims.

Specifically, Barber states in her deposition that the August 8, 2008 email did not satisfy Article X's "particulars and estimates" requirement. Barber Dep. 159:16-23; 163:10-12; 171:6-11; 173:8-15.   Yet, she does not explain why the Article X requirement should apply to claims first noticed under Article XVI and not yet subject to reporting under Article X. This aspect of her deposition testimony appears to contradict earlier testimony of hers that Article XVI encompasses those claims not yet reportable under Article X. See id. at

---

[28]     Barber further opines that the August 8, 2008 email does not satisfy Article XVI's dictates because the spreadsheet does not designate which claims are likely to result in a claim under the Munich-ANICO agreements. See id. at 184:8-16. I address this aspect of Barber's expert opinion infra.

146:16-147:14 (agreeing that "to the extent that other reporting requirements haven't been triggered by other clauses," Article XVI "contemplates that claims will be reported up to seven years after the expiration of the contract").

Under Article X, Munich is not obligated to report claims until it receives notice from Everest, the underlying ceding insurer. The Article X.A. notice requirement is triggered once Everest reports its claims to Munich and Munich concludes that such claims are covered by the Munich-ANICO agreements. The Article X.B. immediate notice requirement is triggered when Everest reports to Munich any accident involving a brain injury, certain types of burns, or a spinal cord injury. In addition, under Article X.B., Munich must report any accident for which it has reserved at 50% of ANICO's attachment point. The Article XVI notice requirement, in contrast, could apply where none of these occurrences have taken place. Because Article XVI, by its terms, serves as an absolute bar to all claims that "are <u>likely</u> to result in a claim under this Agreement," Article XVI places the onus on Munich to report any possible claims of which Munich was aware or should have been made aware. That being the case, it is not clear from Barber's deposition testimony why she believes the Article X "particulars and estimates" requirement would apply to claims not yet subject to Article X but subject only to the Article XVI sunset bar.

Furthermore, Barber relies on the Article X "particulars and estimates" requirement in support of her conclusion that the spreadsheet did not contain sufficient detail. In her view, the following data should have been listed on the spreadsheet: "the name of the claimant, the date of the accident, the nature of the injury, and description of the claim, potential subrogation, the amounts that have been paid, the amount of the reserve, how that

reserve was arrived at ....". Id. at 161:14-22. To Barber, this data "is the particulars and estimates and information that goes to providing a complete picture of the claim." Id. at 161:22-162:1. With Article X guiding her inquiry, she concludes that the August 8, 2008 spreadsheet, which she refers to as "that one long report," was insufficient. Id. at 162:12-163:12. See also id. at 228:18-229:8 (when asked "what is required to be reported . . . according to Article 16," Barber responds "you need to provide, if you haven't already, the particulars and estimates regarding that claim, as well as the critical data points which would be necessary for the reinsurer to understand the key elements of the claim for valuation purposes."). I do not find that this aspect of Barber's deposition testimony sufficiently contradicts Mack's testimony that industry custom allows for a different, more abbreviated form of notice for sunset provision purposes than for billing purposes under a provision like Article X because Barber bases her conclusion on the application of Article X's particulars and estimates language to sunset reporting.

That said, Barber further opines that the August 8, 2008 spreadsheet inappropriately fails to specify which claims are likely to result in a claim under the Munich-ANICO agreements. See Barber Dep. 184:8-16. I find that this opinion testimony provides some support for ANICO's argument that the spreadsheet does not meet Article XVI's dictates. As noted, Barber acknowledges in her deposition that it is industry practice for a ceding reinsurer to utilize bordereau-style reporting, although such reporting is not used as often in excess of loss contracts like the one here. Id. at 182:1-184:16; 223:19-224:5. Her opinion is consistent with the rationale expressed by the Steadfast Court that a bordereau or summary report should designate which claims are likely to result in a claim to the retrocedent.

In sum, and upon review of each parties' experts' deposition testimony, Mack's expert report, the Schmidt-Washburn e-mail chain regarding the August 8, 2008 spreadsheet, and the rationale of the <u>Steadfast</u> court, I conclude that there exists a genuine issue of material fact as to whether Munich's prior practice of individual claim reporting under Article X should be determinative of what type of reporting the parties intended with respect to Article XVI.  This key factual dispute is part of a larger genuine issue of material fact as to the type of notice contemplated by Article XVI.  Each party has presented evidence which, if believed, could support a finding by the factfinder that the spreadsheet was either sufficient or insufficient notice under that Article.

In reaching this conclusion, I note that New York law makes clear that ambiguity in contract language "must be resolved by determining the parties' intent <u>at the time of contracting</u>, either from within the four corners of the document, if possible, or, as a last resort, from whatever extrinsic evidence is available." <u>Cortese v. Redmond</u>, 199 A.D.2d 785, 786 (N.Y. 1993) (emphasis added).  <u>See</u> <u>also</u> <u>Fecteau v. Fecteau</u>, 97 A.D.3d 999, 1000 (New York App. Div. 2012).  Neither party has pointed to this sort of extrinsic evidence in its papers or at oral argument.[29]  Lacking extrinsic evidence of intent at the time contracting, the parties' course of dealing necessarily becomes the Court's central focus and, since there is a genuine issue of material fact as to that course of dealing, summary judgment is inappropriate at this juncture.  Resolution of whether the August 8, 2008 spreadsheet

---

[29]     For example, Munich points to Victor Marques' testimony that bordereau reporting is "the way everyone does it."  Marques Dep. 135:16-137:17.  However, his testimony makes clear that, while he placed the retrocessional agreement with ANICO, he did not participate in negotiating the terms of the agreement.  <u>See</u> <u>id.</u> at 25:1-5; 26-27; 43:14; 48:9-49:24; 51:4-53:12.

constituted sufficient notice under Article XVI of the 2001 agreement must be left for trial.

## IV.   CONCLUSION

For the foregoing reasons, the Court reconsiders its September 28, 2012 decision. The Court hereby amends its grant of summary judgment to Munich on the untimely claim submission defense to deny that aspect of Munich's motion regarding the 2000 and 2001 claims submitted after the respective sunset deadlines of December 31, 2007 and December 31, 2008.  With regard to the 2000 claims, the Court now grants summary judgment to ANICO.  With regard to the 2001 claims, the Court denies summary judgment on both parties' motions, having found that there is a genuine issue of material fact as to whether the August 8, 2008 spreadsheet constituted sufficient notice within the sunset deadline for those claims.

Regarding the Court's grant of summary judgment to Munich on ANICO's prejudice defense, which applies to those claims not timely noticed pursuant to Article X of the agreements, the Court's prior grant of summary judgment stands for the reasons stated herein.

Dated:    March 28, 2013                                    /s/ Freda L. Wolfson
                                                            Freda L. Wolfson, U.S.D.J.

52