**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
_____
                                :
MUNICH REINSURANCE              :
AMERICA, INC.,                  :
                                :      Civ. No.: 09-6435 (FLW)
                   Plaintiff,   :
                                :
        v.                      :          OPINION
                                :
AMERICAN NATIONAL               :
INSURANCE COMPANY,              :
                                :
                   Defendant.   :
_____:
```

Amy S. Kline and Sean Tracy O'Neill, Saul Ewing LLP, Philadelphia, PA, for Plaintiff.

Joel Max Eads, Trenk DiPasquale Webster Della Fera & Sodono, P.C., Ardmore, PA, for Defendant.

**WOLFSON, United States District Judge**:

This case involves complex retrocessional agreements between Plaintiff Munich Reinsurance America Inc. ("Munich") and Defendant American National Insurance Company ("ANICO"). Munich filed a Complaint alleging breach of contract for ANICO's refusal to pay certain claims submitted for payment by Munich under the parties' agreements, and in response, ANICO filed a counterclaim for rescission of the agreements. Following motion practice, the Court conducted a nine-day bench trial with numerous experts and witnesses testifying as to each party's obligations under the agreements as well as their respective business practices.

In light of the evidence presented at trial, the Court concludes that ANICO is not entitled to rescission of the agreements. The Court further finds that Munich satisfied its

reporting obligations under the agreements in part, and thus ANICO breached its respective payment obligations for those claims that were properly ceded and reported. To wit, those claims to which Munich is entitled to payment include all claims that were properly ceded to ANICO via IOA Re before the expiration of the Sunset Provision deadlines, including claims that arise from underlying primary policies of workers' compensation written by either Everest or Everest Re, but they do not include claims arising from injuries sustained by a roofing contractor or subcontractor. Further, Munich is not entitled to payment on those claims that were only first noticed on a spreadsheet Munich provided to IOA Re in August 2008, as that document did not satisfy the reporting requirements of Article XVI of the parties' agreements.

## I.    OVERVIEW

### A.    Reinsurance

Before proceeding to the specifics of this case, the Court sets forth a brief overview of the reinsurance industry. As I noted in my previous opinion resolving the parties' summary judgment motions, this overview of an issue as complex as reinsurance must be taken with a grain of salt; I merely seek to provide a basic primer to help orient the reader.

In *Pacific Employers Ins. Co. v. Global Reins. Corp. of America*, 693 F.3d 417 (3d Cir. 2012), the Third Circuit described reinsurance as

> insurance for insurance companies. A reinsurer agrees to indemnify a reinsured for certain payments the latter makes under one or more of its issued policies. In return, the reinsurer receives a share of the underlying premiums. Ceding a portion of an insured risk prevents a single catastrophic loss from hurling the reinsured into insolvency. It also allows the reinsured to invest more capital or to insure more risks.

*Id.* at 421.  Reinsurance is comparable to "a contract of indemnity."  *Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 271 (2d Cir. 1992).

"The reinsurance of reinsurance is called a retrocession, and the reinsurers of reinsurers—that is, reinsurers who assume retrocession risk through retrocessional agreements—are called retrocessionaires."  *Century Indem. Co. v. Certain Underwriters at Lloyd's, London, subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646*, 584 F.3d 513, 519 (3d Cir. 2009).  Such retrocession agreements present considerably more complex legal and factual scenarios because "there is another layer of coverage created and another party thrown into the mix."  Plitt, *et al.*, 1A COUCH ON INSURANCE § 9:3.

There are two overarching categories of reinsurance and retrocession—treaty and facultative; the agreements here are the former.  Through treaty reinsurance,

> the reinsurer [or retrocessionaire] agrees to accept an entire block of business from the reinsured. Once a treaty is written, a reinsurer is bound to accept all of the policies under the block of business, including those as yet unwritten. Because a treaty reinsurer accepts an entire block of business, it does not assess the individual risks being reinsured; rather, it evaluates the overall risk pool.

*Pac. Employers*, 693 F.3d at 421.  As with primary insurance, reinsurance comes in several basic types, including proportion and "excess of loss" policies.  The instant agreements are excess of loss policies, which obligate the retrocessionaire to pay up to its "retention" amount, *i.e.*, the amount of "cover" the retrocessionaire agreed to provide the reinsurer, once the total claim amount has surpassed a set monetary limit or "layer" that the reinsurer must first pay.  *See Hartford Acc. and Indem. Co. v. Ace Am. Reins. Co.*, 284 Conn. 744, 750 n.5 (2007).  Excess of loss policies come in three forms: "per risk," "annual aggregate," or "per occurrence."  *See* Orpett, *et al.*, 3 LAW AND PRAC. OF

INS. COVERAGE LITIG. § 41:10 (2012).  These three methods differ in the manner in which risks "attach" to the reinsurance agreement.  Under a per occurrence policy, like those at issue here, the retrocessionaire's obligation is triggered by a particular incident, such as a personal injury.  *Id.*

## B.      The Parties and the Agreements

For the purposes of the present case, Munich[1] was the ceding reinsurer and ANICO was the retrocessionaire for two excess of loss retrocessional agreements of workers' compensation reinsurance, on a per-occurrence, or per-claim, basis, which cover the periods of November 1, 2000 through December 31, 2000 (referred to by the parties as the "2000 Year Agreement," and also as the "Stub Year Agreement," due to its short, two-month duration), and January 1, 2001 through December 31, 2001 (the "2001 Agreement") (collectively, the "Retrocession Agreements").  The terms of the two agreements are identical except for the following differences: (1) their duration; (2) the relevant provision of Article X (Claims) is reflected in Endorsement No. 1 in the Stub Year Agreement, while the identical corresponding provision for the 2001 Year is in the body of that agreement; and (3) under the Stub Year Agreement, ANICO only took a 75% share of the retrocession.  Pl.'s 1 at MRAM-01-0304 to -0305 (Stub Year Agreement); Pl.'s 2 at MRAM-01-0034, -0040 (2001 Agreement).[2]

As detailed more fully *infra*, the Retrocession Agreements provide that ANICO shall not be liable for any single loss until Munich's loss exceeds $500,000, that ANICO

---

[1]      At the time the agreements were executed, Munich was known as American Re-Insurance Company, sometimes referred to by the parties as "AmRe."

[2]      For consistency, I reference trial exhibits as "Pl.'s [exhibit number] at [page]," or "Def.'s [exhibit number] at [page]."   I reference trial testimony as "[Date] Tr. at [page(s)/page(s):line(s)]."  Lastly, I reference the parties' proposed findings of facts and conclusions of law as "Pl. FF&CL at [paragraph]" and "Def. FF&CL at [paragraph]."

is not liable for more than $500,000 per loss occurrence, and that for the 2001 Agreement ANICO is not liable beyond $20,000,000. Pl.'s 1-2 (Art. IV). A "loss occurrence" is each and every accident or occurrence, or series of accidents or occurrences, arising out of one event. Pl.'s 1-2 (Art. VII).

The story behind the Retrocession Agreements, however, is considerably more complex. Underlying the Retrocession Agreements is a reinsurance agreement Munich entered into with Everest National Insurance Company ("Everest") and Everest Reinsurance Company ("Everest Re"), whereby Munich agreed to reinsure Everest and Everest Re's workers' compensation insurance program for the period of January 1, 1998 through December 31, 2001 under an excess of loss reinsurance agreement entitled "Workers' Compensation Excess of Loss Reinsurance Agreement between Everest National Insurance Company, Everest Reinsurance Company and American Re-Insurance Company" (the "Everest Agreement") for the period November 1, 1997 to December 31, 2001. The Everest Agreement was governed by limits of $750,000 excess of $250,000. This means that under the Everest Agreement, Munich had no liability for any claim of less than $250,000—the layer from $0 to $250,000 was Everest's responsibility.

During the periods covered by the Everest Agreement, Munich purchased retrocessional "carve-out" coverage. Another entity, IOA Re, underwrote retrocession contracts for every year in which Munich purchased retrocessional cover for the Everest Agreement. Specifically, Munich obtained carve-out retrocessional coverage for its 1998 and 1999 treaty years through other retrocessionaires, including Continental Casualty Insurance Company ("Continental Casualty"). 6/20/13 Tr. at 93 (Dorosz). For the

periods January 1, 1998 to October 31, 1998, November 1, 1998 to October 31, 1999 and November 1, 1999 to October 31, 2000, IOA Re underwrote the retrocession on behalf of Continental Casualty.  Pl.'s 50 at AAHRU-00129 to -00189 (period Jan. 1, 1998 to Oct. 31, 1998), AAHRU-00103 to -00127 (period Nov. 1, 1998 to Oct. 31, 1999); Def.'s 248 at ANICO-IOA-5836 to -5870 (period Nov. 1, 1999 to Oct. 31, 2000).

In 2000, Munich Re and Everest agreed to extend the Everest Agreement for two months, from November 1, 2000 to December 31, 2000, to enable them to have more time to discuss the terms on which Munich would reinsure the Everest Program for 2001. Munich asked IOA Re whether IOA Re, on behalf of Continental Casualty, would agree to extend the retrocessional agreement for the same two-month period.  Def.'s 248 at ANICO-IOA-5790.  IOA Re determined that it was interested in continuing to participate in the retrocession; however, at that time IOA Re had lost its authority to write on behalf of Continental Casualty.  *Id.* at ANICO-IOA-5789.  Instead, IOA Re proposed, and Munich agreed, that ANICO replace Continental Casualty as the retrocessionaire on the program for the two-month extension and for the calendar year 2001—the Retrocession Agreements.[3]  6/25/13 Tr. at 112:17-113:13 (Hoekstra).

---

[3]       At that time, IOA Re and ANICO were parties to a Reinsurance Management Agreement (the "RMA").  Pursuant to the RMA, subject to the supervision of ANICO, IOA Re performed the following services, among others, on behalf of ANICO:  accepting applications, specifications and other requests for proposals, negotiating, underwriting, pricing, setting brokerage commissions thereon; binding, executing and delivering reinsurance contracts, including exhibits and endorsements thereto and renewals and cancellations thereof; billing, collecting and receiving premiums and other sums due with respect to all reinsurance contracts; receiving notice of any loss occurrence, which may cause a claim under reinsurance contracts, including settling, compromising, adjusting, managing and paying any loss and loss adjustment expense submitted against such contract; giving and receiving notice pursuant to the terms of the reinsurance contracts; and seeking and securing legal and other outside professional counsel when deemed appropriate.  6/20/13 Tr. at 65:12-66:25 (Dorosz); Def.'s 246.

To summarize, Munich purchased a carve-out for the Everest Agreement for the period November 1, 2000 and December 31, 2000, through ANICO and another retrocessionaire; ANICO accepted only a 75% share of the Stub Year Agreement with the other retrocessionaire accepting the other 25%. Munich also purchased retrocessional carve-out for the Everest Agreement for January 1, 2001 through December 31, 2001; ANICO accepted 100% of that risk.[4] The relevant portions of the Retrocession Agreements are set forth as follows.

Article I of the Retrocession Agreements, the "Business Covered" provision, provides:

---

Because of the nature of IOA Re and ANICO's relationship, IOA Re's actions with respect to the Retrocession Agreements are binding on ANICO, a fact that neither party disputes. For this reason, in determining ANICO's liability and defenses in this matter, I interchangeably refer to IOA Re and ANICO as needed.

[4]   More simply put, under the Everest Agreement, insurance payments on a covered claim would follow this schedule:

| Amount (per claim) | Paid By |
|---|---|
| $0.00 – $250,000 | Everest National |
| $250,001 – $1,000,000 | Munich |

Munich then purchased carve-out coverage as follows:

| Amount (per claim) | Paid By |
|---|---|
| $500,001 – $1,000,000 | ANICO pays 75% of this amount for claims arising under the Stub Year Agreement<br><br>ANICO pays 100% of this amount for claims arising under 2001 Agreement, subject to a maximum annual aggregate of $20,000,000 |

 A. [ANICO] hereby agrees to indemnify [Munich] for the amount of ultimate net loss[5] as herein provided and specified which may accrue to [Munich] as a result of loss or losses occurring during the term of this Agreement as a result of its participation in the following Reinsurance Agreement, covering insurance or reinsurance business in force at the inception of this Agreement and business written and/or renewed during the term of this Agreement:

WORKERS' COMPENSATION EXCESS OF LOSS
REINSURANCE AGREEMENT NO. 2726-0001

 B. The Reinsurance Agreement listed above (hereinafter referred to as the "Underlying Agreement") is between [Munich] and the following insurance company or group (hereinafter referred to as the "Original Ceding Company"):

EVEREST NATIONAL INSURANCE COMPANY
Phoenix, Arizona
(as identified in the Underlying Agreement)

Pl.'s 1-2 (Art. I).

 Article X(B) of the 2000 Retrocession Agreement and Article X(C) of the 2001

Retrocession Agreement Contracts state:

> [ANICO] agrees to pay [Munich Re] on demand, [ANICO]'s proportion of all losses and/or loss expenses paid by [Munich Re] arising from the Underlying Agreement, including any and all expenses incurred directly by [Munich Re] in the litigation, defense and settlement of claims made against [Munich Re] by the Original Ceding Company under the Underlying Agreement, excluding, however, all office expenses of [Munich Re] and the salaries and expenses of its employees.

*Id.* at 1 (Art. X(B)); *id.* at 2 (Art. X(C)).

---

[5] Ultimate net loss is defined by the Retrocession Agreements as "only such amounts as are actually paid or payable by [Munich] and [Everest National] under the Underlying [Munich-Everest National] Agreement." Pl.'s 1-2 (Art. VII).

8

Disputes eventually arose between the parties over payment of claims, primarily over whether Munich was properly reporting claims to ANICO, and whether these claims were within ANICO's obligations to pay under the Retrocession Agreements.

## C.   Procedural History

On December 22, 2009, Munich filed its Complaint, alleging three claims against ANICO. *See* Dkt. No. 1. In Count I, Munich contends that it billed ANICO for claims under the Stub Year Agreement but did not receive payment, amounting to breach of contract and damages estimated at $674,897.27. *See* Dkt. No. 117 ("Final Pretrial Order"), 5. In Count II, Munich alleges similar breach of the 2001 Agreement, amounting to estimated damages of $5,587,847.62. *Id.* at 16-17. Munich's Count III seeks a declaratory judgment that Munich is entitled to payment for unspecified future losses under the Retrocession Agreements for its reinsurance of Everest. *See* Dkt. No. 1. On February 16, 2010, ANICO filed its answer, affirmative defenses, and a counterclaim alleging it overpaid Munich under the Retrocession Agreements, and was entitled to a refund. *See* Dkt. No. 7. Munich answered ANICO's counterclaim and asserted affirmative defenses on March 4, 2010. *See* Dkt. No. 11. On April 20, 2011, ANICO filed its First Amended Answer, bringing counterclaims and affirmative defenses against Munich for rescission, breach of the Retrocession Agreements, fraudulent inducement, breach of the duty of utmost good faith, breach of the duty of good faith and fair dealing, for offset under the contracts for claims not properly payable, and for estoppel, waiver, and failure of consideration. *See* Dkt. No. 60. Munich filed an answer on May 9, 2011, alleging the affirmative defenses of waiver, estoppel, failure to mitigate damages, excuse

of performance due to contractual breach by ANICO, and breach of the duty of utmost good faith and fair dealing.  *See* Dkt. No. 61.

The parties filed cross-motions for partial summary judgment.  This Court ruled that the Retrocession Agreements calculated retention on a ground-up basis,[6] and the Court granted summary judgment dismissing ANICO's untimely claim defense.  *See* Dkt. No. 96 at 2.  On rehearing, the Court granted summary judgment in part for ANICO, concluding that ANICO did not have to pay claims Munich submitted after the December 31, 2007 "Sunset" deadline for the 2000 Retrocession Agreement.[7]  Dkt. No. 112 at 1-2. The Court also dismissed ANICO's untimely claims defense under Article X, holding that the prior grant of summary judgment to Munich on ANICO's Article X prejudice defense stood.  *Id.*  All remaining issues were left for trial.

The Court held a bench trial on June 17, 2013, that spanned 9 days.  During the trial, both parties presented witnesses and experts and supplied volumes of exhibits relating to the specific Retrocession Agreements as well as the business practices of Munich, ANICO, IOA Re, and Everest generally.  Following trial, the parties submitted their proposed findings of facts and conclusions of law.  For convenience, I provide below a list of the trial witnesses and general summaries of the scope of their knowledge.

---

[6]     A ground-up calculation is one that includes Everest's $250,000 layer as part of the amount for which Munich bases its liability under the Retrocession Agreements; thus, under a ground-up basis, Everest is responsible for $0 to $250,000, Munich is responsible for $250,001 to $500,000, and ANICO is responsible for $500,001 to $1,000,000. 6/19/13 Tr. 153–154 (Schmidt); *see also* Dkt. No. 96 (Opinion dated Sept. 28, 2012), at 38-49 (discussing ground-up calculation).
[7]     Specifically, ANICO was not responsible for claims for Rosario Diaz, Patricia Gates, Maria Guadalupe-Carranza, Maria Gil, Joseph Ibanez, and Margarita Martinez.

| NAME | TITLE/ROLE |
|------|-----------|
| Michael Alan Frantz | Munich employee who currently manages Munich's reinsurance claim operations division.  6/17/13 Tr. at 62-63 (Frantz). |
| Thomas J. Mauch | Munich's senior accounting manager for the retrocessional accounting department, he currently manages accounting for all retrocessional programs, including billing.  6/18/13 Tr. at 3-4 (Mauch). |
| Arthur Giacobbe | Munich senior claims consultant for the Everest Agreements.   6/18/13 Tr. 127-29; 6/19/13 Tr. at 168 (Giacobbe). |
| Timothy Schmidt | Employee of Am Re Brokers—a subsidiary of Munich that served as the broker and intermediary between Munich and IOA Re when the Retrocession Agreements were negotiated—whose main function was reinsurance recoverables and claims handling between 2002 and 2009. 6/19/13 Tr. at 93-4 (Schmidt). |
| Samuel J. Freda | Munich's Claims Director who has overseen the Everest Agreement from August 2007 to the present, and is responsible for ensuring proper reporting, updates, billing overview, reserving, and program oversight.  6/19/13 at Tr. 167-68 (Freda). |
| Susan Mack | Munich's expert witness on reinsurance claims administration and reporting, including industry custom and practice with respect to claims administration and reporting generally, and in connection with commutation or "Sunset" provisions in the Retrocession Agreements.   6/20/13 Tr. at12-13 (Mack). |
| Walter Dorosz | IOA Re's Chief Operating Officer, his involvement with the Retrocession Agreements was on IOA Re's operational side after coverage was bound, including premium and claims payment. 6/20/13 Tr. at 60, 67 (Dorosz). |
| Cyndi Charney | A former IOA Re employee, she was the Assistant Vice President and Director of Reinsurance Operations, and oversaw staff, including claims adjusters who received and processed loss notices, and payment requests.  *Id.* at 181-83 (Charney). |

| | |
|---|---|
| Cathy Washburn | IOA Re employee in the claims department, she began handling workers' compensation claims for the Retrocession Agreements in 2004.  6/21/13 Tr. 3, 7 (Washburn). |
| Ed Pawlowski | Currently a Munich Vice President, he served as Munich's treaty underwriter for the Program for the Retrocession Agreements before promotion to account executive.  6/24/13 Tr. 4-6 (Pawlowski). |
| Lisa Hoekstra | Former IOA Re employee who underwrote the Retrocession Agreements, evaluated the risks submitted, and proposed pricing for the coverage on ANICO's behalf.  *Id.* at 177-78 (Hoekstra). |
| Steven Schouweiler | ANICO's Executive Vice President responsible for accident and health business.  6/25/13 Tr. at 130 (Schouweiler). |
| James Stelling | ANICO's Vice President of Compliance, *id.* at 149 (Stelling), he sent correspondence to Munich tendering a return of net premiums.  Def.'s 269. |
| Linda Martin Barber | ANICO's expert on reinsurance claims operations and administration, the industry and practice for reinsurance claims handling, the duty of utmost good faith, and reinsurance industry and practice with respect to the Retrocession Agreements' Sunset provisions. 7/1/13 Tr. at 8 (Barber). |
| Thierry Verhaegen | Currently a Munich account manager in the business runoff division, he was an account executive in charge of Munich's relationship with Everest during the times relevant to this case. *Id.* at 37 (Verhaegen). |
| Richard Waterman | ANICO's expert in reinsurance and retrocessional underwriting, including the placement process, industry custom and process, and the duty owed by a cedent to a retrocessionaire in the underwriting process.  *Id.* at 150-52 (Waterman). |
| Lydia B. Kam Lyew | Munich's expert in reinsurance and retrocession underwriting, including workers' compensation, excess of loss, and carve-out retrocession, and in industry custom and practice in the underwriting process, the disclosure of information, and the duties owed between a reinsured and its retrocessionaire. 7/2/13 Tr. at 19-20 (Lyew). |

## II.    FINDINGS OF FACT

### A.    Formation of the Retrocession Agreements

*1.    Underwriting Process*

In entering into the Retrocession Agreements, both Munich and ANICO relied on brokers.  Munich was represented by its wholly owned subsidiary, Am Re Brokers,[8] who operated as Munich's intermediary in obtaining retrocessional coverage for the Everest Agreements.   6/24/13 Tr. at 23-25 (Pawlowski).   ANICO was represented by its independent broker, IOA Re, who, as noted, also represented other retrocessionaires. 6/20/13 Tr. at 65 (Dorosz).  Indeed, Munich's relationship with IOA Re was not limited to the Munich-ANICO Retrocession Agreements: for every year that Munich obtained retrocessional coverage for the Everest Agreements, IOA Re acted as the retrocessional underwriter: for 1998, 1999 and the period from January 1 to October 31, 2000, IOA Re underwrote the retrocession on behalf of Continental Casualty; for the period from November 1 to December 31, 2000 and for 2001, IOA Re underwrote the retrocession on behalf of ANICO.[9]  6/24/13 Tr. at 181:9-181:15 (Hoekstra) (1998); *id.* at 186:13-187:19 (2000 and 2001); 6/25/13 Tr. at 22:4-29:11 (Hoekstra) (Jan. 1, 1998 to Oct. 31, 1998); *id.* at 29:12-61:5 (Nov. 1, 1998 to Oct. 31, 1999); *id.* at 61:4-79:13 (Nov. 1, 1999 to Oct. 31, 2000).  IOA Re served as ANICO's reinsurance manager in placing and underwriting the retrocessional contracts; additionally, IOA Re also acted as ANICO's servicing agent,

---

[8]    At the time of the formation of the Retrocession Agreements, Am Re Brokers operated as a subsidiary of Munich; since then, Am Re Brokers has been subsumed into Munich, which now handles its retrocessional accounting in-house.  6/17/13 Tr. at 102 (Frantz).

[9]    As previously noted, for the 2000 Stub Year, Munich obtained retrocessional coverage from two different retrocessionaires, with ANICO taking a 75% share; the other retrocessionaire is not relevant to the resolution of this matter.

which included paying claims and receiving and distributing premiums.  *Id.*  In particular, IOA agreed to manage and administer ANICO's reinsurance business, including: marketing, underwriting, billing and processing premiums, and receiving reinsurance claims and adjusting losses.   Def.'s 246 (IOA-ANICO Reinsurance Management Agreement) at 2-3; *see also supra* Note 3.

Lisa Hoekstra was an underwriter at IOA Re for workers' compensation excess of loss reinsurance from 1993 to 2004, and was the point of contact for Am Re Brokers with respect to obtaining retrocessional coverage for the Everest Agreements.  6/24/13 Tr. at 176:21-177:14 (Hoekstra).  As an underwriter at IOA Re, it was Ms. Hoekstra's job to evaluate risks for retrocessional coverage submitted to IOA Re, and to provide proposed pricing for coverage on behalf of the companies IOA Re represented, including ANICO.  *Id.* at 178:3-178:8.

In underwriting and proposing retrocessional coverage, IOA Re relied primarily on the nature of the insurance polices underlying the reinsurer's business, in order to ascertain the risk of loss on those policies.  Thus, in the case of providing retrocessional cover for Munich's reinsurance of the Everest program, Ms. Hoekstra explained that her underwriting process focused on the policies written by Everest, not on Munich's reinsurance of Everest.  *Id.* at 17:4-13.  That said, as a retrocessional underwriter, Ms. Hoekstra relied on the retrocedent—Munich—to provide all information material to IOA Re's underwriting process.  *Id.* at 178, 194.

During the period encompassing the reinsurance of the Everest program, Am Re Brokers supplied Ms. Hoekstra the same information that Munich had received from Everest in the form of an underwriting package; Ms. Hoekstra used the same

underwriting package to underwrite both the 2000 Stub Year and 2001 Retrocession Agreements. *Id.* at 187:9-188:6; 6/25/13 Tr. at 80:18-22 (Hoekstra). It was Munich's practice, through Am Re Brokers, to supply these materials each year it sought retrocessional coverage, and to then wait for any follow up questions or additional requests from IOA Re regarding the package. 6/24/13 Tr. at 8:20-23 (Pawlowski); 7/1/13 Tr. at 66:1-16, 67:18-23, 68:18-69:7 (Verhaegen). Through this, Am Re Brokers hoped and expected that the underwriting package conveyed the information necessary to calculate IOA Re's clients' exposure, and to accurately price retrocessional coverage. 6/24/13 Tr. at 8:24-9:14 (Pawlowski). Indeed, Ms. Hoekstra agreed that the types of submissions she received from Am Re Brokers were typical of the underwriting submissions for the workers' compensation excess of loss program covered by the Everest program. 6/25/13 Tr. at 22:15-22:19 (Hoekstra).

Ms. Hoekstra did not follow any specific checklist for required underwriting submissions; however, under IOA Re's general underwriting guidelines, Ms. Hoekstra explained that she expected to receive the following information from a ceding reinsurer in order to accurately propose retrocessional coverage, each pertaining to the underlying insurer: (i) loss control, (ii) historical splits of business by hazard code by state, (iii) a summary of the underwriting, loss control and claims departments, and (iv) any audit reports. *Id.* at 127:8-128:6. Ms. Hoekstra further noted that beyond this information, she would not typically request other materials that may be in the retrocedent's possession because she would not be in the position to know what other information existed; however, if she were to request, for example, audit reports, she expected to receive all such reports available to the ceding reinsurer. *Id.* at 126:12-17, 128:23-25. Indeed, as

described *infra*, it is generally a matter of industry custom and practice for the ceding company to send an underwriting package to the retrocessionaire or its broker, and await specific follow-up questions or requests—and this was the process followed by IOA Re in the years it served as the broker underwriting the Munich retrocession.  7/2/13 Tr. at 35:22-39:12; 43:22-45:8 (Lyew).    In sum, Ms. Hoekstra trusted that Munich's underwriting package contained everything material to IOA Re's underwriting process, and it was her practice, after reviewing this package, to request additional information she believed relevant and necessary to her underwriting process, and in doing so, to generally memorialize these questions in writing in her file.  *Id.* at 20:6-21:10.

Significantly, Ms. Hoekstra explained that in calculating the premium rate for retrocessional coverage for Munich during the years covered by Munich's reinsurance of the Everest program, she relied on data related *only* to Everest's business, not that of Munich.   In calculating a rate for retrocessional coverage, IOA Re used a "Treaty Underwriting Work Sheet" and "Basis Underwriting Information" form; these documents are completed solely from data pertaining to Everest—*e.g.*, the opportunity summary, description of the business to be written, underwriting guidelines, historical results, projected premium and expected loss ratios on these worksheets relate to Everest—and do not allow for any input of data related to the ceding reinsurer.  *Id.* at 20:2-5, 35:20-36:11, 37:8-39:9, 41:9-45:9, 53:12-54:4, 61:19-64:7, 68:18-69:18, 81:10-24, 86:9-88:12; *see also* Pl.'s 50 at AAHRU 00104; Def.'s 248 at ANICO-IOA-5842, 5801.  At the same time, Ms. Hoekstra would also review prior years' performance of retrocessional cover written by IOA Re for the Everest program.  6/25/13 Tr. at 21:25-22:3 (Hoekstra).

With this information, IOA Re applied its proprietary internal model to create a "manual rate" for retrocessional coverage.[10]  *Id.* at 50:4-51:6.  After the manual rate was generated, Ms. Hoekstra further discounted the rate based on discretionary adjustment factors that again related solely to Everest, not Munich.[11]  *Id.* at 71:2-74:10.  In performing each of these calculations and discounts, IOA Re does not take into account the ceding reinsurer's—Munich's—own rate that it charged Everest or the cedent's own expected loss ratio.  *Id.* at 54:24-60:12.  Similarly, Ms. Hoekstra did not factor Munich's experience into IOA Re's calculation of the rate it would propose to Munich, as Munich's reinsurance coverage of the Everest program was different than what IOA Re would propose as retrocessional coverage.  *Id.* at 112:3-16.  That said, Ms. Hoekstra conceded that had Munich disclosed additional information that it had in its possession, it is possible that IOA Re would not have entered into the Retrocession Agreements on behalf of ANICO at the same rate or at all.  6/24/13 Tr. at 208-211 (Hoekstra).

Ms. Hoekstra also learned additional information regarding Munich's reinsurance of the Everest program, outside of the underwriting packages, through discussions with

---

[10]    A manual rate is based off of industry standards, whereas an "experience rate" is based off of information specific to the business being insured.  When there is not enough data regarding losses for a specific book of insurance business, as was the case with the Everest program, an experience rating of the risks specifically related to that book cannot be credibly calculated; accordingly, brokers such as IOA Re instead apply a "manual" or "exposure" rate, which does not rely on loss data from the program but rather uses industry averages for business of the type that will be written. 6/25/13 Tr. at 45:13-47:10 (Hoekstra); 6/24/13 Tr. at 155:5-18 (Pawlowski)

Munich and IOA Re both employed manual ratings to develop their own pricing in light of limited historical loss experience for the Everest program, finding the manual rating to be more reliable under these circumstances. 6/24/13 Tr. at 155:19-156:23 (Pawlowski); 6/25/13 Tr. at 45:10-50:3 (Hoekstra); Def.'s 70.

[11]    In that connection, Ms. Hoekstra explained that the fact that the expected loss ratio was greater than 100% when comparing the original manual rate and the discounted rate did not mean that she expected the discounted rate to be unprofitable.  *See* 6/25/13 Tr. at 75:12-77:6 (Hoekstra).

Am Re Brokers.  For example, Ms. Hoekstra was aware that Munich Re was losing money on the $250,000 excess $250,000 layer of its reinsurance.[12]  6/25/13 Tr. at 107:10-108:3 (Hoekstra); 110:11-111:2; Def.'s 248 at ANICO-IOA-5799.  Indeed, at the time the Retrocession Contracts were being underwritten, IOA Re was aware of a number of losses that had reached the retrocession layer for prior years of the program, including a full limits loss in March 2000, and was projecting additional loss development to those years.  6/25/13 at 90:11-95:8 (Hoekstra); Def.'s 248 at ANICO-IOA-5807.  Munich told Ms. Hoekstra that the results of Munich's prior years covering Everest were unsatisfactory, and Ms. Hoekstra's file reflects Munich was losing money on its prior years of reinsurance and was displeased with the performance of this program.  6/24/13 Tr. at 21:21-22:5 (Pawlowski); Def.'s 248 at ANICO-IOA-5799.

Ms. Hoekstra nevertheless explained that Munich's losses were not something she considered or took into account when underwriting retrocessional coverage; thus, she did not inquire further into Munich's own financial experience with the Everest program, such as why Munich was not profitable at the $250,000 excess $250,000 layer, nor did she request any information regarding Munich's own evaluation of the profitability of reinsuring Everest.   6/25/13  Tr.  at  107:10-112:16,  109:21-110:9,  121:12-123:25 (Hoekstra).  Rather, Ms. Hoekstra explained that, in reviewing Munich's reinsurance of

---

[12]    Ms. Hoekstra also learned that, at this time, the Everest insurance programs underlying the Everest Agreement were expanding to include California, which raised issues with IOA Re based on its perception that California tended to have higher than average healthcare costs, and thus could be potentially less profitable.  6/25/13 Tr. at 121:12-123:25 (Hoekstra).  IOA Re, however had no data about the California business that was coming into the program, and so Ms. Hoekstra requested additional information from Am Re Brokers on this matter prior to proposing a renewal quote for retrocessional coverage of the Everest Agreement.  Def.'s 248 at ANICO-IOA-5800.  Mr. Marques, at Am Re Brokers, supplied this information to Ms. Hoekstra pursuant to her request.  *See id.* at  ANICO-IOA-5790 to -5796.

Everest, she focused on the layer of coverage for which Munich was seeking retrocessional coverage; for that reason, IOA Re did not expect that that the loss ratio for Munich's reinsurance of Everest would be the same as Everest's own loss ratio or for the layer of any assumed retrocessional coverage of Munich's own layer. *Id.* at 66:13-67:23. Put differently, Ms. Hoekstra understood that ANICO, through IOA Re, was reinsuring only part of Munich's coverage: only losses that breached the $500,000 layer of an Everest-issued workers' compensation policy would impose liability on ANICO under the retrocession. *Id.* at 16:24-17:3. Because IOA Re expected there to be more losses in the $250,000 excess of $250,000 layer than in the $500,000 excess of $500,000 layer, the projected loss ratios, and corresponding premium rate, for the $750,000 excess of $250,000 layer would not be the same as the projected loss ratios and rate for the $500,000 excess $500,000 layer, notwithstanding that that layer falls within the $750,000 excess $250,000 layer. *Id.* at 56:16-58:2. Thus, in the case of the losses amounting to less than $500,000, Ms. Hoekstra explained that those losses did not significantly affect her underwriting of the $500,000 excess $500,000 layer because she was more focused on the potential for a catastrophic loss, not on the frequency of losses, which were different for the $500,000 excess $500,000 layer than for the layer of $0 up to $500,000. *Id.* at 111:3-12, 112:3-16. In Ms. Hoekstra's view, the only "sharing of risk" between Munich and ANICO would be that they both shared the common risk associated with the underlying Everest policies. *Id.* at 18:25-19:22. For this reason, IOA Re's calculated premium price, on behalf of ANICO, for the retrocession of the Everest program from Munich was a percentage of the premiums *Everest* received from the policies it issued, not the premium Munich received from Everest. *Id.* at 28:25-29:11.

In that connection, it was Ms. Hoekstra's assumption that Munich would be conducting its own evaluation of the Everest underwriting package, including (i) doing due diligence on the losses and loss history as well as audits of Everest and (ii) reviewing the performance of its prior years of reinsuring the Everest workers' compensation program. *Id.* at 21:11-24, 26:19-27:11. In spite of this assumption, Ms. Hoekstra never requested any such information from Am Re Brokers.[13] *Id.* at 27:12-25.

2.    *Findings of Munich's (Non)disclosures*

The Court finds that Munich supplied IOA Re with the same underwriting files that it received from Everest, and that Munich supplied virtually all information that IOA Re requested of Munich. Beyond that, the Court finds that Munich failed to disclose, or failed to fully disclose, information relating to Munich's own evaluation of Everest, and its reinsurance of the Everest program. I pause to note that these facts form the basis of ANICO's counterclaim for rescission, as ANICO contends that this undisclosed information was material to IOA Re's underwriting process and decision to provide retrocessional coverage. Although materiality is a question of fact, it is guided by legal principles. Thus, for ease of understanding, I set forth my findings on materiality within my analysis of ANICO's counterclaim, *infra*.

a.    *Munich's Review of Changes to Everest's Business in and around 2000*

Thierry Verhaegen, the account manager of the Everest Agreements in the business runoff operations at Munich, 7/1/13 Tr. at 37:1-37:15 (Verhaegen), explained that Munich first looked to Everest because Munich was interested in growing its

---

[13]    According to Thierry Verhaegen, Munich's account manager for the Everest Agreements, 7/1/13 Tr. at 37:1-37:15 (Verhaegen), Munich would have supplied such information had it been requested. *Id.* at 73:18-74:1.

workers' compensation line of business. *Id.* at 37. Initially, Mr. Verhaegen considered Everest's business to be "pretty poor."[14] Def.'s 229; 7/1/13 Tr. at 75 (Verhaegen). However, Munich's view of the Everest program quickly changed to positive, and Munich continued to renew the program, sometimes at reduced rates. 7/1/13 Tr. at 42:10-45:8 (Verhaegen); Pl.'s 70. In that connection, in or around August 2000, Everest informed Munich that it would be adding a book of business from a new managing general agent ("MGA"), American All Risk Insurance Services ("AARIS"), to its program beginning on November 1, 2000, and thus Munich was required to consider the consequences to its reinsurance based on this additional book of underlying policies. Def.'s 67; 6/24/13 Tr. at 31-32 (Pawlowski). Mr. Verhaegen explained that this was initially received as "good news," because it would double the size of the Everest program, allowing Munich to further expand its workers' compensation line of business Def.'s 248 at ANICO-IOA-5786; Pl.'s 94; 7/1/13 Tr. at 45:17-47:1 (Verhaegen).

Munich proceeded to review AARIS from an underwriting standpoint in September 2000. Def.'s 281 at MRAM-06-01337. At the time, Ed Pawlowski, Munich's treaty underwriter on the Everest program, *see* 6/24/13 Tr. at 4-6 (Pawlowski), sent an

---

[14]     For example, in the early years of Munich's relationship with Everest, Munich had some concerns over Everest's reserves, which are important to underwriters when analyzing risk and setting reinsurance pricing. *See* Def.'s 276 at MRAM-03-00520; Def.'s 275 (January 1, 1998 letter referencing study); 7/17/13 Tr. 80-82 (Verhaegen). Munich was aware of a November 1997 review conducted by Everest of a managing general agent ("MGA") and third-party administrator, Professional Business Owners Association, Inc. ("PBOA"), whose business was to be transferred to Everest in the upcoming year. *See* Def.'s 276 at MRAM-03-00516. The review of PBOA noted that its reserve procedures were "inadequate," which Munich understood in the context of the review to mean that reserves were being understated. Def.'s 276 at MRAM-03-00520; 7/1/13 Tr. at 83 (Verhaegen). In seeking to improve the PBOA program acquired by Everest, Munich sent Everest audit reports, and by 2000, Munich was satisfied that the reserve issues had been rectified. 7/1/13 at 129:7-131:18 (Verhaegen).

email to Mr. Verhaegen with respect to Munich's current estimated premium after the inclusion of AARIS; in particular, Mr. Pawlowski was concerned that AARIS had unfavorable historical losses. Def.'s 70; 6/24/13 Tr. at 74-76 (Pawlowski).  In October 2000, Mr. Verhaegen sent an email to Everest expressing these concerns regarding the AARIS book of business, and on November 2, 2000, Mr. Verhaegen sent Everest another email regarding an AARIS claims review, specifically noting that one of Munich's concerns about AARIS was the "stair-stepping" of reserves.[15]  Def.'s 78, 238.

Much of these discussions relating to AARIS were not disclosed to IOA Re.  That said, Munich's internal evaluation of AARIS was based off of the same underwriting package from Everest that IOA Re had for retrocessional coverage purposes.  6/24/13 Tr. at 76:15-76:25 (Pawlowski).  Further, when Ms. Hoekstra requested specific loss history for AARIS, Am Re Brokers provided her with an underwriting audit report of AAIRS from September 2000.  After reviewing this audit report, Ms. Hoekstra determined that the audit report was "favorable" in that it would support extending retrocessional coverage of the Everest program even with the inclusion of the AARIS book of business.  Def.'s 248 at ANICO-IOA-5786; 6/25/13 Tr. at 113:20-115:19 (Hoekstra); 6/24/13 Tr. at 195:2-5 (Hoekstra).

---

[15]     Stair-stepping of reserves refers to what occurs when an MGA, such as AARIS, sets an initial reserve and then continues to "step up" that reserve in line with increased claim costs; stair-stepping is problematic because an underwriter cannot accurately determine whether the current estimate of the claim's value is fair—if stair-stepping occurs, the reserve reported to the reinsurer potentially understates the anticipated losses. 6/24/13 Tr. at 98-99 (Pawlowski); 7/1/13 Tr. at 29 (Barber). That said, according to Munich's expert on the issue, stair-stepping by MGAs was not uncommon in the industry at that time.  7/2/13 Tr. at 62:10-64:8 (Lyew).  Munich never disclosed the issue of stair-stepping in AARIS to IOA Re.  *Id.*

b.   *Fay Isik Memorandum*

Munich did also not disclose to IOA Re a memorandum from Fay Isik, a former Munich underwriter for the Everest program, to her replacement, Mr. Pawlowski, who, as noted, served as Munich's underwriter of the reinsurance of Everest for the 2000 and 2001 years.   Def.'s 69.   In the memorandum, Ms. Isik provided a retrospective assessment and summary of the performance of the Everest program from its inception up to the date of August 15, 2000, and explained, *inter alia*, that (i) Everest and Munich considered their relationship to be "opportunistic,"[16] (ii) an actuarial exposure rating study had been prepared due to recent loss activity, (iii) Munich needed a rate increase, which had already been discussed with Everest, (iv) a statistical study had been performed in October 1999, and was scheduled to be updated in August 2000,[17] (v) in 2000, several underwriting reviews had been performed, and one included a "needs improvement" recommendation,[18] and (vi) Munich was projecting a loss ratio of 150 percent on its own coverage for the 2000 year. *Id.*; 6/24/13 Tr. at 6, 31, 52-57, 142-144

---

[16]   Munich's reinsurance of Everest was considered opportunistic because Everest had only recently entered into insuring workers compensation policies due to a marketplace shift, and both Munich and Everest were focused on more short term agreements for that reason.  6/24/13 Tr. at 41-42 (Pawlowski).

[17]   A statistical study is a tool used to measure how well Munich had performed on its reinsurance coverage to date.  6/24/13 Tr. at 17-18 (Pawlowski).

[18]   Specifically, Work Care NorthWest, Inc., an Everest underwriter, was audited in April 2000.  Def.'s 234; 7/1/13 Tr. at 91 (Verhaegen).  The audit disclosed unfavorable findings, which Munich initially believed justified a follow-up audit; however no additional audit appears to have been conducted. Def.'s 234; 7/1/13 Tr. 91–92 (Verhaegen).  As a matter of company practice, Munich did not to send this report to IOA Re. 7/1/13 Tr. at 94-96 (Verhaegen).

(Pawlowski);  Def.'s 69. Most of these details were not disclosed to IOA Re at the time of the formation of the Retrocession Agreements.[19]

### c.    Munich's Rate Calculations

Around the time that Munich was seeking to renew its retrocessional coverage of the Everest Agreements, Munich had sustained higher than expected losses to its reinsurance of the Everest program, which led Munich to increase its premium rate going forward.  7/1/13 Tr. at 47:12-48:23 (Verhaegen); 6/24/13 Tr. at 48 (Pawlowski); Def.'s 69 at MRAM-06-00708.  Nevertheless, Munich still decided to extend its coverage of the Everest program without first obtaining continuing retrocessional coverage; this decision was made because Everest agreed to pay a new higher premium rate, which satisfied Munich's underwriting guidelines without the need for a retrocession.  6/24/13 Tr. at 100:15-24, 101:4-9, 157:15-158:3, 160:25-161:18, 164:22-165:13 (Pawlowski); Def.'s 77.  Although these facts were generally known or apparent to IOA Re, see 6/25/13 Tr. at 21:11-15 (Hoekstra), the specifics underlying Munich's decision to renew its coverage of the Everest Agreements, such as the actual premium rate, were not provided to Ms. Hoekstra or IOA Re.

In determining whether to renew the Everest programs for 2000, Munich reviewed underwriting information from prior years. 6/24/13 Tr. at 14-15 (Pawlowski). For example, on August 28, 2000, an underwriting experience report of the entirety of Munich's coverage of Everest—including the carve out layer that ANICO eventually

---

[19]    Similarly, in October 1999, Ms. Isik emailed Mr. Verhaegen to recommend that Munich renew its relationship with Everest for the upcoming 1999-2000 year, as well as continue obtaining retrocessional coverage for the program, based on a new premium rate model.  Def.'s 232.   As a matter of policy, Munich informed Everest of its premium price change but did not so inform IOA Re.  Def.'s 232 at MRAM-03-00121; Def.'s 248 at ANICO-IOA-5797; 7/1/13 Tr. at 85-86 (Verhaegen).

assumed—revealed a loss.[20]  *Id.* at 62 (Pawlowski); Pl.'s 98.  A September 10, 2000 rate study on the Everest program was also run in a manner that included the carve out layer. 6/24/13 Tr. at 72 (Pawlowski); Def.'s 235.   Beyond these studies, Munich's internal correspondence shows that while Munich's overall evaluation of reinsuring the Everest program was positive, Munich did not expect to make much money off of Everest, if at all;[21] however, Munich expected that renewing the Everest business for 2001 would make sense from an overall business and economic standpoint.  Def.'s 239; 6/24/13 Tr. 95-97 (Pawlowski); *id.* at 173:15-174:24 (Pawlowski).   These internal communications, including Munich's loss ratios for years prior to 2000, were not shared with IOA Re during the underwriting of the retrocessional agreements.[22]

### d.    Munich's Underwriting Standards

Munich relied not only on underwriting profitability in determining whether to renew its reinsurance coverage of Everest, but also on profits gained off investments made from premiums.  7/1/13 Tr. at 144 (Verhaegen); 6/24/13 Tr. at 139 (Pawlowski).

---

[20]    Relatedly, after Mr. Pawlowski took over underwriting Munich's reinsurance of the Everest Agreements, he noted that Everest's projected estimated loss ratio for 2001 was "dubious" because it was without much history to support it.  6/24/13 Tr. at 79:24-80:8 (Pawlowski); Def.'s 72.  Ms. Hoekstra also came to the same conclusion.  Def.'s 248 at ANICO-IOA-5799 to -5800.

[21]    For example, Mr. Pawlowski testified that there were "known losses" on Munich's reinsurance of the Everest program when the underwriting of the Retrocession Agreements occurred; however, he explained that by "known losses," he was referring to the fact that any retrocession of the Everest program "should not be expected to be loss-free necessarily."  6/24/13 Tr. at 97, 158-59 (Pawlowski); *see also* Def.'s 239.

[22]    The only instance of IOA Re inquiring about Munich's own rate for its reinsurance of the Everest program is found in a October 30, 2000 email from Ms. Hoekstra to Mr. Marques.  Def.'s 248 at ANICO-IOA-5798.  In response, on November 21, 2000, Mr. Marques wrote "I'm trying to get this."  *Id.* at ANICO-IOA-5797.  There does not appear to be any follow-up on Ms. Hoekstra's part to ascertain Munich's rate, and the parties have not identified anywhere else in the record where Ms. Hoekstra or IOA Re tried to obtain Munich's rate for the Everest program, or how this rate would have affected her underwriting process.

Munich did not disclose to IOA Re that it was considering investment gain as a portion of its profitability on the Everest program, although it was not uncommon for workers' compensation reinsurers to do so at that time.  6/24/13 Tr. 139; 140-42 (Pawlowski).

Similarly, Munich also did not fully disclose to IOA Re that it was considering using an offshore entity, Inter-ocean, for the 2001 renewal of Munich's coverage of the Everest program.  *See id.* at 117.  At the time, Munich determined that if it was unable to adjust its pricing rate, its internal guidelines would have required Munich to move its reinsurance of the Everest program into an entity like Inter-ocean for accounting purposes.  Def.'s 72; Def.'s 238 at MRAM-23-00066; Def.'s 248 at ANICO-IOA-05786. Munich only disclosed to IOA Re that it was considering Inter-ocean for tax discount purposes.  Def.'s 248 at ANICO-IOA-05786.  Ultimately, Munich did not need to proceed with using Inter-ocean because it obtained a more favorable pricing rate with Everest.  6/24/13 Tr. at 174:25-175:1 (Pawlowski); 7/1/13 Tr. at 48:24-49:22, 52:2-57:24 (Verhaegen); Pl.'s 125.

    e.    *Commodore*

Also around the time that Munich was entering into the Retrocession Agreements, it was arranging with Everest to make adjustments on another, unrelated reinsurance program between Everest and Munich, named Commodore.  24/13 Tr. at 90 (Pawlowski); Def.'s 238; *see also* Def.'s 219.  The Commodore program, which was coming to an end around 2000, had performed unsatisfactorily from Munich's perspective, and so Munich negotiated retroactive adjustments of Commodore, in the form of a payback,[23] as part of

---

[23]    Payback is an understanding that a ceding company, here Everest, will continue to work with its reinsurer, Munich, to attempt to rectify underwriting deficit.  6/24/13 Tr. at 166:21-167:8 (Pawlowski).

Munich's agreement to continue reinsuring Everest's workers' compensation program. Def.'s 238; 6/24/13 Tr. at 175:2-5 (Pawlowski); 7/1/13 Tr. at 58:6-60:19 (Verhaegen). Although Munich received this adjustment on Commodore in connection with the workers' compensation program, Munich's decision to continue to reinsure Everest was not contingent on the Commodore adjustments or vice-versa; nevertheless, IOA Re was not made aware of Munich's deal with Everest regarding Commodore. 6/24/13 Tr. at 90-91, 93, 127, 175 (Pawlowski); 7/1/13 Tr. at 58:6-60:19 (Verhaegen).

3.    *Expert Testimony on Underwriting*

Both Munich and ANICO presented testimony at trial from experts in the field of insurance and reinsurance underwriting concerning the formation of the Retrocession Agreements.[24]   Munich relied on Ms. Lydia Kam Lyew, and ANICO on Richard Waterman.  Ms. Lyew has extensive and current experience working for companies that assume and cede reinsurance, and has extensive experience underwriting workers' compensation reinsurance and workers' compensation carve out reinsurance. 7/2/13 Tr. at 10:25-18:19 (Lyew).  Mr. Waterman also has extensive experience in the field of reinsurance; however, he has not been employed by a company that assumes or cedes reinsurance for more than 20 years and has never underwritten workers' compensation carve out reinsurance. 7/1/13 Tr. at 151:12-151:23 (Waterman).

Ms. Lyew testified that the relevant material information that needed to be disclosed between Munich and IOA Re was all information pertaining to the layer that ANICO would be reinsuring, as well as information about Everest, *i.e.*, the same

---

[24]    Specifically, both experts were qualified in reinsurance and retrocessionaire underwriting, including, placement process, custom and process, and duty owed by a cedent to a retrocessionaire in the underwriting process.

materials that were available to Munich.  7/2/13 Tr. at 24:9-24:22, 25:6-27:17, 70:7-70:17 (Lyew).  With regard to industry customs and practices, Ms. Lyew testified that ceding companies typically send underwriting packages like those sent by Munich to the reinsurer or retrocessionaire, or the broker, and then expect the reinsuring entity or broker to follow up with any questions or requests for additional information.  *Id.* at 35:22-39:12, 43:22-45:8.  To that end, Ms. Lyew explained that the ceding company would not typically include in the underwriting package (i) audit reports that do not contain materially adverse information—and stair stepping of reserves was not, at the time, considered in the industry to be materially adverse information; (ii) loss ratios for prior coverage years; or (iii) the use or proposed use of an offshore entity.  *Id.* at 22:6-17, 23:6-14, 40:11-43:21, 45:20-46:14, 52:12-57:5, 61:18-25, 62:10-64:8, 83:5-85:24.

Mr. Waterman agreed that the standard between the cedent and the reinsurer is to disclose all information reasonably material to the underwriting process.  7/1/13 Tr. at 194:7-8 (Waterman).  Mr. Waterman disagreed with Ms. Lyew as to what constituted "material" information, for example, testifying that it would be material for an underwriter, such as Ms. Hoekstra, to know (i) that Munich had loss ratios over 150% on its prior coverage of the Everest program, (ii) the reasons Munich was considering using an offshore entity, and (iii) of the stair-stepping of reserves at MGAs covered by the Everest program.  *Id.* at 156:2-159:1.  According to Mr. Waterman, this information should have been disclosed because it was clear to him that, in pricing and assessing the risk of the Everest program, Munich was relying on information not contained in the underwriting package that it shared with IOA Re.  *Id.* at 159:2-20.

The Court determines that while both witnesses were generally credible, based on the testimony of the experts and the testimony of the other witnesses, Ms. Lyew's descriptions of the industry customs and practices were better supported.  Ms. Lyew's explanation that the ceding reinsurer typically sends the underwriting package to the retrocessionaire in the same form as the reinsurer receives it, and then waits for any follow up from the retrocessionaire, aligns with Ms. Hoekstra's testimony and IOA Re's business practices.  *Compare* 7/2/13 Tr. at 35:22-39:12, 43:22-45:8 (Lyew) *with* 6/25/13 Tr. at 107:10-112:16 (Hoekstra). Moreover, Mr. Waterman agreed with Ms. Lyew that a potential retrocessional such as ANICO, or its experienced broker IOA Re, would know and expect that the ceding reinsurer would be conducting internal audits of the underlying program, and that the ceding reinsurer does not have an affirmative duty to disclose audit reports in its possession if those reports do not contain materially adverse information. 7/1/13 Tr. at 188:7-190:8 (Waterman); 7/2/13 Tr. at 8:13-8:25 (Waterman).  Indeed, Mr. Waterman further agreed that it is incumbent on the retrocessionaire, or its broker, to request from the ceding reinsurer any audits or other information of which it may be aware.  7/1/13 Tr. at 191:7-191:16 (Waterman).  Overall, given that Mr. Waterman does not have recent experience in underwriting reinsurance, or any experience with workers' compensation carve out reinsurance, I place little weight on his description of what information would be "material" to a retrocessionaire underwriter.

4.    *Munich's Payment Demand and Schouweiler's Testimony*

Steven Schouweiler is an Executive Vice-President for ANICO, responsible for the accident and health business, including the business covered by the Retrocession Agreements.   6/25/13 Tr. at 130:13-130:17 (Schouweiler).   At a certain point after

29

litigation began in the instant case, Mr. Schouweiler determined that there were sufficient facts being disclosed in discovery previously unknown to him, ANICO, or IOA Re, that would justify rescission of the Retrocession Agreements—particularly deposition testimony from Mr. Pawlowski.  6/25/13 Tr. 133 (Schouweiler); *see* Def.'s 67-70, 72, 76-77, 81-82.   Indeed, much of Mr. Schouweiler's basis for rescission turns on the discovery, following Mr. Pawlowski's deposition, of Munich's internal calculations of its estimated loss ratios for the years covered by the Retrocession Agreements, which, as noted above, were not disclosed to IOA Re.  6/25/13 Tr. at 133 (Schouweiler).  After this point, ANICO did not receive premium from, or pay any claims to, Munich, and shortly thereafter, in January 2011, ANICO moved to amend its answer to include the rescission counterclaim, which motion was granted in April 2011.[25]

In addition to a tender of premium allegation in ANICO's Amended Answer, ANICO wrote to Thomas Mauch, Munich's senior accounting manager, in December 2011, and offered a tender in the amount of premiums received, offset pursuant to the contracts by amounts paid by ANICO for claims.[26]  Def.'s 269.  Around this time, in 2012, ANICO and Munich realized that they had different understandings of the amount of premiums Munich had paid under the Retrocession Agreements, to wit, whether ANICO, through IOA Re, had received premium payments for the 2000 Stub Year. Munich therefore rejected ANICO's tender offer, *inter alia*, because it did not include

---

[25]     ANICO also premises it rescission counterclaim on Munich's claims handling, which was known to ANICO through IOA Re for a considerable period of time before ANICO amended its answer to include the rescission counterclaim.  *See* Def. FF&CL, 72-106.  I address this *infra*, Part III.C.2

[26]     Based on ANICO's calculations, this amounted to $2,486,803.25.  Def.'s 269.

remittance of the premiums Munich had paid IOA Re for the 2000 Stub Year.  Def.'s 270.

Upon further investigation by Munich and IOA Re in 2012, the following facts became apparent regarding the 2000 Stub Year premium.  During the years that Munich obtained retrocessional coverage for the Everest program between 1998 and 2001, IOA Re, in addition to acting as the broker, operated as a servicing agent by paying claims and receiving and distributing premiums for retrocessional companies.  These companies included Continental Casualty, whose coverage was managed by a "runoff manager" known at times as either Castlewood, International Solutions, or ENSTAR (collectively, "Castlewood").[27]  *See* 6/20/13 Tr. at 93:3-94:16 (Dorosz).  Prior to the 2000 Stub Year, Munich had obtained from IOA Re retrocessional coverage from Continental Casualty for the period from November 1, 1999 to October 31, 2000 (the "1999 Year").  *Id.* at 92:23-93:15.  Following the expiration of Continental Casualty's coverage of Munich at the end of the 1999 Year, Castlewood took over Continental Casualty's business as its runoff manager; Continental Casualty's records and premiums were transferred to Castlewood, and Munich's future claims were directed to Castlewood.  *Id.* at 93:16-95:11, 96:11-22.  Review of Munich's files reveal that when Munich remitted payment to IOA Re in 2002,[28] it supplied a check in the amount necessary to cover premiums for both the 1999 Year and the 2000 Stub Year, but failed to indicate to IOA Re that the

---

[27]     A runoff manager manages a block of business of a primary insurer, reinsurer, or retrocessionaire, and "runs it off" until all of the claims have been paid and all the liabilities have been satisfied.  6/20/13 Tr. at 94:19-24 (Dorosz).

[28]     Some premiums for coverage are paid up front in the form of a "minimum deposit," and the total premium is then paid after the actual earned premium can be calculated at the end of the year or coverage period.  6/20/13 Tr. at 107:13-108:24. (Dorosz).

check was intended to cover both years; instead, it appeared from Munich's remittance that the check was intended for only the 1999 Year.[29]  *See id.* at 109:12-110:16; Pl.'s 20; Def.'s 314.  Accordingly, IOA Re sent the entire payment that Munich submitted for both the 1999 Year and the 2000 Stub Year to Continental Casualty/Castlewood; only after IOA Re reviewed its files in 2012 did it determine that the amount remitted by Munich at that time should have been applied to both the 1999 Year and the 2000 Stub Year. 6/20/13 Tr. at 109:12-110:16; 174-76 (Dorosz); Pl.'s 20; Def.'s 313-15.  Indeed, in an email response to Munich following this discovery, Mr. Dorosz stated that it he was "not sure how anyone would have been able to determine that the [Stub Year] was included in what you sent me."  Def.'s 313.  Both IOA Re's and ANICO's subsequent attempts to determine if Continental Casualty/Castlewood actually received the premium for the 2000 Stub Year have been unavailing, and thus ANICO contends it cannot tender that premium because it never received it.  6/20/13 Tr. at 105:23-106:20 (Dorosz); 6/25/13 Tr. 153-54 (Stelling).

In light of the foregoing, the Court finds that IOA Re received the 2000 Stub Year premium, but erroneously, based on Munich's failure to properly identify the payment, remitted the premium to Castlewood Casualty/Continental as part of the 1999 Year adjusted premium; the Court further finds that Mr. Stelling credibly testified that ANICO itself has never received the premium for the 2000 Stub Year.

---

[29]     Munich sent a "premium advice" to IOA Re in May 2002 with the remittance of the premium that identified the "Period of Cover" as November 1, 1999 through October 31, 2000—the 1999 Year related to Continental Casualty —and the "Participant Name" as Continental Casualty.  Def.'s 314; 6/20/13 Tr. at 173-174 (Dorosz).

**B.       Claims Reporting under the Retrocession Agreements**

*1.      Munich's Reporting Procedures*

As discussed above, Munich's reinsurance obligations and ANICO's retrocessional obligations related to the Retrocession Agreements arise solely from claims paid by Everest on its workers' compensation polices under the Everest Agreement.  In that connection, Article X of the Retrocession Agreements ("Article X") provides in relevant part:

> A.      [Munich] agrees to advise [IOA Re for and on behalf of ANICO] promptly of all claims under this Agreement on being advised by [Everest National], and to furnish the Reinsurer with such particulars and estimates regarding the same as are in the possession of [Munich]. An omission on the part of [Munich] to advise [IOA Re for and on behalf of ANICO] of any loss shall not be held to prejudice [Munich]'s rights hereunder.
>
> B.      In addition, the following categories of claims shall be reported to [IOA Re for and on behalf of ANICO] immediately, regardless of any questions of liability of [Munich] or coverage under the Agreement:
>
>       1.      Any accident reserved at 50% of the reinsured attachment point;
>       2.      Any accident involving a brain injury;
>       3.      Any accident resulting in burns over 25% or more of the body;  or
>       [4].      Any spinal cord injury.

Pl.'s 1-2 (Art. X); Dkt No. 117, ¶ 4 (Pretrial Order).

For claims arising under those Everest policies covered by the Everest Agreement, Everest would report to a claims handler at Munich in the "Assumed Claims Department."  6/18/13 Tr. at 140:11-141:13 (Giacobbe).  Upon receipt of a reported claim, the claims handler would ensure that there was a proper basis for the claim, and would review other details such as the description, date of the loss, and whether the claim

arose from the claimant's employment; also at that time, the claims handler would review the amount of reserves posted by Everest and would then set Munich's own reserves. *Id.*

For purposes of its retrocessional coverage, when Munich's Assumed Claims Department processed a paid loss from Everest, resulting in Munich having to set reserves and/or pay Everest, this information would be entered into a computer system accessible by Munich's Retrocession Accounting Department ("Retro Accounting"). 6/18/13, Tr. at 7:23-8:15 (Mauch). Retro Accounting would receive notifications from this system as well as generate weekly, monthly, and quarterly reports for claims reserved or paid by the Assumed Claims Department. *Id.* If Munich sent a payment to Everest that fell within the retrocessional coverage under the Retrocession Agreements, Munich's system would generate a bill for the retrocessionaire; if Munich had not sent a payment but only had set reserves that fell within the retrocessional coverage, Retro Accounting would still generate a notification for the retrocessionaire but there would be no underlying payment information in the Munich system. *Id.* at 10:5-11:4. In either event, Retro Accounting would not bill or notify IOA Re directly; rather, after a Retro Accounting accountant reviewed the claim or reserve information entered by the Assumed Claims Department for the purposes of determining retrocessional coverage, Retro Accounting sent the information to Am Re Brokers.[30] *Id.* at 7:25-8:11. Am Re Brokers then processed that information and entered it into its own computer system, known as ARBISS, which automatically generated a bill or notice to be sent to IOA Re, based on the coverage under the Retrocession Agreements. *Id.* at 6:6-7:6, 8:11-15, 81:5-

---

[30] As noted, Am Re Brokers was originally a separate operating entity that was later subsumed into Munich. *See supra*, Note 8. For simplicity, in the above discussion, I refer to both the separate entity and the subsequent in-house division as Am Re Brokers.

16; 6/19/13 Tr. at 95 (Schmidt).  The financial information reported to IOA Re from Am Re Brokers—such as reserves and paid/loss information—was essentially the same information that was provided by Munich's claims department.   6/19/13 Tr. at 96 (Schmidt)

From the start of the Retrocession Agreements until 2002, Munich's claim handler in charge of the Everest program was Joseph Canuncio. 6/17/13 Tr. at 140 (Frantz).  When Mr. Canuncio retired in 2002, Arthur Giacobbe was hired to replace him in claims handling.  6/18/13 Tr. at 127-28 (Giacobbe).  For the period spanning 2002 to 2007, Mr. Giacobbe served as the senior claims handler for claims arising under the Everest Agreement, handling only standard workers' compensation claims, and reporting claims to IOA Re via Am Re Brokers employee Timothy Schmidt.  *Id.* at 53-55, 127-29, 132-33, 159-60 (Giacobbe); 6/19/13 Tr. at 168 (Freda); 6/19/13 Tr. at 93-94 (Schmidt). In 2007, Samuel Freda assumed Mr. Giacobbe's duties with respect to claims from the Everest program.  6/18/13 Tr. at 133-34 (Giacobbe); 6/19/13 Tr. at 173 (Freda).  Mr. Freda had previously worked for Everest, and had been involved in handling Everest's claims under the program.  6/19/13 Tr. at 167 (Freda); 6/18/13 Tr. at 128-29 (Giacobbe). Mr. Freda continued reporting claims to IOA Re through Mr. Schmidt at Am Re Brokers. 6/19/13 Tr. at 93-94 (Schmidt)

When Mr. Giacobbe started working on the Everest program, in line with Munich's general practices, he received no formal or informal training regarding retrocessional reporting procedures, including none by his predecessor Mr. Canuncio, nor

was he provided with copies of the Retrocession Agreements or any portion thereof.[31] 6/19/13 Tr. at 83, 127-28, 134-36 (Giacobbe).  Instead, Mr. Giacobbe reviewed Mr. Canuncio's history of reporting to the retrocessionaires, and endeavored to continue reporting in the same fashion—*i.e.*, when the incurred amount for any particular claim reached $500,000.[32]  6/18/13 Tr. at 133:22-134:1; 136:9-136:21 (Giacobbe).  According to Mr. Giacobbe, he believed this satisfied the reporting and notice terms of the Retrocession Agreements.  *Id.* at 39:8-42:24.  Indeed, in Mr. Giacobbe's experience as a claims handler, it was not uncommon for the reporting threshold to be at the attachment point of the reinsurer or retrocessionaire's coverage—here, $500,000.   6/19/13 Tr. at 43:12-44:21 (Giacobbe).

Contrary to Mr. Giacobbe's understanding of the reporting requirements under the Retrocession Agreements, under Article X, claims were to be reported to IOA based upon the reserve amount, regardless of any amount actually paid.  6/18/13 Tr. at 142-43 (Giacobbe); Pl.'s 1-2 (Art. X.B).  Additionally, Munich was required to report to IOA Re immediately, for the follow categories of claims: those reserved at 50% of the attachment point of the Retrocession Agreements—*i.e.*, at $250,000—and those involving a brain injury, spinal cord injury, or resulting in burns over more than 25% of the body.[33] 6/17/13 Tr. at 107–108, 110 (Frantz); Pl.'s 1-2 (Art. X).  Mr. Giacobbe did not follow

---

[31]     This is so despite the fact that Mr. Giacobbe overlapped with Mr. Canuncio for a week. 6/18/13 Tr. at 127-28, 136 (Giacobbe).

[32]     "Incurred" means any amount actually paid plus any outstanding reserves that had been set.  6/18/13 Tr. at 142-43 (Giacobbe)

[33]     Similarly, Everest had to report to Munich when claims reached $125,000, and immediately report catastrophic illnesses or injuries such as burns, spinal and brain injuries, which would potentially incur high dollar amounts of losses.  6/19/13 Tr. at 18-19 (Giacobbe).

these reporting requirements during the period 2002 to 2007.[34]  Indeed, during this time, Giacobbe never looked at the Retrocession Agreements or the underlying agreements between Everest National and Munich. 6/18/13 Tr. 134 (Giacobbe).

Beyond Mr. Giacobbe's incorrect understanding of his reporting obligations under the Retrocession Agreements, there were also claims that were reported late to IOA Re due to delayed reporting by Everest to Munich.  6/19/13 Tr. at 15:20-23 (Giacobbe). When Mr. Giacobbe received a late claim from Everest, he would ask Everest why it was being first reported at that point; typically, the response would be that Everest "missed" the claim.  6/18/13 Tr. at 155:16-23 (Giacobbe). When this occurred, Mr. Giacobbe "didn't think of reporting it to ANICO" if it had not yet reached retention.[35]  *See* 6/19/13 Tr. at 21:6-12 (Giacobbe).   Notwithstanding these reporting issues from Everest, Mr. Giacobbe sometimes would choose not to monitor—in his words, "de-control"—Everest claims where the initial reported claim reserves were relatively low.  6/19/13 Tr. at 15:5-18:8.   When Mr. Giacobbe de-controlled a claim, he did not set reserves for the claim, and instead relied on Everest to re-report the claim if there had been any changes.  *Id.* Mr. Giacobbe did not inform IOA Re when he made a decision to de-control a claim.  *Id.* at 66:21-67:8.

---

[34]     For example, Mr. Giacobbe did not report to Am Re Brokers, to report to IOA Re, on the Randall Jones claim until the incurred amount of the claim was at $558,214. 6/19/13 Tr. at 76 (Giacobbe); Def.'s 3.

[35]     As a reinsurer, and as provided for under the Everest Agreements, Munich had the right to audit Everest's claims handling; however, no audit of the Everest program was conducted when Mr. Giacobbe was the claims handler in charge of the program.  6/18/13 Tr. at 147:3-21 (Giacobbe). When Mr. Freda took over the position, he and Mr. Giacobbe conducted the first of two audits of Everest on November 7, 2007. *Id.* at 147:5-8, 149:20-150:5; Def.'s 53.  When Munich informed Everest that it would be conducting an audit, Munich received additional claims from Everest that had not been previously reported. 6/19/13 Tr. at 70:12-16 (Giacobbe).

From 2002 until 2005, Mr. Giacobbe was not aware of any potential problems with his reporting method under the Retrocession Agreements; no one at IOA Re's claims department contacted him in that regard.[36]  6/18/13 Tr. at 145:2-9 (Giacobbe).  On December 7, 2005, Mr. Giacobbe received an email from Cyndi Charney at IOA Re, who oversaw IOA Re's claims operations, noting that "[i]n recent months several claims have been reported to [IOA Re] under the subject agreement where either the initial notice or updates were delayed well beyond the date of loss."  Def.'s 42; *see also* 6/18/13 Tr. at 161:25-163:14 (Giacobbe).  Based on this delayed reporting, Ms. Charney requested in her email that Munich provide "a complete listing of *all claims* reported by Everest Re [*sic*], reserved and precautionary, to *all years* of this agreement."  Def.'s 42 (emphasis added).  Mr. Giacobbe responded to Ms. Charney's email that same day as follows:

> Cyndi,
>
> My understanding is that we report all claims on this program when the total ground up reserve reaches 500,000.  Do you have something stating different? I will continue reporting at this level in the future.  Do you have something in writing that changed the reporting procedures?
>
> Thanks,
> Art Giacobbe

*Id.*; *see also* 6/18/13 Tr. at 163:9-20 (Giacobbe).  Shortly thereafter, Ms. Charney wrote back to Mr. Giacobbe, stating, in her own words, that "the contract calls for reporting of

---

[36]    In October 2003, Ms. Hoekstra, the underwriter at IOA Re, did send Mr. Giacobbe an email seeking additional information on an Everest claim that Munich had ceded to IOA Re, with the notation: "This is the second claim (of 2) [reported to IOA Re] AFTER reserves have gone over the retention."  Def.'s 3.  In light of this apparent discrepancy, Ms. Hoekstra inquired of Mr. Giacobbe whether these claims had been reported to IOA Re in line with Munich's obligations under the Retrocession Agreements, and indicated that she herself would verify. 6/19/13 Tr. at 64:15-65:5 (Giacobbe); Def.'s 3.   It is unclear why Ms. Hoekstra, an underwriter, was communicating with Mr. Giacobbe on a claims handling issue.  In any event, neither Ms. Hoekstra nor anyone else at IOA Re followed up from this communication.

certain serious injury claims, including: brain injuries, burns, and spinal cord injuries and any claim at 50% of the retention."   Def.'s 42; *see also* 6/18/13 Tr. at 167:1-10 (Giacobbe).   Ms. Charney repeated her earlier request that IOA Re "would prefer to receive notice of *all claims* reported by Everest Re [*sic*]" but that if Mr. Giacobbe "insist[ed] on strictly following the contract wording," then IOA Re would ask that he "provide a listing of all of the serious injury claims and all that are currently reserved at 50% of the retention in accordance with the contract terms."  Def.'s 42 (emphasis added). Lastly, Ms. Charney noted that it might be appropriate for IOA Re to preform a review of Munich's files, and that she would be in touch to schedule such an audit in early 2006. *Id.*   Although Ms. Charney referenced the Retrocession Agreements, she did not attach the actual agreements or any portion thereof to her email as Mr. Giacobbe had requested. Nor did Ms. Charney's email directly answer Mr. Giacobbe's question as to whether reporting was proper at $500,000 ground-up retention.

Notwithstanding Ms. Charney's communications, at no point did Mr. Giacobbe search the computer system for the terms of the agreements or ask anyone at Munich for copies of the Retrocession Agreements.  *Id.* at 138-139, 144.  In sum, Giacobbe took no affirmative steps to determine what Munich's reporting obligations were during his time as a claims handler at Munich for the Everest program.  There was, however, also no follow up by anyone at IOA Re following the 2005 emails, including with respect to the proposed audit of Munich's files.  It also must be noted in that regard that it was never communicated to Cathy Washburn, the IOA Re claims adjuster specifically handling Munich's retrocession of the Everest program, that Ms. Charney had had an email exchange with Mr. Giacobbe on the matter of claims handling.  Similarly, Ms. Washburn

was never instructed to deny any late reported claims or, in paying claims, send a reservation of rights on behalf of the retrocessionaire—as was IOA Re's typical practice for claims it considered to be improperly reported.   6/21/13 Tr. at 155:22-156:24 (Washburn); 6/20/13 Tr. at 148:1-5, 149:17-24 (Dorosz).

When Mr. Freda began working at Munich around August 2007, he too was not officially trained in the reporting requirements under the Retrocession Agreements. 6/19/13 Tr. at 168, 173-74 (Freda).  Rather, Mr. Giacobbe told Mr. Freda that Munich's responsibilities were to report claims when they incurred $500,000.  *Id.* at 173-74, 176. Although Mr. Freda was provided with a copy of the original Retrocession Agreement, it was not a complete copy because it did not contain the addendum to Article X reporting requirements.  *Id.* at 174-75.  Around July 2008, following a round of communications between Mr. Freda, Mr. Schmidt, and Ms. Washburn at IOA Re, Mr. Freda raised the issue with Ms. Washburn of Munich's reporting under the Retrocession Agreements. 6/19/13 Tr. 170, 179 (Freda).  Mr. Freda thereafter requested from Ms. Washburn a full copy of the Retrocession Agreements; after he looked at the reporting provision, Mr. Freda immediately reviewed his files of the Everest program to ensure that claims had been properly reported, and to report any claims that had not. *Id.* at 171-72.

During the same time period of 2002 to 2007, in addition to the problem of when Munich reported claims arising under the Everest Agreement to IOA Re, there was confusion over some of Munich's other reporting requirements.  For example, there were notices sent out by Munich/Am Re Brokers that were inconsistent in that some calculated

claims on a ground-up basis and others used an ultimate net loss basis.[37]  6/19/13 Tr. at 151 (Schmidt).   Munich's general understanding was that claims were to reported ground-up, whereas IOA Re believed that the Retrocession Agreements operated under an ultimate net loss basis.  *See generally* Dkt. No. 96 (Opinion dated Sept. 28, 2012), at 38-49.   Significantly, this dispute over the contract terms was not resolved until my decision on the parties' partial summary judgment motions, in which I determined that the parties' obligations under the Retrocession Agreements were based on ground-up loss calculations.  *See id.*  Additionally, in a few instances Munich supplied claim summaries that did not exactly match the information contained in the accompanying claim notices—causing IOA Re problems in matching records.[38]  6/21/13 Tr. at 19, 26-28, 31-33 (Washburn).   While these discrepancies might have initially caused IOA Re difficulties in matching claims to its own records, Ms. Charney credibly explained at trial that it was her understanding that as long as there was a Munich claim number on the document, she would be able to cross-reference it to IOA Re's internal claim number.  *See* 6/20/14 Tr. at 194:8-12 (Charney).  Lastly, Am Re Brokers wrongly sent several claims notices to Castlewood instead of to IOA Re; some of these claims were then

---

[37]     *See supra*, Note 6.  IOA Re made its payment calculations based off an ultimate net loss analysis—*i.e.*, only after Munich itself had paid out $500,000, rather than $250,000 under a ground-up basis—which is what it understood its obligations to be under the Retrocession Agreements.  *See generally* Dkt. No. 96 (Opinion dated September 28, 2012).  As I found in my Opinion resolving the parties' motions for partial summary judgment on this issue, the Retrocession Agreements obligate ANICO to pay on a ground-up calculation.  *See id.* at 37-49.

[38]     Ms. Washburn also testified that, during IOA Re's 2009 audit of Munich, she discovered claim reports that indicated that Munich paid more on a claim than had the underlying insurer, Everest.  6/21/13 Tr. at 26-27 (Washburn).  However, no specific claim was identified at trial or in the parties' submissions in this manner.

forward by Castlewood to IOA Re.[39]  6/19/13 Tr. 143 (Schmidt); Def.'s 310 (ten claims

Am Re Brokers incorrectly sent to Castlewood); Def.'s 311 (claims IOA Re received

from Castlewood).

2.      *IOA Re's Claims Handling Procedures*

        With respect to IOA Re's claims handling, IOA Re issues a written denial of

coverage for claims it believes to be outside the scope of retrocessional coverage, and a

written reservation of rights where retrocessional coverage is unclear.   6/20/13 Tr. at

148:1-5, 149:17-24 (Dorosz).  Notwithstanding the foregoing issues with Munich's claim

handling under the Retrocession Agreements from 2002 up to 2009, IOA Re did not issue

any denials or reservations of rights due to late reporting of claims for those claims at

issue in this litigation.[40]  6/20/13 Tr. at 153:10-13 (Dorosz); 6/21/13 Tr. at 132:5-15

(Washburn); *see, e.g.*, Pl.'s 17; *see also* 6/20/13 Tr. at 209:16-213:12 (Charney); 6/21/13

Tr. at 133:7-133:19 (Washburn).  Moreover, in circumstances where IOA Re had no

record of receiving a bill on a claim, but then later received a subsequent bill that

included a new request for payment as well as reflected the amount of the prior, unpaid,

claim, *a fortiori* IOA Re would be aware that Munich was seeking payment of the entire

---

[39]      IOA Re had difficulty deciphering these forwarded notices because at least some of them did not contain claimant names, which is how IOA Re primarily tracks claim files.  6/19/13 Tr. at 161 (Schmidt); Def.'s 310 at 4; Def.'s 311.  *But see* 6/20/14 Tr. at 194:8-12 (Charney) (explaining that as long as either there was a Munich claim number on the document, Ms. Charney would be able to cross-reference it to IOA Re's internal claim number).

[40]      Only those claims that were reported after the Article XVI Sunset provision deadline, *see infra* Part II.C.3, were denied by IOA Re as being late.  6/20/13 Tr. at 134:21-24 (Dorosz); 6/21/13 Tr. at 113:17-114:11 (Washburn); *see, e.g.*, Pl.'s 155.

outstanding amount—including previous amounts for which IOA Re had no record of having received a bill.  *See* 6/21/13 Tr. at 87:17-99:5 (Washburn).[41]

3.    *IOA Re's Audit and Explanation of Nonpayment*

It is also IOA Re's practice, and its right under the Retrocession Agreements, to audit the ceding company when necessary.  *Id.* at 156:5-25; Pl.'s 1-2 (Article XII).  Yet, it was not until November 2009, after internal discussions between Ms. Charney, Ms. Washburn, and Walt Dorosz, the Chief Operating Office of IOA Re, that IOA Re undertook its first audit of Munich related to the Retrocession Agreements.[42]  6/20/13 Tr. at 60, 69-70 (Dorosz).   During the audit, Munich declined to disclose all records requested by IOA Re, including Am Re Broker files.  6/20/13 Tr. at 83-85 (Dorosz).

---

[41]    Specifically, Ms. Washburn testified on cross-examination as follows:

Q. I take it it's your testimony that although you have determined that you did not receive these bills or you think you didn't receive the bills, on those particular dates you did nothing to identify what bill you were missing or to update your records. Is that fair?
A. Yes.
Q. But you knew you were missing a bill?
A. Yes.
Q. You could tell that. Right?
A. Yes.
Q. You could tell it from the very process you just described. Right?
A. Yes.
Q. And the more recent bill would tell you the total amount Munich Re was seeking to collect. Right?
A. Yes.
Q. So even though you didn't have the prior bill, you knew Munich Re was billing you for that amount in the aggregate?
A. Yes.

6/21/13 Tr. at 98:10-99:5 (Washburn).
[42]    IOA Re had informed Munich at least a few months previously of its intent to begin an audit, but had difficultly setting up the audit with Munich.  6/20/13 Tr. at 73 (Dorosz); Def.'s 245.  By the time the audit occurred in November 2009, Munich had already sent a demand to IOA Re, in October, for payment on $4.1 million of outstanding invoices.  6/20/13 Tr. at 153:19-155:3 (Dorosz); Pl.'s 154.

After IOA Re conducted its audit, it provided Munich with a written explanation for why IOA Re had not, and would not, pay certain claims in part or in full; these claims were limited to the claims where IOA Re disputed the amount of retention owed, roofer claims, and "Sunset" claims[43]—no other basis for non-payment, including (i) late reporting, (ii) claims handling, (iii) insufficient access to materials during the audit, or (iv) possible rescission of the Retrocession Agreements, was explicitly identified in the written explanation.  Pl.'s 161; *see also* 6/20/13 Tr. at 163:1-166:18 (Dorosz).  At that time, IOA Re, based on the foregoing disputes, paid what it calculated to be due on Munich's outstanding invoices; that is, IOA Re paid on an ultimate net loss calculation, rather than ground-up, and did not pay the roofer claims at issue in this litigation, or the claims it believed were first reported after the "Sunset" period.  *See* Pl.'s 161 (IOA Re letter enclosing payment and explaining IOA Re's calculation of the payment).  Nowhere in the letter did IOA Re state that it was reserving its rights or denying claims based on late payment or claims handling.  *Id.*

### 4.    Expert Testimony

Both parties presented experts on the issue of claims handling: Munich offered Susan Mack, and ANICO offered Linda Martin Barber.[44]  Ms. Mack testified that, under industry custom, a claims handler who began working on an existing retrocessional program would endeavor to report to retrocessionaires in line with how the predecessor claims handler had been reporting.  Tr. 6/20/13 at 18:6-22:11 (Mack).  On the other hand,

---

[43]    These bases for non-payment are explained in great detail *infra*, Parts II.C.1, II.C.2, and II.C.3.

[44]    Specifically, both experts were qualified in reinsurance claims operations and administration, the industry and practice for reinsurance claims handling, the duty of utmost good faith, and reinsurance industry and practice with respect to the Retrocession Agreements' Sunset provisions.  6/20/13 Tr. at 12-13 (Mack); 7/1/13 Tr. at 8 (Barber).

Ms. Barber testified that claims handlers should nevertheless be aware of their reporting obligations under the relevant contracts.  7/1/13 Tr. at 13 (Barber).  Significantly, both experts agreed that it would be customary in the industry for a claims handler such as Mr. Giacobbe to attempt to obtain a copy of the contract upon being notified by the retrocessionaire that there was an apparent problem in how claims were being reported. 6/20/13 Tr. at 43-44 (Mack); 7/1/13 Tr. at 16 (Barber).  The experts differed as to whether it was the practice for a retrocessionaire to issue reservation of rights or denial letters, with Ms. Mack testifying that failure to issue any such letter may lead to wavier of any later defense by the retrocessionaire to payment on the claim, while Ms. Barber stated that such letters were in line with "best practices," and thus not necessary to satisfy the standard of care. 6/20/13 Tr. at 17:15-21 (Mack); 7/1/13 Tr. at 32-33 (Barber). Lastly, Ms. Barber acknowledged that both the retrocedent and retrocessionaire have a duty to act in accordance with the terms of the contract. 7/1/13 Tr. at 31 (Barber).

5.    *Findings*

The Court finds that between 2002 and 2008, when Mr. Freda finally brought Munich's reporting into compliance with Article X of the Retrocession Agreements, Everest claims were not reported to IOA Re in accordance with the notice requirements of Article X.  Munich failed to train its claims handlers in the sense that it did not provide Mr. Giacobbe or Mr. Freda with any formal or informal instructions or guidance on Munich's reporting obligations under Article X, and likewise, failed to supervise its claims handlers to ensure that the Article X requirements were being followed.  These

failures caused Munich to not timely report claims under the terms of the Retrocession Agreements.[45]

At the same time, it is clear from these facts that IOA Re was aware at least since 2005 that Munich was improperly and/or inconsistently reporting claims in line with its obligations under Article X of the Retrocession Agreements.  There is no evidence that, other than one or two brief communications in 2003 and 2005, IOA Re sought to bring this issue to Munich's attention or demand resolution of the problem.  In that connection, I do not find Ms. Charney's email to Mr. Giacobbe to clearly evince that IOA Re informed Munich it was reporting improperly.  In her email, Ms. Charney requested *all* claims that Everest had reported to Munich; only after Mr. Giacobbe raised a question as to whether that was necessary under the contract did Ms. Charney state, in her own words, that the Retrocession Agreements had specific reporting requirements.  Moreover, it is unclear from this email whether Ms. Charney wholly disagreed with Mr. Giacobbe's assessment that, for other than serious injuries, reporting occurred when retention reached a $500,000 ground-up loss.  Indeed, one of the ongoing disputes between IOA Re and Munich over the reporting requirements concerned whether the Retrocession Agreements relied on ground-up or ultimate net loss calculations—an issue that was not resolved until this Court issued its decision on the parties' motions for partial summary judgment in 2012.  Similarly, I find that Mr. Giacobbe credibly testified that the reason he reported to IOA Re in the manner that he did was because (i) that was how he understood his

---

[45]    For example, under ANICO's calculations for the claims at issue in this litigation, which Munich largely does not dispute in this regard, the delay between the date that Munich reserved at 50% of the retention rate in the Retrocession Agreements and the date that ANICO received notice averages approximately two years.

predecessor, Mr. Canuncio, to have been reporting, and (ii) it also aligned with what he understood to be reporting requirements common to reinsurance.

To that end, there is no evidence that IOA Re followed up on its 2005 communication with Mr. Giacobbe, or took any other related actions such as denying claims or issuing reservations of rights for claims it believed were improperly reported under Article X, even though that was otherwise IOA Re's policy to do so.  Lastly, in light of the experts' testimony, I find that although Munich's claims handling and training procedures were not necessarily out of line with industry custom and practice, nevertheless Mr. Giacobbe had a duty to retrieve copies of the Retrocession Agreements after IOA Re alerted him to reporting problems in 2005.  Similarly, although IOA Re was not obligated to issue reservation of rights letters, it had a duty to inform Munich when there was a discrepancy with claims handling that could form a basis for IOA Re's denial of a claim.

**C.     ANICO's Claim Specific Defenses**

*1.     Roofer Claims*

ANICO contends that certain claims were not properly ceded by Munich to ANICO pursuant to the Retrocession Agreements because (i) the individual covered by the policy was injured while working on a roof, or (ii) IOA Re was told by Munich that the person was a "roofer."  Only two claims are involved in this dispute: the Fields claim, which arises under the 2000 Stub Year, and the Jones claim, which arises under the 2001

Retrocession Agreement [46]   Article VIII of the Retrocession Agreements lists "Exclusions" to the retrocessional coverage; the parties have stipulated that although Article VIII does not contain any exclusion for "roofing contractors," roofing contractors were excluded from the underlying Everest program for the years covered by the Retrocession Agreements.   *See* Dkt. No. 117, (Final Pretrial Order) § III, ¶ 10.   ANICO takes the position that when Munich was renewing retrocessional coverage through IOA Re for the years covered by the Retrocession Agreements, there was an understanding that no roofer claims would be covered going forward, even if they did not come from an employer who was a roofing contractor.[47]

Mr. Dorosz explained that in 2009, when IOA Re was auditing Munich and examining its claims under the Retrocession Agreements, IOA Re determined that statements and materials in the underwriting materials for the 1999 year indicated that Everest was not renewing its workers' compensation excess of loss coverage to existing roofing contractors.   6/20/13 Tr. at 140:19-145:1 (Dorosz); Def.'s 248 at ANICO IOA-

---

[46]      Specifically:

| Claim | Munich Claim Number | Amount Billed Net of Payment by ANICO |
|---|---|---|
| JONES, Randall | 6110216 | $22,555.74 |
| FIELDS, Russell | 6140752 | $299,890.91 |

[47]      Munich previously moved for summary judgment on ANICO's reliance on the roofer exclusion, which was denied because genuine issues of material fact existed as to the parties' intent regarding the scope of the exclusion.  *See* Dkt. No. 97 (Opinion dated September 28, 2012), at 52-56.  Specifically, in its motion, Munich argued that ANICO's Rule 30(b)(6) designee, Michael Paetz, conceded in his deposition that that the roofer exclusion did not bar a claim involving someone employed by a general contractor who happened to fall off a roof.  *Id.* at 53.  I disagreed that the testimony supported any such concession, finding that Mr. Paetz only discussed roofer exclusions generally, and thus his testimony did not "not serve as a concession that the roofer exclusion found in the Everest Program document must be interpreted to apply only to roofing contractors."  *Id.* at 55-56.

5850 to -5854.  In particular, IOA Re relied on information in the underwriting file stating that employers with NCCI Code 5551—the industry code used to classify an insured employer's business as a roofing contractor—were to be excluded going forward from 1999.  6/20/13 Tr. at 145:2-146:24 (Dorosz).  IOA Re also relied on the following description in the underwriting package for the Retrocession Agreement that Everest was renewing its program without roofing contractor coverage:

> After analysis of their book it was decided to non-renew any existing roofing contractors and temporary or leasing agencies. These classes were never a significant portion of the book but contributed to a disproportionate share of losses. It should be noted that these classes were always subject to specific and more stringent underwriting/risk selection criteria. Even so, these classes are better left to those companies who specialize in them.

Def.'s 238 at ANICO-IOA-5854.  Based on the fact that coverage for roofing contractors was excluded, when IOA Re reviewed the Retrocession Agreements in 2009, it further concluded that *any* claims arising out of or related to roofing were excluded, even if the employer covered by the policy was not identified as a roofing contractor or by NCCI Code 5551.  *See id.* at 146:26-147:9; Tr. 6/24/13 at 203:4-13 (Hoekstra).

In reaching this conclusion, IOA Re further pointed to Munich's internal communications during the years covered by the Retrocession Agreements.  In an October 21, 1999 email, Ms. Isik explained to Victor Marques, at Am Re Brokers, that "the [Everest] book is more homogenous with a milder hazard complexion; *e.g.*, they are not writing roofing contractors."  Def.'s 29.  Additionally, in August 2000, Munich documents make clear its internal understanding that roofing companies were excluded from the workers' compensation business in the Everest book.  Def.'s 67 at MRAM-06-

49

01362.  Mr. Pawlowski corroborated this understanding in his testimony at trial.  6/24/13 Tr. 32 (Pawlowski) ("One of the exclusions stated was roofing companies, yes.").

Thus, in 2009, in connection with its audit of Munich, IOA Re determined that because Fields was "injured working on a roof," his claim was not eligible for payment, and accordingly took a refund of the payment that it made on the Fields claim in 2007.  *See* Dkt. No. 117 (Final Pretrial Order), § III, ¶¶ 13-14.  IOA Re also concluded at that time that the Jones claim was ineligible for payment as a "roofing" claim, although it had not yet issued a denial for the that claim.  *See id.*, § III, ¶ 16, 6/21/13 Tr. at 144:3-144:7 (Washburn).  In denying and/or disputing these claims, IOA Re relies entirely on information in the Jones and Fields claim files indicating that these individuals' injuries occurred in connection with being on a roof; it is of no import to IOA Re that the employers for which Jones and Fields were employed at the time of their injuries are not categorized as roofing contractors or identified by NCCI Code 5551.  *See* 6/20/13 Tr. at 146:26-147:9 (Dorosz); Tr. 6/24/13 at 203:4-13 (Hoekstra).

The Court finds as follows.  Workers' compensation insurance policies are issued to employers, not individuals.  6/20/13 Tr. at 145:2-7.  This is one of the reasons insurers, such as Everest, rely on NCCI codes, which categorize an employer's general line of business.  *Id.* at 145:8-19.  Indeed, the underwriting file, as well as Munich's internal documents, only reference employers who are categorized as roofing contractors; there is no reference in the underwriting materials or in Munich's files referring to claims based on injuries sustained while on or near a roof.  Moreover, IOA Re paid the Fields claim in 2007, even though the description of the injury related to Fields having fallen off a roof.  Similarly, IOA Re acknowledged in its own file that the Jones claim was eligible for

coverage while simultaneously describing Jones as a "roofer."  Indeed, the only evidence of any dispute regarding roofer claims arose solely in connection with IOA Re's audit of Munich based on other reporting and claims handling issues.  There was no evidence presented that at the time of contracting, the parties understood that *all* claims involving injuries sustained in connection with work on a roof were to be excluded.[48]

In that connection, the Court further finds Ms. Hoekstra's and Mr. Dorosz's testimony at trial that IOA Re understood that no roofer claims would be covered from the inception of the Retrocession Agreements to be not credible.  Ms. Hoekstra testified in response to the question "What was your intention with respect to roofing claims": "With the class of roofers being removed from the book, we would not have roofing claims, we would not have roofing contractors, and no roofing claims as a result." 6/24/13 Tr. at 203:8-13.  I interpret this testimony to be consistent with the finding that the parties intended to exclude roofing contractors; I do not find credible Ms. Hoekstra's conclusion that all claims involving workers injured on a roof would necessarily be excluded simply because roofing contractors were excluded.  Neither Ms. Hoekstra nor Mr. Dorosz provided any explanation for why this should be so, in light of the fact that workers' compensation policies are categorized and issued by *employer class*, not

---

[48]    Reliance on evidence extrinsic to the Retrocession Agreements, including surrounding circumstances, is appropriate here because the parties dispute the scope of coverage and the contracts themselves are ambiguous. *Christiania*, 979 F.2d at 274 (explain that where the terms of the contract are ambiguous, "reference to extrinsic evidence provides guidance to the parties' intent"); *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 3 N.Y.3d 577, 590-91 (2004) ("Our precedent establishes that where there is ambiguity in a reinsurance certificate, the surrounding circumstances, including industry custom and practice, should be taken into consideration") (Read, J., dissenting) *cited with approval in Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S.Ct. 1758, 1769 n.6 (2010); *see also Christiania*, 979 F.2d at 274 (noting that under New York law, a "reinsurance contract is governed by the rules of construction applicable to contracts generally").

*employee work. See* 6/20/13 Tr. at 145:2-19.   Furthermore, to the extent that Ms.

Hoekstra's testimony could be understood to mean that it was her intent at the time of

underwriting to exclude any claim involving injuries sustained from roofing, that

testimony is contradicted by IOA Re's payment of the Fields claim.[49]

Thus, in determining whether the roofing exclusion applies to the Fields or Jones

claims, I look to whether they were employed by companies whose primary business was

as a roofing contractor or subcontractor.[50]   In denying the Fields claim, IOA Re relied

solely on information in the Fields claim file indicating that this individual's injuries

occurred in connection with being on a roof; this is insufficient to show that Fields was

employed by a roofing contractor or subcontractors at the time of his injury.[51]   Def.'s 3;

6/21/13 Tr. at 136 (Washburn).   His claim is not excluded from coverage under the

---

[49]      My findings lead to an interpretation that gives meaning to the roofer exclusion as
it ensures that an entire category of employers deemed high risk—roofing contractors—
are excluded from coverage.   That some claims may still arise from roofing injuries does
not undermine the roofing exclusion as I have interpreted it.   By removing what is
certainly the broadest category of employers involved in roofing, I have given effect to
the parties' intent to minimize risk.   Thus, it cannot be said that such an interpretation
leads to absurd results.   That said, my findings must also lead to an interpretation that the
roofing exclusions applies equally to roofing subcontractors; it would certainly lead to an
absurd result if roofing contractors were excluded but subcontractors were not.   Indeed,
there is no principled reason to treat roofing contractors and subcontractors differently, as
they both are engaged in the business that the parties understood to be high risk.   *See
generally Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (N.Y. App.
Div. 2010) ("[A] contract should not be interpreted to produce a result that is absurd,
commercially unreasonable or contrary to the reasonable expectations of the parties.").
[50]      The burden of demonstrating that an exclusion to coverage applies is on ANICO.
*Checkrite Ltd., Inc. v. Illinois Nat. Ins. Co.*, 95 F. Supp. 2d 180, 189 (S.D.N.Y. 2000)
(quoting *Sylvan Beach*, 55 F.3d at 115-16); *see also Cone v. Nationwide Mut. Fire Ins.
Co.*, 551 N.E.2d 92, 93 (1989) (explaining that a court should construe an exclusion
provision narrowly, in favor of coverage); *Home Ins. Co. of Ill. v. Spectrum Information
Tech., Inc.*, 930 F. Supp. 825, 848 (E.D.N.Y. 1996) (same).
[51]      Indeed, Ms. Washburn testified that Mr. Fields was described in the claim file as a
"construction worker" and that there was nothing that she was aware of in the claim file
describing Mr. Fields' employer as a roofing contractor.   6/21/13 Tr. at 136:20-137:3
(Washburn); *see also* 6/20/13 Tr. at 146:26-147:9 (Dorosz).

Retrocessional Agreements.  Conversely, in denying the Jones claims, IOA Re relied on Munich's representations that Jones was an independent contractor whose job title was "roofer," and that his injuries occurred on the third story of a building on which he was working.[52]  6/21/13 Tr. at 62:2-16 (Washburn); *see also* Def.'s 286 (Jones claim file). This evidence is sufficient to show that the Jones claim pertains to a roofing contractor or subcontractor, and thus is excluded from coverage under the Retrocession Agreements.

2.    *Everest Re Claims*

ANICO also disputes coverage for claims arising under polices written by Everest Reinsurance ("Everest Re"), as opposed to Everest, arguing that Everest Re policies are not within the scope of coverage of the Retrocession Agreements.  These include claims for Russell Fields, Lavern Marion, and Ronald Moreira, (collectively, "Everest Re Claims").  *See* Dkt. No. 117 (Final Pretrial Order), § III, ¶ 8.[53]  ANICO argues that the Retrocession Agreements only provide for retrocessional cover of claims arising from policies issued by Everest, and, further, exclude coverage for any assumed reinsurance. In contrast, Munich argues that because the Everest Re Claims are all claims arising

---

[52]    Although the policy under which the workers compensation claim was submitted pertained to a general contractor, the Jones claim file makes clear that Jones was an independent contractor who did not have his own insurance, thus making the general contractor who had hired him responsible under its own workers' compensation policy.

[53]    Specifically:

| Claim | Munich Claim Number | Amount Billed Net of Payment by ANICO |
|---|---|---|
| FIELDS, Russell | 6140752 | $ 299,890.91 |
| MARION, Lavern | 6109956 | $ 250,332.43 |
| MOREIRA, Ronald | 6140754 | $ 89,400.07 |

The Fields claim is the same claim that ANICO also argues is excluded under the roofer exclusion, *see supra*, Note 46, and ANICO also seeks to exclude the Moreira claim under Article XVI, *see infra* Note 58.

under policies of primary workers' compensation insurance—and not assumed reinsurance—and because the underlying Everest Agreement is between Munich and both Everest and Everest Re, these claims are properly ceded and payable under the Retrocession Agreements.[54]

Article I of the Retrocession Agreements provides the scope of coverage, and provides:

ARTICLE I - Business Covered

A. The Reinsurer hereby agrees to indemnify the Company for the amount of ultimate net loss as herein provided and specified which may accrue to the Company as a result of loss or losses occurring during the term of this Agreement as a result of its participation in the following Reinsurance Agreement . . .

B. The Reinsurance Agreement listed above (hereinafter referred to as the "Underlying Agreement") is between the Company and *the following insurance company or group* (hereinafter referred to as the Original Ceding Company.):

EVEREST National Insurance Company
Phoenix, Arizona
(*as identified in the Underlying Agreement*)

Pl.'s 1-2 (Art. I) (emphasis added).[55]

In that connection, the "Underlying Agreement" identified in Article I is the Everest Agreement, *see* 6/17/13 Tr. at 64:12-64:23, 80:13-81:10 (Frantz), which in turn provides:

---

[54]    This Court denied Munich's previous motion for summary judgment on this issue because (i) Everest Re's title strongly suggested it was a reinsurer, (ii) Munich had not presented evidence to the contrary, and (iii) the language of the Retrocession Agreements could be understood to refer only to policies written by Everest.

[55]    Similarly, the Everest underwriting packet submitted by Munich to IOA Re states that it relates to the "Everest National Insurance Company" program.  Def.'s 248 at ANICO-IOA-5852

> THIS AGREEMENT is made and entered into by and between EVEREST NATIONAL INSURANCE COMPANY of Phoenix, Arizona *and EVEREST REINSURANCE COMPANY* of Wilmington, Delaware, both with administrative offices in Liberty Corner, New Jersey ("the Company"), and AMERICAN RE-INSURANCE COMPANY of Dover, Delaware, having administrative offices in Princeton, New Jersey ("the Reinsurer").

Pl.'s 3 (emphasis added).

The Everest Re Claims have never actually been denied by IOA Re, and in fact, the Marion claim was paid by IOA Re in April 2007, without question or any reservation of rights. 6/21/13 Tr. at 138:1-3; Pl.'s 17. At trial, the parties stipulated that, notwithstanding Everest Re's name, the Everest Re Claims all constitute primary workers' compensation insurance claims, not assumed reinsurance claims. 6/17/13 Tr. at 79:23-80:10. Also at trial, Mr. Dorosz, for IOA Re, agreed that for the purposes of the Retrocession Agreements, a claim arising from a primary policy of workers' compensation insurance written by Everest Re, and ceded to Munich under its reinsurance of Everest, is covered by the Retrocession Agreements. 6/20/15 Tr. at 138:21-139:2 (Dorosz). No evidence was presented as to whether Everest Re is a reinsurer, a primary insurer, or both, of workers' compensation policies.

Finally, although not addressed by the parties, is an email exchange in 2001 between Mr. Marques at Am Re Brokers and Ms. Hoekstra at IOA Re regarding the formation of the Retrocession Agreements. On April 18, 2001, Mr. Marques wrote an email requesting, *inter alia*, that the Retrocession Agreements "allow reinsurance [to be] accepted on an inter-company basis within the Everest Re group," as well as for the retrocessional carve-out cover. Def.'s 248 at ANICO-IOA-5785. On April 23, 2001, Ms.

Hoekstra responded to Mr. Marques' email with "OK."  *Id.* at ANICO-IOA-5784. Although there appears to have been no subsequent change to the actual wording of the Retrocession Agreements, as requested by Mr. Marques, when viewed in light of the parties' performance under the Retrocession Agreements, this email exchange further evidences the parties' intent that primary workers' compensation policies written by either Everest or Everest Re were to be covered under the Retrocession Agreements.[56]

In sum, given the April 23, 2001 email, Mr. Dorosz' testimony at trial as to the intent of the parties, the logical inference—based on the stipulation that Everest Re Claims are primary insurance claims—that Everest Re writes primary insurance policies in addition to whatever other policies it may issue, the Court finds that the parties intended the Retrocession Agreements to include primary workers' compensation policies written by Everest Re and otherwise properly ceded to Munich under the Everest Agreement.

3.     *Article XVI Claims (Sunset provision)*

ANICO's final claim-specific defense is based on Article XVI of the 2001 Retrocession Agreement—the Sunset provision.[57]  The Court previously ruled that Article XVI notice is a condition precedent to ANICO's coverage obligation under the 2001 Retrocession Agreement and, absent such notice, ANICO has no liability to Munich for those claims.  *See* Dkt. No. 112 (Reconsideration Opinion) at 25-26.  The operative

---

[56]     I rely on this email exchange only to show the parties understanding of the scope of coverage under the Retrocession Agreements in connection with their expectations and performance thereunder.

[57]     The Court ruled in its Opinion, dated March 28, 2013, granting ANICO's motion for reconsideration of the Court's previous summary judgment decision, that Munich's claims under the 2000 Stub Year were not timely noticed under the Sunset provision.  *See* Dkt. No. 112 (Reconsideration Opinion) at 39.

date for the Sunset provision for the 2001 Retrocession Agreement is December 31, 2008; claims first noticed after that date will not give rise to liability on ANICO's part.[58]

Article XVI provides in relevant part:

> A.   Seven years after the expiry of this Agreement, the Company shall advise the Reinsurer of all claims for said annual period, not finally settled which are likely to result in a claim under this Agreement.   No liability shall attach hereunder for any claim or claims not reported to the Reinsurer within this seven year period.

Pl.'s 1-2 (Art. XVI).

In support of its position that the 11 disputed claims were timely noticed to ANICO under the terms of Article XVI (the "Sunset Claims"), Munich relies on an August 8, 2008 spreadsheet submitted to IOA Re (the "August Spreadsheet").[59]  This 24-

---

[58]    The specific claims that ANICO contends were untimely noticed under Article XVI of the 2001 Retrocession Agreement are:

| Claim | Munich Claim Number | Amount Billed Net of Payment by ANICO |
|---|---|---|
| CONWAY, Richard | 6207502 | |
| MURRAY, Tamara | 6203081 | |
| HOLLAND, Judy | 6137793 | $ 90,570.93 |
| SCHULER, William | 6219163 | |
| CHILDERS, Catherine | 6218270 | |
| WHITE, Roger | 6129760 | $ 4,492.60 |
| BROADUS, Anne | 6216883 | |
| FRANK, Nancy | 6166260 | |
| MOTA, Felix | 6110497 | $ 500,000.00 |
| MOREIRA, Ronald | 6140754 | $ 89,400.07 |
| CHAMBERLAIN, Sharon | 6128894 | $ 92,312.65 |

*See* Dkt. No. 117 (Final Pretrial Order) § III, ¶ 17.  These claims were denied by IOA Re, on ANICO's behalf, as not being timely reported before December 31, 2008.  *See* 6/21/13 Tr. at 114:8-19 (Washburn).

[59]    Because the only arguable notice that Munich provided for the Sunset claims is the August Spreadsheet, Munich's argument that it timely noticed these 11 claims under the Sunset provision necessarily succeeds or fails with its contention that the August Spreadsheet satisfied its obligations under Article XVI.

page spreadsheet lists all Everest claims that had been reported to Munich for all years of the Everest program, including those years outside the period of the Retrocession Agreements, up through August 2008.  Pl.'s 13; *see also* 6/19/13 Tr. at 163 (Schmidt); 6/18/13 Tr. at 27 (Mauch).  The August Spreadsheet listed these claims individually by Everest and Munich's respective claim numbers, and included the following additional, corresponding information: (i) underwriting year; (ii) the code of either A/C; (iii) the code LOB; (iv) "Cause"; (v) named insured; (vi) date of loss; (vii) date of loss reported to Munich; (viii) "S-T"; (ix) "Paid Loss"; (x) "Paid ALAE"; (xi) "OSALAE"; (xii) "Reported Loss"; (xiii) "Reported Loss Plus Paid ALAE"; (xiv) "Reported Loss WCDISC"; (xv) "Salvage and Subro."; (xvi) "ACRINC in RPT loss in ALAE"; (xvii) "Attachment"; (xviii) "MRAm Limit"; (xix) "AAD (yes/no)"; (xx) "CIPHER (yes/no)". Pl.'s 7(28); Pl.'s 13.

There is no key or legend on the spreadsheet itself providing an explanation of the terms used on the August Spreadsheet, nor is there any explanation of the codes used under each column with respect to specific claims; however, during trial, Michael Frantz, who manages Munich's reinsurance claim operations division, *see* 6/17/13 Tr. at 62-63 (Frantz), attempted to explain the meaning of each column heading code or description. 6/17/13 Tr. at 84:9-94:12, 149:25-150:20 (Frantz); *see* 6/20/13 Tr. at 116:17-121:9. Nevertheless, Mr. Frantz could not identify all of the codes used in the column entries, such as the codes used in the "Cause" column, and Mr. Schmidt, the Am Re Broker who forwarded the spreadsheet to IOA Re, similarly was unfamiliar with all the codes used in the column headings or entries.  *See* 6/17/13 Tr. at 149:25-150:20 (Frantz); 6/20/13 Tr. at 116:17-121:9 (Schmidt).  Moreover, Mr. Frantz testified that he did not know whether

IOA Re had ever been provided with a key or explanation for the codes and descriptors used on the August Spreadsheet.  6/17/13 Tr. at 150:21-24 (Frantz).  In that regard, Ms. Washburn testified that upon receipt of the August Spreadsheet, she was able to understand several of the headings and codes used, but not all, and that when she received this document, she first went to her superior, Ms. Charney, for advice on how to proceed.  *See* 6/21/13 Tr. at 120:8-122:10 (Washburn).  Notwithstanding the foregoing, Munich considers the spreadsheet's format to be typical for the type of reporting it receives from its own cedents for reporting under similar Sunset provisions, although Mr. Schmidt testified that he had never reported to IOA Re using a report like the August Spreadsheet because all previous claims had been reported individually. 6/17/13 Tr. at 94:13-19 (Frantz); 6/19/13 Tr. at 150:12-151:5 (Schmidt).

When Mr. Schmidt forwarded, by email, the August Spreadsheet from Munich's internal audit division to Ms. Washburn at IOA Re, he noted that he thought the document would be helpful to "working out contract issues," as it comprised a listing of *all* of Munich's "assumed claims from Everest."  Pl.'s 13; 6/19/13 Tr. at 149:8-150:2 (Schmidt).  It was never Mr. Schmidt's understanding that the August Spreadsheet constituted a report under Article XVI; rather, it was merely intended to ensure that IOA Re had copies of all losses under the Everest program prior to the Sunset date.[60]  6/19/13 Tr. at 156:6-10 (Schmidt).  And while Mr. Schmidt believed that it would be possible for IOA Re to set its own reserves based on the information in the spreadsheet, he also acknowledged that it would not be possible for IOA Re to do its own independent

---

[60]     In that connection, it appears that IOA Re had at least once previously sought a report of all of Munich's claims under the Everest program.  *See* Def.'s 42; *see also supra*, Part II.B.1.

analyses of these claims.[61]  *Id.* at 156:11-157-16.  In that connection, Mr. Frantz testified that when Am Re Brokers sent IOA Re the August Spreadsheet, Munich had not made any "definitive determination" whether the claims listed on the spreadsheet would be likely to impact ANICO's retrocessional coverage.  6/17/13 Tr. at 95:4-11 (Frantz).

When Ms. Washburn received the August Spreadsheet, she consulted with Ms. Charney on how to proceed.  Although Ms. Charney understood the document to be Munich's attempt to report claims under Article XVI, she instructed Ms. Washburn to write back to Mr. Schmidt via email and explain that the August Spreadsheet was "not considered adequate notice of loss.   Individual notices must be provided for each claimant and should include claimant name, complete claim details, and financial data broken down by medical, indemnity, and expense."  Pl.'s 14; 6/20/13 Tr. at 194:13-23 (Charney).  It was Ms. Charney's belief that in order to satisfy the notice requirement of Article XVI, Munich was obligated to provide a listing of claims with particulars and estimates, as required under Article X.   6/20/13 Tr. at 194:24-195:2 (Charney).  Responding to Ms. Washburn's email, Mr. Schmidt indicated that he "agreed," and explained that Munich was "working on getting you the necessary back up documentation."  Pl.'s 14 (emphasis added).  Despite his response, Mr. Schmidt testified at trial that when he said he agreed with Ms. Washburn's email, he meant only that Munich still needed to send IOA Re supporting documentation; he did not mean to agree with Ms. Washburn's statement that the August Spreadsheet did not constitute adequate notice to IOA Re.  6/19/13 Tr. at 123 (Schmidt).

---

[61]     Mr. Schmidt admitted that he is not involved in claims operations, and thus he could not actually testify "as to what IOA Re needed in order to set reserves."  6/19/13 Tr. at 139-40 (Schmidt).

Mr. Dorosz also testified, in connection with the sufficiency of the August Spreadsheet, that ANICO's decision to commute[62] the Retrocession Agreements required a determination of whether it made sense to settle both (i) the current outstanding claims and (ii) any future claims likely to arise.  6/20/13 Tr. at 72 (Dorosz).  In other words, it was Mr. Dorosz's understanding that IOA Re needed to have sufficient information from Munich and Everest to allow the individual at IOA Re in charge of setting reserves—a nurse with experience in the medical issues related to workers' compensation claims—to determine the potential future cost of the claim.  *Id.* at 99.

Both parties' experts testified as to the industry standard for adequate reporting under requirements like those set forth in the Sunset Provision.  Ms. Mack, Munich's expert, opined that the August Spreadsheet "constitutes reasonable and customary notification of loss" for clauses like the Sunset provision.  6/20/13 Tr. at 13:20-14:1 (Mack).  Ms. Mack explained that she considered the spreadsheet to be a "bordereau" report,[63] which is "the customary and reasonable way to notify [*sic*] claims under a

---

[62]    As I explained in my previous decisions: "'A commutation is a settlement agreement reached between a reinsured and a reinsurer by which the reinsurance obligation is terminated by an agreement by the reinsurer to pay funds at present value that are not yet due under the reinsurance agreement. Similar to a policy buy-back with an insured, a commutation allows the reinsured to receive cash now to invest for the payment of claims that will come due in the future.'" *See* Dkt. No. 96 (Summary Judgment Opinion), at 35 n.13 (quoting Larry P. Schiffer, Esq., To Commute or Not To Commute, that Is the Question, http://www.irmi.com/expert/articles/2003/schiffer07.aspx (last visited February 13, 2014)).

[63]    As I explained in my March 28, 2013 Opinion, for the reporting of losses in a reinsurance relationship, a bordereau report has been defined by a recognized treatise as:

> Furnished periodically by the reinsured, a detailed report of reinsurance premiums or reinsurance losses. . . . A loss bordereau contains a detailed list of claims and claims expenses outstanding and paid by the reinsured during the reporting period, reflecting the amount of reinsurance indemnity applicable thereto. Bordereau reporting is primarily applicable

Sunset provision." *Id.* at 14:3-24.  In that connection, Ms. Mack stated that it is common for such reports to be somewhat over-inclusive of the claims noticed.  *Id.* at Tr. 15.  In sum, Ms. Mack concluded that the August Spreadsheet suffices for notice purposes under Article XVI, although she acknowledged that the document does not contain any information about the type or severity of the injury.  *Id.* at 32, 46-47.

ANICO's expert, Ms. Barber, flatly disagreed with the assessment that the August Spreadsheet was sufficient notice under Article XVI.  7/1/13 Tr. at 17:4-18 (Barber). Rather, Ms. Barber explained that the Sunset provision required "information that permits a retrocessionaire to determine the value of each claim," which the August Spreadsheet did not provide.  *Id.* at 17:22-24.  And while Ms. Barber acknowledged that workers' compensation insurance and reinsurance is a "long-tail" business—meaning claims can take years to develop—she testified that in deciding whether to commute, it is nevertheless expected that the parties will have sufficient basis on which to value present and future claims.  *Id.* at 18:15-19:11.  In Ms. Barber's opinion, the August Spreadsheet failed to provide the information necessary to value each claim listed in the document, *i.e.*, it did not "indicate which of the claims that Munich Re believes are likely to impact

---

> to pro rata reinsurance arrangements and to a large extent has been supplanted by summary reporting.

STRAIN, REINSURANCE CONTRACT WORDING at 747 (3d ed. 1998); *see also* Larry P. Schiffer, Patton Boggs, LLP, Reinsurance Terminology Explained: Bordereau, http://www.irmi.com/expert/articles/2011/schiffer08-insurance-reinsurance-law.aspx (August 2011) ("Generally, the loss bordereau will contain risk details such as the insured's name, claimant's name, policy number, claim number, effective date, date of loss, loss reserve, expense reserve, and any paid losses or expenses.").  I note that neither party has provided contrary definitions for, or otherwise challenged these definitions of, a bordereau.

the reinsurance that American National provided." *Id.* at 19:19-22.  Ms. Baber expressed

no opinion on whether the document constituted a bordereau report.

I find that the August Spreadsheet did not include sufficient information that

would have allowed IOA Re to make a determination on the likelihood that a claim

arising under the Retrocession Agreements would breach ANICO's retrocessional

retention layer.  This finding is supported by Mr. Frantz's own admission that Munich

made no definitive determination in this regard, and Ms. Washburn's email requesting

additional information.  I also find not credible Mr. Schmidt's testimony at trial that his

response "I agree" to Ms. Washburn's email was limited to agreeing that he would

provide additional information, as opposed to agreeing with her assessment that the

August Spreadsheet did not constitute adequate Article XVI notice.  This testimony is

also contradicted by the fact that in at least one prior instance, IOA Re had asked Munich

to provide all information on claims that Everest had ceded to Munich.  *See* Def.'s 42

(email from Charney to Giacobbe requesting all claims).

Moreover, I give little weight to Ms. Mack's conclusion that the August

Spreadsheet suffices for notice purposes, regardless of whether the August Spreadsheet

was intended to be a bordereau report.  Ms. Mack's conclusion is undermined by her

concession that the document contains no information regarding the nature of the

claimant's injury.  Indeed, this lack of information supports Ms. Barber's conclusion that

the August Spreadsheet failed to provide the information necessary to determine which

claims Munich believed likely to impact ANICO's retrocessional layer.  Finally, I find

Ms. Charney's testimony that Article XVI requires reporting of "particulars and

estimates," or other similar detailed information as required by Article X, to be not

credible, nor supported by the record, because it fails to make any distinction between the initial notice reporting for Sunset purposes and reporting for payment of claims. Rather, I find that Ms. Mack credibly and convincingly explained that reporting for Sunset purposes is based on providing the reinsurer, or here, retrocessionaire, with adequate notice of the cedent's existing claims. However, as I stated above, the August Spreadsheet failed to provide such adequate notice of Munich's claims covered by the Retrocessional Agreements.[64]

---

[64]     Munich does not dispute that 8 of the 11 claims identified by ANICO as the Sunset Provision claims in this litigation were first and only noticed on the August Spreadsheet prior to the Sunset deadline. However, Munich argues that the Mota, Moreira and Chamberlain claims, listed in the August Spreadsheet, were also reported to ANICO via IOA Re prior to December 31, 2008 by means other than the August Spreadsheet.

According to Munich, the Mota claim was first ceded to Munich by Everest in 2001. 6/17/13 Tr. at 83:22-83:24 (Frantz). Munich's assumed claims department then provided notice to Am Re Brokers on November 27, 2001, in order to notify IOA Re. *See id.* at 81:19-82:23. Munich also identifies a bill sent to IOA Re on the Mota claim, dated September 18, 2006, which also reflects that a previous notice was sent to IOA Re on November 28, 2001. Pl.'s 7-5(B); *see also* 6/19/13 Tr. at 107:24-109:14 (Schmidt). Finally, for the Mota claim, Munich points to ANICO's filing in its previous partial summary judgment motion, where ANICO acknowledged in its statement of undisputed facts that the Mota claim was reported to IOA Re within two days of the date that Munich first received notice of the claim from Everest. Dkt. No. 68-1, ¶ 79.

For the Moreira and Chamberlain claims, Munich relies on initial notices generated by Am Re Brokers on March 8, 2006 and July 8, 2008, respectively, which Munich contends would have been mailed to IOA Re within a day or two of that date, consistent with Am Re Brokers' normal procedures. Pl.'s 7(23)(A); *see also* 6/19/13 Tr. at 124:22-127:4 (Schmidt). Additionally, with respect to the Chamberlain claim, Munich points to Ms. Washburn's testimony that she initially was confused as to the claimant identified in the July 2008 notice, and that Mr. Schmidt explained to her that the Chamberlain notice was incorrect and sent in error, asking her to disregard the July 2008 notice and await a new one. 6/21/13 Tr. at 158:22-160:14, 163:9-164:24; Def.'s 311.

Lastly, for all three of these claims, Munich points to a letter from IOA Re to Munich, dated July 20, 2011, in which IOA Re requested additional information on various open claims including the Mota, Moreira and Chamberlain claims. Def.'s 307. It appears to be Munich's contention that because IOA Re issued denials on Sunset Provision claims, this letter is evidence that it did not consider these three claims to be barred by Article XVI. Based on these facts, Munich contends that IOA Re received

notice of the Mota, Moreira, and Chamberlain claims prior to the Sunset Provision deadline.

ANICO, relying on the testimony of Ms. Washburn and the absence of records from IOA Re, argues that IOA Re never received notice of the Mota, Moreira, or Chamberlain claims and was unaware that the claims even existed until IOA Re received the August Spreadsheet.  *See* Def.'s 292, 301, 304.  Furthermore, ANICO rejects Munich's reliance on the dates reflected on the any claim notices or bills on the basis that those dates only show when the document was generated by Munich or Am Re Brokers, and do not indicate when a document was (1) mailed or (2) received by IOA Re.

For the Mota claim, Munich identified two separate notices or bills that it claims were sent to IOA Re.  More importantly, ANICO previously admitted in its statement of undisputed material facts submitted with its motion for partial summary judgment that "Munich reported . . . the Mota claim [to IOA Re] in two days" of having received it from Everest.  Dkt. 66-1, ¶ 79.  Specifically, in admitting this fact—which ANICO appeared to use as evidence that Munich knew how to and/or had the ability to timely report claims—ANICO adopted Munich's interrogatory response detailing that Munich (i) received notice of the Mota claim from Everest on November 14, 2001, (ii) reserved at 50% of the reinsured attachment point on November 26, 2001, and (iii) noticed ANICO, through IOA Re, on November 28, 2001.  *See id.* (citing Dkt. No. 69-9 at Ex. 12).  ANICO has not pointed to anything undermining the validity of this fact or otherwise supporting its change in position regarding notice of the Mota claim.  Thus, in light of ANICO's admitted fact and Munich's evidence that it submitted two notices or bills to IOA Re on the Mota claim, I find that Munich has shown that it was more likely than not that IOA Re received adequate notice of the existence of the Mota claim in advance of the Sunset provision deadline.

On the other hand, the difficulty with Munich's position for the Moreira claim is that it relies almost entirely on Munich's own documents without any proof of mailing or receipt by IOA Re.  Munich's claim reporting procedures, however, were hardly "normal," or consistent, and thus Munich's reliance on its own course of business to show when IOA Re did or should have received these notices is misplaced.  Indeed, if anything, I find that the facts support ANICO's position that the Moreira claim was not received by ANICO prior to the August Spreadsheet.  Munich's inconsistent reporting procedures, including lengthy delays in reporting claims, make it more likely than not that Munich never actually mailed the Moreira claims, or mailed them to the wrong address.

Lastly, the communication between Ms. Washburn and Mr. Schmidt regarding the Chamberlain claim actually undercuts Munich's position—Mr. Schmidt's explanation to Ms. Washburn that the July 2008 notice was sent in error did not provide IOA Re with the notice required by Article XVI, as I define that notice in this Opinion.  Thus, all that is left to support Munich's argument is the IOA Re's 2011 letter that identified the Moreira, and Chamberlain claims as still open.  This alone is insufficient to show that these two claims were properly noticed under Article XVI in advance of the Sunset Provision deadline.

### III.     DISCUSSION

#### A.     *In Limine* Motions

Two motions *in limine* remain undecided from trial.  First, Munich sought to introduce, and ultimately rely on, two summary exhibits, Pl.'s 6 & 7, containing the claims ceded by Munich to ANICO, the date of Munich's payment demands for each ceded claim, and the amount of payment demanded.   ANICO objected to the admissibility of the summary exhibits on several grounds.  Initially, ANICO challenged the authenticity of the documents underlying the summary exhibits on the basis that the addresses listed on those records were different than the addresses on the original records. At trial, Munich's witness explained that the system in which these records are kept does not have an archival function, and thus when the billing address on a file is updated, the previous address is no longer listed on the record and is not otherwise accessible in the system.  *See* 6/18/13 Tr. at 6:6-7:6, 81:5-16 (Mauch).  No other information is altered, however, when this billing address is updated.  *Id.*  Based on this testimony, which I found credible, I find that the change of address does not give rise to a question of authenticity.

Next, ANICO argued that some of the underlying records pertained to Castlewood, not ANICO.  However, each of the records used for the summary exhibits show a Bates stamp relating to IOA Re—in other words, the records have all been received by IOA Re, even if they were initially sent first to Castlewood.  *See* 6/17/13 Tr. at 22:7-25.  That said, absent from these underlying documents is the date that IOA Re actually received the notices.  *Id.*  Accordingly, I find that while the Castlewood records were received by IOA Re, the dates in the summary exhibits relating to when these

Castlewood records were received by IOA Re are unreliable.  In that regard, counsel for Munich conceded that the summary exhibits would not be offered for the purposes of notice.  *Id.* at 24:19-24.

The second undecided motion relates to ANICO's request for an adverse inference based on Munich's failure to produce a specific statistical study of the Everest program, which is referenced in Munich's internal underwriting files.  *See* Def.'s 81 (internal Munich memo referencing July 31, 2000 statistical study showing Munich's past loss ratios).  Specifically, ANICO argues that "ANICO is entitled to the inference that the statistical study would have revealed that the loss experience and factors utilized in conjunction with the statistical study were not provided to IOA Re and this information was different from the loss experience which was provided to IOA Re."  *See* Dkt. No. 123, at 1.  I reserved decision on whether ANICO could show its entitlement to an adverse inference, which I determined was premised on a claim of spoliation, dependent upon the proofs at trial.  *See* 6/17/13 Tr. at 13.

An adverse inference is one type of sanction available for a spoliation claim. *Scott v. IBM Corp.*, 196 F.R.D. 233, 248 (D.N.J. 2000).  Crucial to such a claim, the party seeking the adverse inference must prove "that there has been an actual suppression or withholding of the evidence.  No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for."  *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995).  Having reviewed the trial evidence, I find that ANICO has not shown that Munich's failure to disclose this July 31, 2000 statistical study was the result of "actual suppression or withholding of evidence."

67

*Id.* Accordingly, I find that ANICO has not shown that an adverse inference is proper in this regard.[65]

**B.    Munich's Case in Chief**

Munich's case in chief is premised on ANICO's breach of contract of the Retrocession Agreements for failure to acknowledge, and/or pay amounts currently due and owing on, certain claims submitted to ANICO, via IOA Re.[66]  Specifically, Munich argues that ANICO has breached its obligations under the Retrocession Agreements by failing to pay the claims that are due, or to acknowledge as properly ceded those claims that have not yet breached ANICO's retrocessional coverage layer, and to which ANICO has raised no claim-specific defense to payment (collectively, the "Ceded Claims").   In addition to the Ceded Claims, Munich also contends that ANICO breached its obligations under the Retrocession Agreements by failing to acknowledge and pay claims that ANICO has categorized as arising from roofer injuries or from policies issued by Everest Re.  Lastly, Munich argues that it timely provided notice of certain claims in advance of the Sunset Provision deadline, and thus ANICO has improperly denied these claims.  In total, there are 65 Ceded Claims, to which ANICO has raised no specific defense, 2 roofer claims, 3 Everest Re claims, one of which is also a roofer claim, and 11 Sunset Provision claims, one of which is also an Everest Re claim, for a total of 79 claims at issue in this litigation.[67]

---

[65]    Moreover, even assuming an adverse inference is proper, as my below analysis demonstrates, ANICO has not carried its burden of demonstrating that Munich's past loss ratios were material to IOA Re's underwriting process.  *See infra*, Part III.C.3.

[66]    Munich also seeks a declaratory judgment that ANICO is obligated to pay all future losses on those claims that may become due in the future. I address Munich's request for a declaratory judgment, *infra* Part III.E.

[67]    Specifically:

| | Claim | Munich Claim Number | Amount Billed Net of Payment by ANICO | Notes |
|---|---|---|---|---|
| 1 | WELCH, Edmond | 6098145 | $187,500.00 | As of 8/23/13 |
| 2 | OWENS, Johnson | 6124309 | $187,506.36 | As of 8/23/13 |
| 3 | SANCHEZ, Jose | 6109126 | $250,000.00 | As of 8/23/13 |
| 4 | KRONER, George | 6102272 | $250,000.00 | As of 8/23/13 |
| 5 | McMANUS, Raymond | 6125230 | ($19,506.84) | As of 8/23/13 |
| 6 | CHAVEZ, Sylvia | 6144422 | $316,204.21 | As of 8/23/13 |
| 7 | CUMMINGS, Michael | 6110205 | $412,460.89 | As of 8/23/13 |
| 8 | MIMS, Alan | 6139831 | $237,879.12 | As of 8/23/13 |
| 9 | OLIVER, Christopher | 6112221 | $135,680.00 | As of 8/23/13 |
| 10 | BEST, John | 6142918 | $8,745.81 | As of 8/23/13 |
| 11 | MITTLEBERGER, David | 6142930 | $314,383.55 | As of 8/23/13 |
| 12 | SAAVEDRA, Martin | 6133577 | $56,944.50 | As of 8/23/13 |
| 13 | TISON, George | 6140171 | $39,668.35 | As of 8/23/13 |
| 14 | WILLIAMS, Melvin | 6129003 | $107,961.63 | As of 8/23/13 |
| 15 | LOPEZ, Karen | 6135970 | $227,799.59 | As of 8/23/13 |
| 16 | KOZLOWSKI, Joseph | 6142745 | $250,000.00 | As of 8/23/13 |
| 17 | ORELLANO, Fausto | 6129315 | $343,469.90 | As of 8/23/13 |
| 18 | SEXTON, Lisa | 6135960 | $174,707.41 | As of 8/23/13 |
| 19 | SIS, Gonzalo | 6159351 | $0.00 | As of 8/23/13 |
| 20 | MAGANA, Juan | 6102276 | $31,394.41 | As of 8/23/13 |
| 21 | BARTOSZEWIC, Waldemar | 6150020 | $414,752.36 | As of 8/23/13 |
| 22 | KENNEMORE, David | 6213189 | $19,905.14 | As of 8/23/13 |
| 23 | SOSA, Lidia | 6150266 | $181,811.86 | As of 8/23/13 |
| 24 | JIMENEZ, Ricardo | 6125915 | $500,000.00 | As of 8/23/13 |
| 25 | KELLY, Paul | 6135728 | $60,048.34 | As of 8/23/13 |
| 26 | BUFORD, Derrick | 6169131 | $8,233.95 | As of 8/23/13 |
| 27 | ROSETTE, A. | 6223129 | | Not Billed |
| 28 | STREETER, R. | 6220894 | | Not Billed |
| 29 | BABS, M. | 6219483 | | Not Billed |
| 30 | JARAMILLO, S. | 6219138 | | Not Billed |
| 31 | SCRUGGS, N. | 6214137 | | Not Billed |
| 32 | SALVADOR, C. | 6203088 | | Not Billed |
| 33 | GALLARDO, M. | 6200302 | | Not Billed |
| 34 | ORTEGA, E. | 6161338 | | Not Billed |
| 35 | HALL, W. | 6106084 | | Not Billed |
| 36 | FRANCE, Patricia | 6197830 | | Not Billed |
| 37 | VALENCIA, M. | 6200308 | | Not Billed |
| 38 | ROMANO, T. | 6150024 | | Not Billed |

| 39 | HAYDEN, J. | 6135971 | | Not Billed |
|----|------------|---------|--|-----------|
| 40 | KNOPP, Laurie | 6201573 | | Not Billed |
| 41 | PARTON, Georgene | 6207518 | | Not Billed |
| 42 | MAPLES, Albert | 6129006 | | Not Billed |
| 43 | GONZALES, Ramon | 6140257 | | Not Billed |
| 44 | LEA, Donna | 6139784 | | Not Billed |
| 45 | CALVERT, Steven | 6150261 | | Not Billed |
| 46 | CHRISTIE, Glenn | 6156350 | | Not Billed |
| 47 | SHORT, Mark | 6183074 | | Not Billed |
| 48 | MERRILL, P. | 6190662 | | Not Billed |
| 49 | HALL, J. | 6136033 | | Not Billed |
| 50 | SOTO, R. | 6138818 | | Not Billed |
| 51 | GILBERT, Andrew | 6187443 | | Not Billed |
| 52 | MEDINA, L. | 6201435 | | Not Billed |
| 53 | COVINGTON, E. | 6195263 | | Not Billed |
| 54 | SCHWARTZ, M. | 6201430 | | Not Billed |
| 55 | LUGO, Rosalina | 6138807 | | Not Billed |
| 56 | RIVAS, Daniel | 6207513 | | Not Billed |
| 57 | SOLES, Ronald | 6127566 | | Not Billed |
| 58 | HARRISON, Dylane | 6196870 | | Not Billed |
| 59 | ESQUIVEL, Ernesto | 6142814 | | Not Billed |
| 60 | GARCIA, Alonzo | 6203083 | | Not Billed |
| 61 | JACKSON, Rodney | 6150016 | | Not Billed |
| 62 | EARLEY, Lucas | 6153310 | | Not Billed |
| 63 | ROJAS, Elizabeth | 6179981 | | Not Billed |
| 64 | CUNNINGHAM, Teresa | 6203082 | | Not Billed |
| 65 | TODRIFF, Debbe | 6221306 | | Not Billed |
| 66 | JONES, Randall | 6110216 | $22,555.74 | Roofer |
| 67 | FIELDS, Russell | 6140752 | $299,890.91 | Roofer/Everest Re |
| 68 | MARION, Lavern | 6109956 | $250,332.43 | Everest Re |
| 69 | MOREIRA, Ronald | 6140754 | $89,400.07 | Everest Re/Sunset |
| 70 | CONWAY, Richard | 6207502 | | Sunset |
| 71 | MURRAY, Tamara | 6203081 | | Sunset |
| 72 | HOLLAND, Judy | 6137793 | $90,570.93 | Sunset |
| 73 | SCHULER, William | 6219163 | | Sunset |
| 74 | CHILDERS, Catherine | 6218270 | | Sunset |
| 75 | WHITE, Roger | 6129760 | $4,492.60 | Sunset |
| 76 | BROADUS, Anne | 6216883 | | Sunset |
| 77 | FRANK, Nancy | 6166260 | | Sunset |
| 78 | MOTA, Felix | 6110497 | $500,000.00 | Sunset |
| 79 | CHAMBERLAIN, Sharon | 6128894 | $92,312.65 | Sunset |

Munich contends that all of these claims are properly ceded to ANICO under the Retrocession Agreements, and that ANICO has no basis for nonpayment of those claims if and when they breach ANICO's layer of coverage.  It bears noting that the only claims at issue in this litigation that have actually been denied by ANCIO are the Article XVI claims—ANICO has not issued any denial of the other claims, it merely has not paid them.  Moreover, ANICO has not disputed that Munich has correctly calculated the dollar amount of payments due on claims that have been billed to ANICO, only whether these claims are actually payable under the Retrocession Agreements.

ANICO contends that it owes no obligation to Munich for any claims because there is a basis on which to rescind the Retrocession Agreements.[68]  Alternatively, ANICO also argues that if rescission is not proper, Munich nonetheless is not entitled to payment on the claims because it acted in bad faith in reporting claims to IOA Re. Lastly, ANICO argues that even if the contracts are enforceable, it has no obligation to pay on the roofer claims, the Everest Re claims, or those claims not timely reported ahead of the Sunset Provision deadline.

The essential elements of a cause of action to recover damages for breach of contract are: the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages.  *See, e.g.*, *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.,* 893 N.Y.S.2d 237, 239 (App. Div. 2010).   In that connection, the Retrocession Agreements provide that:

---

[68]    In response to ANICO's rescission claims, Munich argues that ANICO has waived the right to raise defenses to payment or bring claims for rescission because they were not timely asserted and, with respect to rescission of the 2000 Stub Year, ANICO failed to tender return of the premium received.

> [ANICO] agrees to pay [Munich Re] on demand, [ANICO]'s proportion of all losses and/or loss expenses paid by [Munich Re] arising from the Underlying Agreement, including any and all expenses incurred directly by [Munich Re] in the litigation, defense and settlement of claims made against [Munich Re] by the Original Ceding Company under the Underlying Agreement, excluding, however, all office expenses of [Munich Re] and the salaries and expenses of its employee.

Pl.'s 1-2 (Art. X).

As the ensuing analysis makes clear, for the Ceded Claims—which are not specifically contested by ANICO—there is no dispute that Munich ceded these claims to ANICO, and thus they are payable under the Retrocession Agreements *unless* ANICO prevails on its rescission claim.[69]  Thus, for the Ceded Claims, ANICO will be liable to Munich if ANICO's rescission counterclaims fail.  With respect to those claims for which ANICO has asserted a specific defense to non-payment, Munich will only be entitled to payment if (i) ANICO's rescission counterclaims fail, (ii) Munich proves that the claims are covered by the Retrocession Agreements, and (iii) ANICO fails to prove that the relevant coverage exclusion applies.  *See Sylvan Beach v. Travelers Ins. Co.*, 55 F.3d 114, 115-16 (2d Cir. 1995).  I address ANICO's rescission counterclaims first, for if rescission is proper it would dispose of this matter in its entirety.

---

[69]     ANICO, almost in passing, argues that Munich cannot prove that ANICO has breached the Retrocession Agreements because "Munich has failed to show its demands for payment fall within the scope of coverage, and that it has met all obligations required for payment under the agreements."  Def.'s FF&CL at ¶ 253.  To begin, this argument is so vague and underdeveloped that the Court finds it difficult to understand how it differs from ANICO's claim for breach of the duty of utmost good faith.  Indeed, it appears from ANICO's papers that, in arguing that Munich has not satisfied its obligations under the Retrocession Agreements, ANICO is simply reframing its rescission counterclaim.  In any event, I address whether Munich breached its reporting obligations—*i.e.*, "failed to show its demands for payment fall within the scope of coverage"—*infra* at Part III.C.4.

### C.     ANICO's Rescission Claims

ANICO has raised two counterclaims for rescission of the Retrocession Agreements based upon Munich's breach of the duty of utmost good faith during (1) the underwriting process associated with the formation of the Retrocession Agreements, and (2) Munich's performance of the Retrocession Agreements due to Munich's failure to timely and properly submit claims to IOA Re.

Under New York law,[70] in order to for ANICO to succeed on a rescission claim, it must prove:

> (a) [a] lawful right to rescind; (b) due notice of an intention to rescind; and (c) the restoration of benefits received by the party attempting to rescind, so that the other party may be placed in status quo.  Even if the most complete right of rescission exists it cannot be exercised without a return or an offer to return such benefits.

*In re Domestic Fuel Corp.*, 79 B.R. 184, 193 (Bankr. S.D.N.Y. 1987) (citing *Cox v. Stokes*, 156 N.Y. 491 (1898), *Lee v. The Vacuum Oil Co.*, 126 N.Y. 579 (1891)).  Here, as noted, ANICO's "right to rescind" is premised on breaches of the duty of utmost good faith between an insured and reinsured.

### 1.     Utmost Good Faith[71]

"The relationship between a reinsurer and a reinsured is one of utmost good faith, requiring the reinsured to disclose to the reinsurer all facts that materially affect the risk of which it is aware and of which the reinsurer itself has no reason to be aware." *Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 278 (2d Cir. 1992) (citing *Sumitomo Marine & Fire Ins. Co.*, *Ltd.-U.S. Branch v. Cologne*

---

[70]     Both parties agree that New York law governs the instant dispute.  Pl. FF&CL, ¶ 368; Def. FF&CL, ¶ 172; *see also* Pl.'s 1-2 at 1.

[71]     Also referred to as *uberrimae fidei* and *uberrima fides*.  For consistency, I refer to the duty as one of "utmost good faith."

*Reinsurance Co. of Am.*, 75 N.Y.2d 295, 303 (1990)); *Home Ins. Co. of Ill. (N.H.) v. Spectrum Info. Tech., Inc.*, 930 F. Supp. 825, 836 (E.D.N.Y. 1996) (utmost good faith defined as "absolute and perfect candor or openness and honesty" (quoting BLACK'S LAW DICTIONARY 1520 (6th ed. 1990))); *see also Matter of Union Indem. Ins. Co. of N.Y.*, 89 N.Y.2d 94, 106 (1996) (characterizing the duty of utmost good faith as "the core duty accompanying reinsurance contracts"). The reinsured is not required to act solely in the reinsurer's interest; however, to satisfy this duty, the reinsured cannot place its own interests above those of the reinsurer. *See Christiana*, 979 F.2d. at 281 (citing, *inter alia*, *St. Paul Fire & Marine Ins. Co. v. U.S. Fidelity & Guar. Co.*, 43 N.Y.2d 977, 978-79 (1978); *see also Hartford Accident & Indem. Co. v. Mich. Mut. Ins. Co.*, 93 A.D.2d 337, 342 (N.Y. App. Div. 1983) (duty to proceed in good faith and in the exercise of honest discretion violated where primary insurer placed its own interests above those of excess insurer)). In sum, under the duty of utmost good faith, the cedent is obligated "to place the underwriter in the same position as himself [and] to give to him the same means and opportunity of judging of the value of the risks." *Christiania*, 979 F.2d at 280 (citing *Sun Mut. Ins. Co. v. Ocean Ins. Co.*, 107 U.S. 485, 510 (1883)); *see also Home Ins. Co. of Ill. (N.H.)*, 930 F. Supp. at 836 (noting that duty of utmost good faith is meant to create a level playing field between the reinsurer and the reinsured (quoting *Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 4 F.3d 1049, 1066 (2d Cir. 1993)).

Relevant here, the duty of utmost good faith requires the reinsured—Munich—"to disclose to potential reinsurers all 'material facts' regarding the original risk of loss, and

74

failure to do so renders a reinsurance agreement voidable or rescindable."[72]  *Matter of Union Indem.*, 89 N.Y.2d at 106 (internal citations omitted); *see also Sumitomo*, 75 N.Y.2d at 303 (citation omitted); *Gerling Global Reinsurance Co.-U.S. Branch v. Ace Prop. & Cas. Ins. Co.*, 42 F. App'x 522, 524 (2d Cir. 2002).  In that connection:

> A fact is material so as to void *ab initio* an insurance contract if, had it been revealed, the insurer or reinsurer would either not have issued the policy or would have only at a higher premium. . . . The issue [then] is whether, [armed with undisclosed information], [the retrocessionaire] would have acted differently, and, if so, whether [the reinsured] should have been aware that such listing would have affected [the retrocessionaire's] decision.

*Christiania*, 979 F.2d at 278; *see also Matter of Union Indem.*, 89 N.Y.2d at 95-96 ("[Material facts are] those likely to influence the decisions of underwriters; facts which, had they been revealed by the reinsured, would have either prevented a reinsurer from issuing a policy or prompted a reinsurer to issue it at a higher premium . . . .").  Moreover, a fact is material only if "a reasonable insured should have believed the fact was something the insurer would consider material . . . as of the time the contract was entered into."  *Christiania*, 979 F.2d at 278-79.  Thus, the standard for determining materiality is an objective one; a court may not rely merely on statements by representatives of the insurer that it would not have issued the policy but for the representation.  *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 119 (2d Cir. 1999) (citing *Feldman*, 241 A.D.2d at 433, 661 N.Y.S.2d at 9).

---

[72]    As other courts have explained, such a duty exists because "the assured is in the best position to know of any circumstances material to the risk," thus, it is within the reinsured's power to share, or conceal, such information.  *Home Ins. Co. of Ill. (N.H.)*, 930 F. Supp. at 836 (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986) (discussing the duty of utmost good faith in context of marine insurance)).

Additionally, as a general principle, the duty of utmost good faith has been described as covering the entire relationship between the parties to a reinsurance contract, not only the contracting stage.  GRAYDON S. STARING, LAW OF REINSURANCE, § 8.1 (2013).  In that sense, the duty of utmost good faith is seen as imposing mutual duties on both the reinsured and reinsurer.  *Id.*, § 8.2; *see also Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 4 F.3d 1049, 1054 (2d Cir. 1993) ("*Unigard II*") ("The reinsurance relationship is often characterized as one of 'utmost good faith.'  This utmost good faith may be viewed as a legal rule but also as a tradition honored by ceding insurers *and* reinsurers in their ongoing commercial relationships." (Emphasis added.)); *cf. New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 318 (1995) ("[I]mplicit in every contract is a covenant of good faith and fair dealing which encompasses any promises that a reasonable promisee would understand to be included. Certainly, a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims."); *N. Am. Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA, Inc.*, 499 F. Supp. 2d 361, 377 (S.D.N.Y. 2007) *on reconsideration in part*, Civ. No. 05 CIV. 4807 (SAS), 2007 WL 2873926 (S.D.N.Y. May 15, 2007) *rev'd in part and aff'd in part*, 292 F. App'x 73 (2d Cir. 2008) ("In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance. This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." (Internal quotation marks omitted.)).

ANICO's rescission counterclaims that are premised on the breach of the duty of utmost good faith arise from two separate sets of facts: the first from Munich's alleged failure to disclose information material to the underwriting of the Retrocession

Agreements, and the second from Munich's alleged improper claims handling in performing under the Retrocession Agreements.  I analyze ANICO's latter argument first.

2.   *Rescission Based on Claims Handling*

ANICO contends that Munich breached its duty of utmost good faith by failing to properly perform its duties under the Retrocession Agreements.  Specifically, ANICO argues that Munich failed to (i) ensure that claims submitted to IOA Re were correctly ceded to and payable by ANICO, (ii) provide adequate and timely notices of these claims, and (iii) maintain or make available records related to the Everest program.  *See* Dkt. No. 117 (Final Pretrial Order), § XII, ¶ 3.   In that connection, ANICO points to the Retrocession Agreements' requirement that Munich provide prompt notice of all claims, with "such estimates and particulars," as well as immediate notice of certain categories of claims.  *See* Pl.'s 1 & 2 (Art. X).  ANICO contends that Munich's failure to abide by these terms constitutes a breach of the duty of utmost good faith, and thus supports ANICO's claim for rescission.

ANICO has not provided this Court with any case law supporting the proposition that New York courts recognize, as an independent cause of action, breach of the duty of utmost good faith based on a party's failure to perform under the terms of the contract.[73] Indeed, this Court has found no case applying New York law in which rescission was granted, or at least contemplated, for breach of the duty of utmost good faith on any basis other than material misrepresentation at the time of contract formation.  This is not to say that in New York, the duty of utmost good faith terminates after the reinsurance agreement has been formed.  Rather, it appears that the duty of utmost good faith is

---

[73]     ANICO only cites to insurance treatises in support of this argument.

treated as concomitant with the duty of good faith implicit in all contracts.  *See, e.g.*, *Unigard II*, 4 F.3d at 1069; *Folksamerica Reins. Co. v. Republic Ins. Co.*, Civ. No. 03 CIV. 0402(HB), 2004 WL 936760 (S.D.N.Y. Apr. 29, 2004); *see also Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (noting that all New York contracts carry with them implied covenant of good faith and fair dealing). In that connection, the *Christiania* court held that a claim of breach of duty of utmost good faith based on a reinsured's failure to provide timely and accurate information to the reinsurer is instead governed by the New York rule that a reinsurer must prove prejudice as a result of late notice.  *Christiania*, 979 F.2d at 281 ("At most, a reinsured's failure to provide prompt notice may entitle the reinsurer to relief without showing prejudice if the reinsured acted in bad faith.").

In other words, a claim based on breach of the duty of utmost good faith premised on improper claims handling in the reinsurance context is no different than a claim based on breach of the duty of good faith attendant to any other contract under New York law. Unfortunately for ANICO, New York law is clear that no independent cause of action exists for a breach of the duty of good faith; rather, such a claim is merely a claim for breach of contract.  *Verzani v. Costco Wholesale Corp.*, 641 F. Supp. 2d 291, 300 (S.D.N.Y. 2009) *aff'd*, 387 F. App'x 50 (2d Cir. 2010) ("[B]reach of good faith and fair dealing does not state an independent cause of action . . . ."); *O'Hearn v. Bodyonics, Ltd.*, 22 F. Supp. 2d 7, 11 (E.D.N.Y. 1998) ("[U]nder New York Law, . . . a claim for breach of an implied covenant of good faith and fair dealing does not provide a cause of action separate from a breach of contract claim; these claims must be dismissed, as a matter of law, as redundant. '[P]arties to an express contract are bound by an implied duty of good

faith, but breach of that duty is merely a breach of the underlying contract.'" (Quoting *Fasolino Foods Co.*, 961 F.2d at, 1056.)); *Silvester v. Time Warner, Inc.*, 763 N.Y.S.2d 912, 918 (Sup. Ct. 2003) *aff'd sub nom. Silvester v. Time-Warner, Inc.*, 787 N.Y.S.2d 870 (App. Div. 2005).   Thus, ANICO's claim for rescission based on Munich's claims handling is no more than a claim for rescission based on breach of the Retrocession Agreements.

New York courts grant rescission, which is considered an "extraordinary remedy," "only when a breach may be said to go to the root of the agreement between the parties." *Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (citing *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir. 1980)).   "[B]efore rescission will be permitted the breach must be 'material *and* willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.'"   *Id.* (emphasis added) (quoting *Callaman v. Powers*, 199 N.Y. 268, 284 (1910)); *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) ("A party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract.").   In general, courts applying New York law have been reluctant to rescind a contract based on breach where the totality of the circumstances show substantial compliance with the contract,  that "the injured party can be adequately compensated for its loss, and the good faith of the breaching party."   *Id.* (citing Restatement (Second) of Contracts § 24)); *Babylon Associates v. Suffolk Cnty.*, 475 N.Y.S.2d 869, 874 (App. Div. 1984) (same); *cf. U.S. Postal Serv. v. Phelps Dodge Refining Corp.*, 950 F. Supp. 504

(E.D.N.Y. 1997) (finding rescission appropriate where party had failed to perform at all under the contract and showed no intention of performing in the future).

As made clearer *infra* in connection with my analysis of whether Munich acted in bad faith in performing, or failing to perform, its obligations under the Retrocession Agreements, the facts here do not support rescission of the contracts based on Munich's claims handling.  There is no evidence that Munich willfully violated its obligations of prompt and/or immediate reporting of claims.  Moreover, Munich's untimely claims reporting and other technical errors are not material as they does not go to the "root" of the Retrocession Agreements; indeed, as I have already found as a matter of law in my Opinion dated September 28, 2012, and which I reaffirmed in my Opinion dated March 28, 2013, ANICO has failed to present sufficient evidence that it was prejudiced by Munich's late notice under Article X of the Retrocession Agreements.

Finally, even assuming *arguendo* that rescission is proper for Munich's claims handling errors, I conclude that ANICO waived any such claim by failing to bring it in a timely manner.  The record is clear that as early as 2003, IOA Re had questions about Munich's claims handling under the Retrocession Agreements, as evidenced by the email Ms. Hoekstra sent Mr. Giacobbe noting that he was reporting claims after they had exceeded the retention and suggesting that this was contrary to most reporting requirements.  Most significantly, IOA Re's employee, Ms. Charney, engaged in an email exchange with Mr. Giacobbe in 2005, wherein Ms. Charney explicitly informed Mr. Giacobbe that he was not reporting in line with the Retrocession Agreements.  Yet ANICO did not assert any right to rescind until April 2011, *see* Dkt. No. 60 (ANICO's Amended Answer), *years* after IOA Re had knowledge of Munich's claims handling

practices.[74]  This delay is fatal to ANICO's rescission claim.  *Sumitomo*, 75 N.Y.2d at

304 ("[D]efendants not only failed to take steps to assert their alleged right to rescission

within a reasonable time, as they were required to do, but also affirmatively treated the

agreement as a valid one well beyond the point where they had the most complete

possible notice of the coverage undertaken by Sumitomo. Under these circumstances,

they have waived that claim." (Internal citation omitted.)); *In re Schick*, 232 B.R. 589,

596 (Bankr. S.D.N.Y. 1999) ("[R]escission to be effective must be announced without

unreasonable delay.  This requirement of promptness is not an affirmative defense; it is

an element of a *prima facie* rescission action and the burden of proof is on plaintiff . . . ."

(Internal citations and quotation marks omitted.)).  For these reasons, I conclude that

ANICO has no viable counterclaim for rescission based on Munich's untimely and

incomplete claims reporting.[75]

*3.      Rescission Based on Underwriting Failures*

ANICO also brings a counterclaim for rescission premised on Munich's failure to

disclose information to IOA Re during the underwriting of the Retrocession Agreements.

Specifically, ANICO contends that Munich had the obligation to disclose all material

facts regarding the nature of the risks it was undertaking, and that by failing to do so,

---

[74]     I reject ANICO's argument that it was unaware of Munich's claim handling issue until Munich's response to ANICO's interrogatories as part of this litigation in 2011; this is contradicted by Ms. Hoekstra's and Ms. Charney's communications with Mr. Giacobbe several years prior.

[75]     ANICO also premises its rescission claim on Munich's actions during an audit by IOA Re in late 2009, when Munich declined to disclose all documents requested by IOA Re auditors and then terminated the audit before IOA Re finished.  Without passing on whether Munich's actions during the audit support a rescission counterclaim, this event as well is too far removed in time from when ANICO first asserted a right to rescind in 2011.  Indeed, litigation between the parties commenced shortly after the 2009 audit, yet ANICO offers no explanation for why it did not assert a rescission counterclaim based on Munich's performance during the audit prior to 2011.

Munich breached its duty of utmost good faith to ANICO.[76]  Munich argues that the undisclosed information was not material to ANICO's retrocessional underwriting and that, again, ANICO waived any claim for rescission by failing to promptly assert it.

The inquiry into whether Munich failed to satisfy its duty of utmost good faith during the underwriting of the Retrocession Agreements is two-part: (1) whether it is objectively reasonable for ANICO to consider the undisclosed information as having been material at the time the Retrocession Agreements were formed; and (2) whether it is objectively reasonable that, at that same time, Munich should have believed that ANICO would consider the undisclosed information to be material. *Christiania*, 979 F.2d at 278. Only if ANICO carries its burden of proving both prongs can rescission be proper for breach of the duty of utmost good faith.[77]

As an initial matter, the parties dispute the appropriate burden of proof applicable to ANICO's rescission counterclaims.  Munich contends that under New York law,

---

[76]    ANICO also claims based on the same facts that rescission is proper because Munich fraudulently induced ANICO to enter into the Retrocession Agreements.

[77]    Munich contends that it is unclear whether New York law provides an independent cause of action for breach of the duty of utmost good faith premised on misrepresentation made at the time of contract formation, citing two unpublished federal district court opinions: *Folksamerica Reins. Co. v. Republic Ins. Co.*, 2004 WL 936760 and *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co.*, No. 90 Civ. 7811(AGS), 1995 WL 3006, at *5 (S.D.N.Y. Jan. 4, 1995).  Neither of these cases holds that rescission is not available for a misrepresentation of material fact that amounted to a breach of the duty of utmost good faith, and indeed, other courts applying New York law have explicitly found that rescission is a proper remedy in such a circumstance.  *E.g.*, *Allendale Mut. Ins. Co. v. Excess Ins. Co. Ltd.*, 992 F. Supp. 278, 286 (S.D.N.Y. 1998) ("Allendale's failure to disclose the existence of outstanding recommendations made as part of the survey report constituted a violation of its duty of utmost good faith . . . [and] defendants were thereby entitled to rescission of the parties' contract . . . ."); *Matter of Union Indem.*, 89 N.Y.2d at 107 (explaining that a contract is voidable where the utmost duty of good faith is breached due to failure to disclose a material fact).  Accordingly, I conclude that New York law provides for a rescission claim to be based on breach of the duty of utmost good faith for failure to disclose a material fact.

rescission of a contract, including one for reinsurance, is proper only on a showing of clear and convincing evidence.   ANICO, while acknowledging that the clear and convincing standard applies to its claim of rescission predicated on fraudulent inducement, argues that the usual civil preponderance standard applies to rescission claims premised on a breach of the duty of utmost good faith.

New York courts have differentiated between a claim of rescission based on fraud and one based on a mere failure to disclose.  *See Allendale Mut. Ins. Co. v. Excess Ins. Co. Ltd.*, 992 F. Supp. 278, 282 (S.D.N.Y. 1998) (quoting *Matter of Union Indemn.*, 89 N.Y.2d at 102).   Indeed, in *Christiania*, the court specifically noted that failure to disclose material information does not have to be fraudulent or intentional.  979 F.2d at 279; *see also Matter of Union Indem.*, 89 N.Y.2d at 107 ("A reinsured need not possess a specific intent to conceal information from a reinsurer to make a contract voidable, rather "an innocent failure to disclose a material fact is sufficient.")); *In re Domestic Fuel Corp.*, 79 B.R. 184, 193 (Bankr. S.D.N.Y. 1987) ("In order to rescind a contract, the party seeking to rescind has the burden of proving that the other party or parties to the contract fraudulently misrepresented facts at the time the contract was entered into. . . . *A party may also seek rescission* if it proves that certain material facts were innocently misrepresented to it by the other contracting party." (Emphasis added; citations omitted.)).  It is thus clear from the case law that rescission of a reinsurance contract need not be predicated only on fraudulent inducement or misrepresentation.

In each of these cases where rescission is premised on a breach of the duty of utmost good faith for negligent or innocent omissions or misrepresentations, there is no mention of any heightened pleading standard or burden of proof.  *See, e.g., Unigard II*, 4

F.3d at 1069; *Allendale Mut. Ins.*, 992 F. Supp. at 282-83; *Sumitomo*, 75 N.Y.2d at 303. In contrast, each of the cases cited by Munich in support of its argument that rescission must be proved by clear and convincing evidence only addresses the standard of proof for claims based on fraud. *See Mix v. Neff*, 473 N.Y.S.2d 31, 33 (App. Div. 3d Dep't 1984) ("When an opponent of a contract alleges fraud in the inducement, whether as an affirmative defense or by way of a counterclaim seeking rescission, he must sustain the burden of persuasion. . . . That burden of proving fraud in the inducement, or a cause of action seeking rescission on that ground, requires that the proof be 'by most satisfactory evidence' . . . which we interpret to be clear and convincing evidence rather than only a fair preponderance of the credible evidence." (Citations omitted.)); *cf. In re Schick*, 232 B.R. at 596 (explaining that clear and convincing standard applies to reformation).

Here, ANICO has pleaded two different legal bases for rescission: breach of the duty of utmost good faith, and fraudulent inducement. *See* Dkt. No. 117 (Final Pretrial Order), § XII (Defendant's Legal Issues), ¶1 ("Munich concealed material information from American National and gave false information to American National . . . ."), ¶ 3 ("Munich breached the duty . . . of utmost good faith it owed to American National . . . ."), ¶ 4 ("As a result of Munich's fraudulent inducement . . . *and* its breaches of the duty of utmost good faith owed to its reinsurer, American National is entitled to rescission of the [Retrocession Agreements] . . . ." (Emphasis added.)).  In light of this, I find that ANICO need only prove its rescission counterclaim premised on Munich's breach of the duty of utmost good faith by a preponderance of the evidence; on the other hand, ANICO's counterclaim premised on fraudulent inducement must be proven by clear and convincing evidence.

I turn now to the merits of ANICO's rescission claim based on Munich's breach of utmost good faith during the underwriting process associated with the formation of the Retrocession Agreements.  As noted, ANICO must prove that, at the time the agreements were entered into, IOA Re, as ANICO's underwriting agent, would have acted differently had it known about undisclosed information *and* Munich should have been aware that the undisclosed information would have caused IOA Re to act differently.

In support of its counterclaim, ANICO primarily relies on the testimony of, and any trial exhibits associated with: (i) IOA Re's underwriter in charge of the Retrocession Agreements, Ms. Hoekstra, and (ii) Munich's underwriter in charge of the Retrocession Agreements, Mr. Pawlowski.  Specifically, ANICO points to the following testimony of Ms. Hoekstra, in which she identifies each of the following undisclosed pieces of information as "material" to her underwriting decision:

- Munich's consideration of using an offshore entity—Inter-ocean—to underwrite the Everest program for 2001 based Munich's initial calculations of an expected loss ratio above Munich's guidelines;
- Munich's past loss ratio calculations of its performance on the Everest program at or above 150% between 1997 and 2000, and revised overall loss ratio in excess of 200%;[78]
- Munich's internal description of Everest's own loss ratio as "very dubious";
- Munich's decision to conduct its own actuarial exposure rating study based on prior loss activity in the Everest program;
- Munich's knowledge in October 2000 of Everest claims with reserves of around $2.6 million that had not yet been reported to IOA Re for retrocessional coverage purposes;
- Munich's own reviews of the Everest program;

---

[78]     Munich has argued that IOA knew Munich had incurred loss ratios in excess of 100% in prior years. A note in the IOA underwriting file states that another reinsurer, Swiss Re, on the 175 excess of 75 layer, "got hammered." Def.'s 248 at ANICO-IOA-5799; 6/25/13 Tr. at 110-11 (Hoekstra).  In response, ANICO contends that IOA Re's knowledge of Swiss Re's performance did not help IOA Re understand Munich's own performance.

- Munich's awareness of concerns with Everest's MGAs, such as stair-stepping of reserves;
- Munich's calculations that if premiums paid and charged were not altered, it would lose money on the Everest program.

6/24/13 Tr. at 207-12; 6/25/13 Tr. at 13 (Hoekstra).  In Ms. Hoekstra's view, these facts were material to her underwriting because if she knew them, she might have elected not to offer retrocessional coverage on behalf of ANICO, or might have done so at a different rate.  *Id.*  ANICO also identifies testimony from Mr. Pawlowski regarding Munich's own internal reviews of the Everest program that Munich felt were important to its own underwriters—which necessarily included the layer of coverage assumed by the retrocessionaires—that were not shared with IOA Re.[79]  *See* 6/24/13 Tr. at 42-70 (Pawlowski).  I have already found that all of this information was not disclosed, or not fully disclosed, by Munich to IOA Re.  *See supra*, Part II.A.2.  The question now becomes whether this information was objectively material to IOA Re's underwriting process.

I find that ANICO has failed to show that any of the undisclosed information was material to IOA Re's underwriting process.  Materiality is an objective standard; I cannot rely merely on statements from Ms. Hoekstra that IOA Re *might* not have underwritten retrocessional coverage of the Everest program had it known what Munich knew.  *First Fin. Ins. Co.*, 193 F.3d at 119 ("A court may not rely merely on statements by

---

[79]     ANICO cites portions of Mr. Pawlowski's testimony where he described the following items on which Munich's underwriters focused around the time Retrocession Agreements were being formed: the Everest MGAs, and Munich's projection of an incurred loss ratio of 150 percent for 2000.  6/24/13 Tr. at 44, 52-54, 56 (Pawlowski)).  ANICO also points out that Munich had internally described its relationship with Everest as "opportunistic," and how Munich's experience with Everest is "not positive presently."  *Id.* at 53-54, 56; Def.'s 69.

representatives of the insurer that it would not have issued the policy *but for* the representation." (Emphasis added; citing *Feldman v. Friedman,* 241 A.D.2d 433, 433 (N.Y. 1st Dep't 1997).).  In any event, Ms. Hoekstra did not even testify that knowledge of the undisclosed information would have actually affected her underwriting decision, only that there was a possibility that it could.  Such testimony is insufficient to show that, under an objective standard, the undisclosed information was material.  *Christiania*, 979 F.2d at 278.

Similarly, Mr. Pawlowski's testimony does not show that Munich considered this information material to the underwriting of *ANICO's* retrocessional cover.  Rather, Munich's internal documents reflect what was important with respect to the entire liability that Munich had assumed from Everest—the $750,000 excess $250,000 layer.  Although the retrocessional coverage that Munich sought and obtained through IOA Re was a carve-out of Munich's layer—the $500,000 excess $500,000 layer—the facts show that the expectations for the performance of the carve-out were significantly different than those for the portion of cover that Munich would retain under the Retrocession Agreements—the $250,000 excess $250,000 layer.   6/24/13  Tr.  at  48:25-52:5 (Pawlowski); *id.* at 51:23-24 (explaining that he did not see Munich's experience for the entire $750,000 excess $250,000 layer being reflective of a retrocessionaire's experience for the $500,000 excess $500,000 layer); 6/25/13 Tr. at 66:13-67:23 (Hoekstra) (acknowledging that each layer of coverage would necessarily have different loss ratios, which she expected).  Mr. Pawlowski's testimony fails to support ANICO's argument

that, under an objective standard, Munich's undisclosed internal knowledge was material to IOA Re's underwriting of the retrocessional coverage.[80]

Moreover the evidence ANICO presented concerning IOA Re's underwriting procedures also militates against a finding of materiality with respect to Munich's undisclosed internal reviews.  Ms. Hoekstra explained that in developing a quote for retrocessional cover, she relied on certain types of data supplied by the cedent, which she input into a "Treaty Underwriting Work Sheet" and "Basis Underwriting Information" document.  *See* Pl.'s 50 at AAHRU 00104; Def.'s 248 at ANICO-IOA-5842, -5801.  IOA Re then applied its proprietary model to generate manual rates for the retrocession, based solely upon the data supplied by Everest, and then applied discretionary adjustment factors to discount the manual rate it calculated, again based only on Everest's business practices, not those of Munich.[81]  6/25/13 Tr. at 71:2-74:10 (Hoekstra).

In Munich's case, Ms. Hoekstra was always able to complete these documents with the information supplied in the Everest underwriting package she received from Munich.  In the instances that she felt information was lacking or unclear, she would request it of Munich, who then supplied it.  Thus, although Ms. Hoekstra testified at trial that she considered Munich's internal calculations to be material to her underwriting process, this testimony is belied by the actual procedures Ms. Hoekstra followed.  Indeed, there was no evidence presented that Ms. Hoekstra or IOA Re ever considered or used

---

[80]   For the same reason, I find that ANICO has not shown it was material that Munich was expecting an underwriting loss on the Everest program around the time it was negotiating the Retrocession Agreements.  Munich's underwriting calculations concerned a different amount of coverage and a different premium than that of ANICO.

[81]   The fact that IOA Re used a manual rate, based off industry average loss rates, not loss data from the specific program being reinsured, *i.e.*, Everest, *see supra*, Note 10, further supports the finding that Munich's own calculations of loss rates were not material to IOA Re's underwriting process.

Munich's own calculations—such as Munich's own previous or projected losses—in underwriting the retrocessional carve out for the Everest program on behalf of ANICO.[82] *Id.* at 50:4-51:6. Rather, Ms. Hoekstra viewed Munich's liabilities as separate from and different than from those of any retrocessionaire. *Id.* at 18:25-19:22 (explaining that Munich and ANICO's liabilities differed but were both based solely on the risk arising from the underlying Everest policies). For these reasons, I find that Ms. Hoekstra's testimony that the undisclosed information was material to her underwriting process is not credible. In sum, it is ANICO's burden to show that an underwriter would reasonably find such undisclosed information to be material to the underwriting process; here, ANICO has failed to show that even its own underwriter considered such information material at the time the Retrocession Agreements were being formed.

In a similar vein, ANICO has not presented any evidence of IOA Re's underwriting practices for other ceding reinsurers, and New York courts in other insurance contexts have consistently required an insurer to submit evidence of its underwriting practices with respect to other similar applicants to meet the burden of proof on materiality.[83] *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 465 (S.D.N.Y. 2005); *First Fin. Ins.*, 193 F.3d at 119 (2d Cir. 1999) (same); *Cutrone v. American Gen.*

---

[82]     As noted *supra*, Note 22, Ms. Hoekstra in only once instance, at the beginning of the underwriting of the Retrocession Agreements, inquired what Munich's rate was for its reinsurance of the Everest program; Ms. Hoekstra received no response to this, and never followed up or asked for Munich's rate at any other time. This leads to the conclusion that such information was not material to IOA Re's underwriting process.

[83]     None of these cases deal with rescission of reinsurance contracts or the duty of utmost good faith, and for that reason I do not consider it dispositive that ANICO has failed to show IOA Re's general underwriting practices. Nevertheless, that ANICO has not made such a showing further undermines its argument that an objectively reasonable underwriter would consider Munich's undisclosed information to be material.

*Life Ins. Co.*, 199 A.D.2d 1032, 1032 (N.Y. 4th Dep't 1993); *Sonkin Assocs., Inc. v. Columbian Mut. Life Ins. Co.*, 150 A.D.2d 764, 764 (N.Y. 2d Dep't 1989).

Finally, the expert testimony on this issue does not support ANICO's position. As I already found, Munich's expert, Ms. Lyew, credibly explained that the only material information Munich needed to disclose to IOA Re was the information about Everest that Munich obtained and supplied to IOA Re in the underwriting package.  Ms. Lyew further testified that it was customary in the industry for the ceding company to send an underwriting package like that sent by Munich to its reinsurer or retrocessionaire, with the expectation that the reinsuring entity would follow up with further requests or questions as needed.  I also found the contrary testimony of ANICO's expert, Mr. Waterman, to be entitled to less weight given the number of years removed he is from actively participating in the reinsurance market and his lack of experience with workers' compensation excess of loss retrocessions.  Thus, in light of the above findings, the experts' testimony taken together fails to show that an objective underwriter would reasonably consider Munich's undisclosed information to be material.

The cases relied on by ANICO regarding materiality are not to the contrary. ANICO relies principally on *Nichols v. Am. Risk Mgmt.*, Civ. No. 89 Civ. 2999(JSM), 2002 WL 31556384 (S.D.N.Y. Nov. 18 2002), and *Matter of Union Indem.*, 89 N.Y.2d 94, to show that Munich failed to disclose material information.  Both *Nichols* and *Matter of Union Indemnity* concerned the nondisclosure of insolvency.  Here, however, there is no evidence that either Everest or Munich were insolvent, and thus these cases provide little else to help determine the materiality of the information that Munich did not disclose to IOA Re.

90

ANICO also cites to *Allendale Mut. Ins. Co. v. Excess Ins. Co. Ltd.*, in which the court found that rescission was proper where the primary insurer failed to disclose to its reinsurers that it was not implementing all recommendations identified in a survey report on the underlying insured property. 992 F. Supp. 278, 280-82 (S.D.N.Y. 1998). According to the *Allendale* court, the reinsurance agreement required that, in order for the underlying property be to insured, all recommendations in the survey report should have been implemented, and thus these recommendations were material to the parties' agreement; the failure of the insurer to inform its reinsurers that not all recommendations had been implemented amounted to a breach of the reinsured's duty of utmost good faith. *Id.* at 286. Although *Allendale* supports the general proposition that the reinsured's failure to disclose material facts about the underlying insured property allows the reinsurer to seek rescission, it does not provide any direct support for ANICO's claim that Munich's internal calculations—based off of the same information on Everest that was available to IOA Re—are material to IOA Re's underwriting of retrocessional coverage.

Lastly, I reject ANICO's argument that New York's "known loss" doctrine applies to the facts of this case. *See Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1215 (2d Cir. 1995); *see also Barry v. Romanosky*, 147 A.D.2d 605 (2d Dep't 1989). Under New York law, "an insured may not obtain insurance to cover a loss that is known before the policy takes effect." *Stonewall*, 73 F.3d at 1214. Contrary to ANICO's assertion, the facts do not show that Munich knew that Everest, Munich, or ANICO would actually incur a loss under the Retrocession Agreements. The sole evidence relied on by ANICO is Mr. Pawlowski's testimony and a transcribed voicemail

relating to losses in years outside of the Retrocession Agreements.  *See* 6/24/13 Tr. at 97,

158 (Pawlowski); *see also* Def.'s 239.  Mr. Pawlowski's testimony makes clear, however,

that when he said that there would be "known losses" under any retrocession of the

Everest program, he meant that "[i]t should not be expected [for the retrocession] to be

loss-free necessarily."  6/24/13 Tr. at 159.  I do not find such testimony to mean that

Munich expected ANICO to lose money on the retrocession, but rather that there

certainly would be some claims that would breach ANICO's retrocessional layer.

Next, even assuming *arguendo* that some of this information could be considered

material, ANICO has not carried its burden of also demonstrating that it is objectively

reasonable for Munich to have known that IOA Re would have considered this

information to be material.  As the *Christiania* court explained:

> [T]hat an undisclosed fact may have been material to the reinsurer does
> not itself enable a reinsurer to rescind because, though the failure to
> disclose need not be fraudulent or even intentional, the party with a duty to
> disclose must at least have reason to believe the fact not disclosed is
> material. Absent such belief, there is not actually a misrepresentation in
> the sense of a knowing failure to disclose [and] . . . rescission is not
> available . . . .

979 F.2d at 279; *id.* at 278-79 ("[T]he standard for disclosure being whether a reasonable

insured should have believed the fact was something *the insurer* would consider

material." (Emphasis added.)).

ANICO has failed to show that it was objectively reasonable for Munich to

believe that its own undisclosed internal information would be material to its

retrocessional underwriter.  Although Ms. Hoekstra testified that specific knowledge of

Munich's internal information may have affected her underwriting, she also testified that

when she was underwriting the Everest program on behalf of Munich's retrocessionaires,

she assumed that Munich was conducting its own internal studies of Everest.  *See* 6/25/13 Tr. at 21:11-15 (Hoekstra).  Indeed, it appears to be standard in the reinsurance industry for each entity—insurer, reinsurer(s), and retrocessionaire(s)—to conduct its own internal reviews of the program.  *See id.* Tr. at 21:16-22:3.  Yet neither Ms. Hoekstra nor anyone else at IOA Re asked to see all of Munich's internal reports or projections for the Everest program.[84]  And when Ms. Hoekstra made specific requests for audit reports, those requests were honored.

Similarly, the fact that Munich's exposure under the Everest program differed from its retrocessionaire's exposure reasonably could have lead Munich to believe that its loss ratios would not be material to the underwriting of the retrocessionaire's carve out. Again, Ms. Hoekstra's testimony shows that she expected the loss ratio calculation for the retrocessional coverage to be different than that for Munich's layer.  6/25/13 Tr. at 66:13-67:23 (Hoekstra).   ANICO's expert on this issue, Mr. Waterman, also acknowledged that loss ratio calculations for Munich's exposure and ANICO's exposure as a carve-out retrocessionaire would be different.  7/1/13 Tr. at 177:5-178-7, 182:1-17 (Waterman) (explaining and that because in the workers' compensation line of business the frequency of losses are the most in the lower levels of coverage, it would be the expectation of all underwriters involved in the Everest program that Munich would have more losses than ANICO).  Further supporting this conclusion is Munich's expert Ms.

---

[84]   In making this point, I do not mean to suggest that IOA Re had a duty to inquire about, instead of Munich having a duty to disclose, material information.  Rather, my focus is on whether it is objectively reasonable that Munich should have believed that IOA Re would consider these internal reviews to be material in light of the fact that Munich—correctly—assumed IOA Re knew that such internal reviews existed throughout Munich's relationship with IOA Re under the Everest program, and yet IOA Re never once explicitly or implicitly told Munich that such internal reviews were material to IOA Re's underwriting process.  *Christiania*, 979 F.2d at 278-80.

Lyew's explanation that each layer of reinsurance coverage is "distinct," requiring different underwriting for each.  7/2/13 Tr. at 47:10-48:19 (Lyew) (explaining that the Munich layer is "a different coverage" from the ANICO layer, "and, therefore, it requires a different analysis").  In light of this, ANICO has not shown that it was reasonable for Munich to expect that its own loss ratios were material to IOA Re's underwriting of a carve out layer of retrocessional coverage.  Indeed, this reasoning extends to any of Munich's undisclosed internal information related to Munich's own underwriting practices: ANICO has not shown that, in the reinsurance-retrocessionaire relationship, it is objectively reasonable for the retrocedent to believe that its internal calculations of the cedent's exposure are material to the retrocessionaire's underwriting of the carve out coverage.[85]

In sum, ANICO has failed to carry its burden of demonstrating that Munich's undisclosed information was material, such that it would justify rescission.  ANICO has not provided sufficient evidence that this information would have caused IOA Re to not issue retrocessional coverage on behalf of ANICO, or to do so at a different price.  Nor has ANICO shown that it is objectively reasonable for Munich to have believed that this

---

[85]    For example, Ms. Lyew explained that in the reinsurance industry, "each company has their own proprietary methodologies" for generating exposure and loss ratings.  7/2/13 Tr. at 49:8-50:17 (Lyew).  Ms. Lyew further noted that each reinsurer is aware that other companies have their own proprietary methods for examining and pricing risk, and that reinsurers "guard that information" from disclosure.  *See id.* Notably, ANICO provided no evidence, either through its expert or otherwise, contradicting Ms. Lyew's testimony in this regard.  Thus, for this reason as well, ANICO has not shown that it was objectively reasonable for Munich to know that the undisclosed information was material to IOA Re's underwriting process, given that both Munich and IOA Re employed their own proprietary methods for assessing and pricing their exposure to the Everest risk, and IOA Re never disclosed that method, or informed Munich what data IOA Re considered material to its underwriting beyond that supplied in the underwriting package.

undisclosed information would be material to IOA Re's underwriting process.  Without a showing of both, ANICO cannot prove that the undisclosed information was material. *Christiania*, 979 F.2d at 278-80.

Additionally, because ANICO has not shown, by a preponderance of the evidence, that Munich failed to disclose material information during the formation of the Retrocession Agreements, it necessarily follows that ANICO cannot show, by clear and convincing evidence, that Munich fraudulently induced ANICO to enter into the Retrocession Agreements based on the undisclosed information.  *See Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank*, 850 F. Supp. 1199, 1215 (S.D.N.Y. 1994) *aff'd*, 57 F.3d 146 (2d Cir. 1995) ("Under New York law, each element of a fraud claim must be proved by clear and convincing evidence."); *Almap Holdings, Inc. v. Bank Leumi Trust Co. of New York*, 196 A.D.2d 518, 518 (N.Y. App. Div. 1993) (same).  Accordingly, I find that ANICO has no basis on which to rescind the Retrocession Agreements.[86]

### 4.   Breach of the Retrocession Agreements

In the alternative, ANICO contends that even if rescission is not proper, Munich has nevertheless failed to carry its burden of showing that ANICO breached the Retrocession Agreements by failing to pay on the claims at issue in this case.  Although less fully-developed that its rescission claims, ANICO appears to argue that Munich has failed to perform its own obligations under the Retrocession Agreements, resulting in a

---

[86]   For this reason, I need not reach Munich's defense that ANICO did not timely assert its claim for rescission—whether based on breach of the duty of utmost good faith or fraudulent inducement—and by doing so waived any such claim.  I also need not reach Munich's defense that rescission is improper for the 2000 Stub Year because ANICO never attempted to tender a return of the premium for that year.

material breach which justifies ANICO's nonperformance.  Regardless of how ANICO styles its argument, it is clear that the crux of ANICO's defense is that Munich has no claim against ANICO for breach of contract because of Munich's improper claims handling.  In other words, ANICO relies on the same claims handling problems that it did in connection with its rescission claim to defeat Munich's breach of contract claim for all claims at issue in this case.[87]

Under New York law, a reinsured's breach of its obligations under the contract, such as timely and detailed claim reporting, does not automatically relieve the reinsurer of its obligation of payment.

> For a reinsurer to be relieved from its indemnification obligations because of the reinsured's failure to provide timely notice, absent an express provision in the contract making prompt notice a condition precedent, it must show prejudice resulted from the delay.

*Pac. Employers*, 693 F.3d at 433 (quoting *Christiania*, 979 F.2d at 274 (emphasis omitted)).  In my September 28, 2012 Opinion, which I reaffirmed in my March 28 Reconsideration Opinion, I explained with regard to Munich's claim handling that under "the plain language of Article X as a whole, it is clear that Munich's failure to timely advise ANICO of any claim is not a condition precedent that affects Munich's right to receive payment."  Dkt. No. 96, at 30.  Thus, the prompt payment provision in the Retrocession Agreements "is an ordinary contractual covenant the breach of which may entitle [ANICO] to damages but does not automatically forfeit coverage." *Id.* at 32 (internal quotation marks omitted).  I further determined that in this case, ANICO failed to identify sufficient evidence supporting its contention that it suffered any prejudice, and

---

[87]     As noted, ANICO also raises claim-specific defenses to several categories of claims, which I address separately *infra*.

thus any damages, from Munich's late claims reporting.   Dkt. No. 96, at 34. Accordingly, I concluded that ANICO failed to carry its burden of demonstrating prejudice, and thus was not entitled to rely on Munich's untimely claims reporting as a defense to payment of those claims.  *Id.* at 37.  Likewise, in my Reconsideration Opinion, I clarified that ANICO had not presented evidence showing that the late reporting of claims affected its decision on whether to commute its own retrocessional coverage with Max Re, the entity reinsuring ANICO's book of business.  *See* Dkt. No. 112, at 24-25.

With this avenue for ANICO to deny payment foreclosed, the only remaining applicable basis under New York law for ANICO to deny payment of claims is if ANICO can prove that Munich acted in bad faith in failing to perform under the contract.[88] *Christiania*, 979 F.2d at 281 ("[A] reinsured's failure to provide prompt notice may entitle the reinsurer to relief without showing prejudice if the reinsured acted in bad faith."); *see also Certain Underwriters at Lloyd's London v. Home Ins. Co.*, 783 A.2d 238, 240 (N.H. 2001) (applying New York Law) ("Because we conclude that the trial court properly found that Home's late notice was the result of bad faith which, alone, is sufficient to foreclose indemnification, we need not decide whether London Reinsurers suffered any actual prejudice.").  Notably, however, *Certain Underwriters*, appears to be the only decision finding that a reinsured acted in bad faith with respect to claims handling thereby relieving the reinsurer of its indemnity obligations.   *See Certain Underwriters*, 783 A.2d at 241.

A reinsured's bad faith is shown by gross negligence or recklessness. *Unigard II*, 4 F.3d at 1069 ("[W]e do not think simple negligence in not disclosing a material fact

---

[88]      The parties did not move, and I made no determination, on the issue of bad faith in my previous decisions.

constitutes bad faith."); *see also id.* (explaining that "adoption of a negligence standard would negate the prejudice requirement established" by the New York Court of Appeals in *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 594 N.E.2d 571 (N.Y. 1992)).  Gross negligence "differs in kind, not only degree, from claims of ordinary negligence."  *Ryan v. IM Kapco, Inc.*, 930 N.Y.S.2d 627, 629 (App. Div. 2011) (quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 611 N.E.2d 282, 283-84 (N.Y. 1993)).  "To constitute gross negligence, a party's conduct must smack of intentional wrongdoing or evidence a reckless indifference to the rights of others."  *Id.* at 629 (internal citations and quotation marks omitted); *see also id.* (holding that finding of gross negligence will lie only where a party "fails to exercise even slight care or slight diligence").  Likewise, "'recklessness is more than ordinary negligence, more than want of ordinary care . . . impl[ying] a substantially greater degree or grosser form of negligence.'"[89] *Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 644 (E.D.N.Y. 2000) (quoting *Sheridan v. Fletcher*, 58 N.Y.S.2d 466, 469 (App. Div. 1945)).

> Significantly, in the reinsurance context, the *Unigard II* court noted that
>
> if a ceding insurer has implemented routine practices and controls to ensure notification to reinsurers but inadvertence causes a lapse, the insurer has not acted in bad faith.  But if a ceding insurer does not implement such practices and controls, then it has willfully disregarded the risk to reinsurers and is guilty of gross negligence.

4 F.3d at 1069.

---

[89]    For example, in *Sutton Park Dev. Corp. Trading Co. v. Guerin & Guerin Agency Inc.*, the court affirmed the dismissal of claim for gross negligence against an insurance broker where the complaint alleged that the broker misrepresented the premium purchased by the plaintiff would not increase over time, finding that these facts failed to "allege conduct of . . . aggravated character."  745 N.Y.S.2d 622, 624 (App. Div. 2002).

Here, ANICO argues that Munich's actions—particularly Mr. Giacobbe's—support a finding of gross negligence or recklessness in its claims handling.  Specifically, ANICO contends that Munich did not implement any routine procedures or controls to prevent late reporting, and that Mr. Giacobbe's actions amounted to more than mere "inadvertence" in failing to comply with the reporting terms of the Retrocession Agreements.  ANICO points to the fact that there was no written policy or program in place at Munich regarding reporting under the Retrocession Agreements, including no formal training for, or management of, claim reporting; rather, it was Munich's expectation that claims officers would review contracts to ensure compliant reporting.  ANICO further relies on Mr. Giacobbe's testimony that he never read the Retrocession Agreements or the Everest Agreements, even after he was advised at least twice by IOA Re that his reporting did not appear to be in line with Munich's obligations under the Retrocession Agreements.  Similarly, Mr. Giacobbe's replacement, Mr. Freda, received no training and did not learn of the actual Retrocession reporting obligations until over a year after he had assumed the position.

As I found in connection with the experts' opinions on this issue, Munich's lack of formal training for its claims handlers, surprisingly, was not outside of industry custom and practices.  Similarly, Mr. Giacobbe's and Mr. Freda's attempts to continue reporting claims to IOA Re in the same manner as their predecessors had reported them did not fall below the duty of care expected in the reinsurance industry.  In fact, the only apparent violation of Munich's duty owed to IOA Re was Mr. Giacobbe's failure to inform himself of the actual reporting requirements under the Retrocession Agreements after he received the email from Ms. Charney.

Mr. Giacobbe's failure in this regard—and a failure it was—however, does not amount to gross negligence or recklessness because it was not "conduct that evinces a reckless indifference to the rights of others." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (1992). Certainly, Mr. Giacobbe should have conducted his own review of the Retrocession Agreements. Yet, his decision to take no action on Ms. Charney's somewhat ambiguous email response to his question on Munich's reporting obligations did not "smack[] of intentional wrongdoing." *Id.* Rather, it was his understanding, based on his predecessor's reporting, that he was complying with Munich's obligations under the Retrocession Agreements. Indeed, as evidenced by this litigation, Munich and IOA Re continuously operated under different, but not unreasonable, understandings of the contracts' terms, which were only relatively recently resolved by this Court. Although a close call, I find that Mr. Giacobbe's decision to continue to report in the manner he believed was consistent with the contract—which was not arbitrary but based on his predecessor's conduct and Mr. Giacobbe's own industry experience—was not a failure "to exercise even slight care," and thus does not constitute gross negligence.[90] *Food*

---

[90] In my March 28, 2013 Reconsideration Opinion, I stated: "Certainly, no reasonable factfinder could conclude that it was 'inadvertent' error on Giacobbe's part to continue to report claims late following those emails [from Ms. Charney in 2005]." *See* Dkt. No. 112, at 26. Although there might appear to be some tension between this statement and the above reasoning, this is not so. My discussion of Mr. Giacobbe's claim handling occurred in the context of Munich's Article XVI reporting procedures and the "errors and omission" provision of the Retrocession Agreements—Article XIII—not in connection with whether Mr. Giacobbe's actions for late claims handling generally amounted to bad faith under New York law. *Cf. Atlantic Fruit Co. v. Hamilton Fire Ins. Co.*, 251 N.Y. 98, 104 (1929) (discussing that only limited effect should be given to errors and omissions provisions so as not to vitiate the policy, and thus "a willful or persistent failure to make accurate records and reports of the values and locations of the property at risk" is a material breach and not within scope of errors and omissions provision).

*Pageant v. Consolidated Edison Co.*, 54 N.Y.2d 167, 172 (1981); *cf. Christiania*, 979 F.2d at 281 (rejecting argument that reinsured's lack of candor to reinsurer supported finding of bad faith). Put differently, there is nothing dishonest about Mr. Giacobbe's conduct; at worst, he is simply negligent. *See Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 & n.5 (1983) (noting that "gross negligence . . . betokens a reckless indifference to the rights of others," and further, that "[b]ad faith, the mirror image of good faith, connotes a dishonest purpose").

Moreover, despite ANICO's attempts to portray Munich's claims handling procedures generally as aberrant and reckless, the evidence adduced in this case demonstrates that the standard of care in the reinsurance industry as a whole is exceedingly low. IOA Re's claims handling procedures were largely no better than Munich's. For example, when Ms. Charney emailed Mr. Giacobbe in 2005 about his reporting, Ms. Charney never followed up with Mr. Giacobbe or anyone else at Munich regarding Munich's reporting obligations, nor did Ms. Charney communicate to Ms. Washburn, the IOA Re claims adjuster specifically handling Munich's retrocession of the Everest program, any concerns over Munich's claims reporting. Indeed, IOA Re took no negative action with respect to the claim that was the subject of Ms. Charney's 2005 email, and eventually paid the claim without any reservation of rights. Despite apparent

---

The same goes for my statement that "Munich should not be able to skirt any failure to comply with the agreements' notice provision by suggesting that it is industry practice for its employees not to review the governing contract language." *Id.* at 26 n.21. As the context of my decision makes clear, these statements pertain to whether Munich's untimely claims reporting could be excused under the Retrocession Agreement's errors and omissions provision, such that Munich would not be precluded from seeking payment for claims reported after the Sunset deadline. In sum, in my Reconsideration Opinion, I expressed no opinion on the issue of the standard of care for claims handling as it pertains to bad faith because that issue was not before me.

and ongoing problems with Munich's claims handling, IOA Re did not conduct a claims audit to ensure Munich was reporting properly until late 2009, nor did IOA Re ever issue any reservation of rights or denial letters on the basis of late reporting under Article X. Rather, IOA Re paid and continued to pay claims without regard to how they were reported.  Thus, from the perspective of Munich and IOA Re's relationship, neither party exercised great care to ensure that reporting and payments were handled in strict compliance with the terms of the Retrocession Agreements.  In light of this, I conclude that Munich's claims handling practices, although negligently performed at times, do not approach the standard required for gross negligence or recklessness.

The reasoning in *Unigard II* is not to the contrary.  In *Unigard II*, the court explained that failure to implement routine practices and controls to ensure notification to reinsurers could support a finding of bad faith.  4 F.3d at 1069.  The court went on to describe simple routine practices taken by the reinsured, finding that these were sufficient to preclude a finding of bad faith.  *Id.* at 1070.  Significantly, none of these practices could be considered "best practices," at least as described by the experts in the instant matter—instead, the *Unigard II* court found the practices sufficient if they were "reasonable" in light of the circumstances.  *Id.*

Here, I have found that it was not outside industry custom for a claims handler, such as Mr. Giacobbe, to report claims under a retrocessional agreement in the same manner as did his predecessor.  In light of this, the fact that Munich did not have a formal training program for its claim handlers does not run afoul of *Unigard II*, as it was reasonable in light of industry standards for Munich to rely on its claims handlers to essentially train themselves.  Moreover, Munich's overall practices are reasonable when

viewed through the lens of the low standard of care applied in this industry generally, as explained above.  Indeed, this is not the case, as was described in *Unigard II*, of a reinsured's complete failure to have any practices in place for reporting claims.  The facts in this case show that Munich's claim handlers followed certain practices for reporting claims to IOA Re—they just did not always follow the specific reporting requirements of the Retrocession Agreements.

To summarize: ANICO has failed to prove that it is entitled to rescission of the Retrocession Agreements on the basis that Munich (i) breached the duty of utmost good faith during the underwriting process, (ii) breached the duty of utmost good faith due to its claims handling practices, or (iii) fraudulently misrepresented and induced IOA Re or ANICO during the underwriting process.  ANICO has also failed to prove that Munich's improper claims handling practices were conducted in bad faith, or that Munich's conduct in the performance of the Retrocession Agreements constituted a material breach of those contracts.  Because ANICO has not otherwise challenged Munich's position that the Ceded Claims—*i.e.*, those which are not subject to claim-specific defenses—are payable under the Retrocession Agreements, I conclude that Munich is entitled to payment on those claims.[91]  I turn now to those categories of claims that ANICO contends are not payable based on specific defenses to coverage.

---

[91]     ANICO asserted a boilerplate list of affirmative defenses, in addition to the specific defenses noted in this Opinion, that it did not address or pursue during or following trial.  In any event, those affirmative defenses are premised on the same facts and theories underlying ANICO's rescission and breach of contract arguments, and thus are without merit for the same reasons expressed above.

**D.      ANICO's Claim-Specific Defenses**

ANICO raises several defenses to payment for specific categories of claims: (i) roofer claims, *i.e.*, claims arising from injuries sustained on or in connection with a roof; (ii) claims ceded from Everest Re; and (iii) the Sunset claims, arising under the 2001 Retrocession Agreement but submitted after the December 31, 2008, Sunset provision.  I address each of these categories of claims separately.

As a general matter, I note that the parties' arguments as to each of the categories of claims turn on interpretation of the applicable language in the Retrocession Agreements.  Under New York law, "[a] reinsurance contract is governed by the rules of construction applicable to contracts generally." *Christiania*, 979 F.2d at 274 (citation omitted).  Thus, the terms of unambiguous contracts are enforced as written.  An ambiguous contract is one subject to different, reasonable interpretations. Where the terms of the contract are ambiguous, "reference to extrinsic evidence provides guidance to the parties' intent." *Id.* (citation omitted).  Extrinsic evidence may include evidence of custom and usage.  *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 3 N.Y.3d 577, 590-91 (2004) ("Our precedent establishes that where there is ambiguity in a reinsurance certificate, the surrounding circumstances, including industry custom and practice, should be taken into consideration") (Read, J., dissenting) *cited with approval in Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S.Ct. 1758, 1769 n.6 (2010).

In interpreting ambiguous contract language, a court should endeavor to give meaning to all provisions of a contract, *New York State Thruway Auth. v. KTA-Tator Eng. Svcs., P.C.*, 913 N.Y.S.2d 438, 438 (App. Div. 2010), and avoid interpretations that lead to absurd results, *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415

(N.Y. 2010) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."); *see also World Trade Center Props., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003) (same) *overruled in part on other grounds by Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006); *Bank of N.Y. Trust, N.A. v. Franklin Advisers, Inc.*, 674 F. Supp. 2d 458, 463-64 (S.D.N.Y. 2009) ("[A]n interpretation that gives a reasonable and effective meaning to all of a contract is generally preferred to one that leaves a part unreasonable or of no effect.").

In New York, as in most jurisdictions, an insured bears the initial burden of proving that a claim falls within the scope of coverage.  *Consol. Edison Co. of New York, Inc. v. Allstate Ins.* Co., 98 N.Y.2d 208, 218 (2002) ("Generally, it is for the insured to establish coverage and for the insurer to prove that an exclusion in the policy applies to defeat coverage."), *applied in reinsurance context by Union Carbide Corp. v. Affiliated FM Ins. Co.*, 68 A.D.3d 534, 536 (N.Y.A.D. 2009), *aff'd as modified*, 16 N.Y.3d 419, (2011).  "[W]ith respect to coverage exclusions, an insurer bears the burden of proving that an insurance policy's exclusions 'clearly and unmistakably' apply to the insured's claims." *Checkrite Ltd., Inc. v. Illinois Nat. Ins. Co.*, 95 F. Supp. 2d 180, 189 (S.D.N.Y. 2000) (citation omitted) (quoting *Sylvan Beach*, 55 F.3d at 115-16).  A court therefore should construe an exclusion provision narrowly, in favor of coverage.  *See Cone v. Nationwide Mut. Fire Ins. Co.,* 75 N.Y.2d 747, 551 N.Y.S.2d 891, 551 N.E.2d 92, 93 (1989); *Home Ins. Co. of Ill. v. Spectrum Information Tech., Inc.,* 930 F. Supp. 825, 848 (E.D.N.Y. 1996).

1.    *Roofer Claims*

ANICO contends that Munich improperly ceded two claims to ANICO that are excluded from the Retrocession Agreements because the claims arose from injuries sustained by roofers—the Fields and Jones claims.  As I found above, ANICO carried its burden of showing that the Jones claim falls within the roofer exclusion but it failed to carry its burden with respect to the Fields claim.  Accordingly, ANICO breached its obligation by not paying on the Fields claim, but it has no liability for the Jones claim.

2.    *ANICO's Defense to Everest Re Claims*

ANICO contends that Munich improperly ceded the three Everest Re Claims.  I have found that the parties intended the Retrocession Agreements to include primary workers' compensation policies written by Everest Re, and otherwise properly ceded to Munich under the Everest Agreement, and the parties stipulated that the Everest Re Claims are primary policies of workers' compensation.  For those reasons, the Court concludes that Munich has carried its burden of showing that the claims arising from primary workers' compensation insurance policies written by Everest Re are claims falling within the scope of ANICO's obligations under the Retrocession Agreements.  Munich has shown coverage, and ANICO has not demonstrated that any other exclusion to coverage applies; accordingly, the Fields, Marion, and Moreira claims are all properly ceded to ANICO under the Retrocession Agreements.

3.    *ANICO's Defense to Article XVI Claims*

The final category of claims includes those claims that were included in the August Spreadsheet but not otherwise first noticed to IOA Re prior to the Article XVI deadline of December 31, 2008—the Sunset claims.   ANICO argues that it is not liable

for these claims because Munich failed to provide adequate notice as required by Article XVI.  Munich counters that the August Spreadsheet satisfied its notice obligation under the Retrocession Agreements, and thus the Sunset claims were noticed prior to the deadline.

The Article XVI Sunset provision, as I explained in my Reconsideration Opinion, dated March 28, 2013, creates a condition precedent to payment, and thus the burden is on Munich to show that it properly complied with Article XVI in ceding claims to ANICO.  *See* Dkt. No. 112, at 34 & n.18.  Article XVI requires Munich to advise ANICO, through IOA Re, prior to December 31, 2008, of all claims (i) for the period covered by the 2001 Retrocession Agreement that are (ii) likely to result in a claim under this agreement.  *See* Pl.'s 2 (Art. XVI(A)).  Simply put, the plain language of this provision requires Munich to provide notice of claims arising under the 2001 Retrocession Agreement that had not yet been reported to IOA Re that were likely to mature into claims that would breach the $500,000 excess $500,000 layer of retrocessional coverage provided by ANICO.  In that regard, although there must be something in the notice provided to IOA Re that would allow it to ascertain the likelihood that a claim would continue to develop above $500,000, Munich was not required to provide the same type of notice contemplated by Article X.[92]

---

[92] As I explained in my previous decisions in this case, Article X and Article XVI serve two different purposes, and thus could reasonably be construed as requiring different types of notices.  Article X directs Munich to notify ANICO, through IOA Re, of all claims, with cost estimates relating to the claims; based on this ANICO pays Munich on demand for Munich's losses.  *See* Pl.'s 1-2 (Art. X).  Article XVI, on the other hand, provides an outer limit for the reporting of claims by stating that "no liability shall attach" to any claims not reported within seven years; it prevents Munich from reporting claims in perpetuam, by excluding from coverage those claims not noticed within seven years following the expiration of each retrocessional agreement.  *See id.* (Art. XVI).

Here, I have already found that the August Spreadsheet did not include sufficient information that would allow IOA Re to make a determination of the likelihood that a claim arising under the Retrocession Agreements would breach ANICO's retrocessional retention layer.  Although Munich was not required to provide the same level of detail in its notice as it is required to do under Article X claims reporting, Munich was nevertheless required to provide some modicum of information that would allow IOA Re to determine which claims appeared likely to impact retrocessional coverage.  As I have found, the August Spreadsheet failed to do so.

In that connection, the fact that the August Spreadsheet was overbroad, and included claims arising from years outside the 2001 Retrocession Agreement, further shows that the August Spreadsheet did not constitute sufficient notice under Article XVI; the expansive content of the document, without any distinction among claims, would prevent any reasonable claims handler from ascertaining which claims Munich believed were likely to develop further.[93]  *Cf. Steadfast Ins. Co. v Sentinel Real Estate Corp.*, 283 A.D.2d 44, 53 (N.Y.A.D. 2001) ("Even if it is assumed that the loss run report contained sufficient information about the claim to comply with the Policy's notice condition, the fact that the report lists hundreds of claims, most of which were not going to reach the

---

Article XVI also serves the purpose of providing a foundation for commutation. Thus, Article X is essentially the operative provision of the Retrocession Agreements, detailing the method by which Munich obtains payment on its losses, whereas Article XVI ensures that both parties have an accurate understanding of ANICO's exposure at the seven-year mark.

[93]     Ms. Mack's credible testimony, that reports generated for notice purposes similar to that required by Article XVI are often over-inclusiveness, is not to the contrary.  As I noted above, Munich was not required to provide specific detail on the claims, or limit reported claims only to those that it had conclusively determined would breach the retention layer.  Here, however, Munich made absolutely no effort to limit its reporting of claims in any manner; it simply supplied IOA Re with a list of *all* claims that had been ceded to Munich from Everest.

[retention] limit and, therefore, would never become the insurer's responsibility, makes the report entirely unsuitable to be deemed to satisfy the notice condition.").

Accordingly, Munich's August Spreadsheet did not constitute adequate notice for Article XVI, and thus the 11 Sunset claims first noticed in the August Spreadsheet, and not otherwise noticed to IOA Re prior to December 31, 2008, are excluded from coverage under the Retrocession Agreements.

**E.     Declaratory Judgment**

Munich also seeks a declaratory judgment that ANICO is obligated to pay amounts that may come due in the future on all claims at issue in this lawsuit.[94]   ANICO opposes any declaratory judgment that results in a "blank check" for Munich, arguing that payment on any future claims must be covered under the Retrocession Agreements.

To obtain a declaratory judgment, a plaintiff must establish that there is a "definite and concrete" dispute between the parties that the Court can resolve with "a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

As noted, because of the operation of the Sunset Provisions in the Retrocession Agreements, the claims for which ANICO is or may become liable is already known and fixed—namely, those claims that Munich ceded to ANICO prior to the expiration of the Sunset Provision deadlines.  At no point in the future will a new claim arise.  Rather, ANICO's future liabilities turn solely on existing claims developing into amounts that

---

[94]     This includes the Ceded Claims, which are both those claims billed to ANICO but not yet paid, as well as those ceded to ANICO but not yet billed because the claims have not reached the retention limit.

exceed Munich's retention and breach ANICO's retrocessional coverage layer.  To that end, my ruling in this Opinion makes clear that ANICO cannot avoid its payment obligations for these claims due to any reporting delays or the fact that they arise out of (i) injuries sustained while being on or around a roof, unless the individual is a roofing contractor or subcontractor, or (ii) primary policies of workers compensation written by Everest Re.  Munich is thus entitled to a declaratory judgment that ANICO cannot withhold future payment for those claims at issue in this litigation that it has ceded to ANICO, in advance of the Sunset Provision deadlines, with the exception of the Jones claim, which I have found to be properly excluded as a roofer claim.  These claims are set forth in a table in the Appendix to this Opinion, identified by the notation "Not Billed" or "No Bill Due."

**F.      Damages and Interest**

*1.      Damages*

Munich is entitled to contractual damages in the form of payment on all claims that were properly ceded to ANICO under the Retrocession Agreements, as I have interpreted them, that ANICO has not yet paid.  These claims are set forth in a table in the Appendix to this Opinion, identified by the amount that has been billed as of August 26, 2013.  I am unable to calculate a sum certain of damages owed Munich at this juncture because (1) some time has passed since the parties submitted the amount billed but outstanding on these claims, such that additional bills may now be due, (2) I find that Munich is entitled to prejudgment interest on these claims, as explained *infra*, and (3) the amount that Munich is owed on its claims appears to be offset by an adjusted premium

amount based on the number of claims payable by ANICO.[95]  For these reasons, and as set forth in the Order accompanying this Opinion, the parties will supply the Court an updated calculation of damages for the claims identified in the Appendix, to include the amount of prejudgment interest as detailed below, and offset by any adjusted premium amounts.

2.      *Prejudgment Interest*

In addition to damages for nonpayment of claims, Munich requests that the Court award prejudgment interest.  Specifically, Munich contends that an award of prejudgment interest is appropriate on those claims that Munich billed but ANICO did not pay, and which I have determined were properly ceded under the Retrocession Agreements. Munich's reasoning in support of prejudgment interest proceeds as follows: (1) a district court sitting in diversity must apply the forum state's law on prejudgment interest, here, New Jersey's, (2) New Jersey provides for discretionary awards of prejudgment interest in breach of contract cases, and (3) ANICO's actions in the case demonstrate a pattern of withholding payments on claims based on untenable, and constantly-shifting, defenses, when Munich was actually entitled to that money, thus supporting the discretionary award of prejudgment interest.   Munich does not specific the date from which prejudgment interest should begin, but its calculations and relevant case citations show that Munich seeks an award that begins on the dates it billed ANICO for each claim.

ANICO, relying on Second Circuit cases, argues that New York law applies to prejudgment interest, and federal procedural law applies to postjudgment interest, and

---

[95]      See, for example, Munich's summary of claims, Pl.'s Ex. 6-7.  Neither party has supplied this Court with a proper means for calculating or adjusting the amount due to Munich on properly ceded but unpaid claims based upon this apparent offset of adjusted premiums.

that, further, under New York law, the Court must determine the date interest begins to accrue, which should be "the earliest ascertainable date the cause of action existed." Notably, ANICO does not appear to argue that prejudgment interest is inappropriate, should Munich be awarded damages.  Rather, ANICO contends that any award of interest should be computed from no earlier than the date the Court decided how the retention under the Retrocession Agreements should be calculated—September 28, 2012. According to ANICO, because the parties disputed the retention calculation, and Munich reported based on inconsistent retention calculations, there was no viable "cause of action" until the Court's decision on retention.  ANICO alternatively argues that the filing of the lawsuit December 22, 2009, would be the appropriate date for interest to accrue for payment demands that Munich sent prior to that date.  In light of the foregoing,  it is clear that the Court is faced with a choice of law question with respect to which state's rules on prejudgment interest applies.[96]

"In diversity cases, the choice of law rules of the district court's forum state are controlling."  *Draper v. Airco, Inc.*, 580 F.2d 91, 97 (3d Cir. 1978) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) (holding that federal court in Delaware had to follow Delaware choice-of-law rules on prejudgment interest despite fact that New York law governed contract dispute)).  Thus, under *Klaxon*, I apply New Jersey's choice-of-law rules to decide what law applies, which in turn requires a determination whether

---

[96]      I note that it would appear that an award of prejudgment interest is proper under both New York and New Jersey law, and the date from which it would begin to run also could be the same under both state's laws, as, at bottom, both New York and New Jersey allow the court to exercise discretion in calculating prejudgment interest.  Nevertheless, the percentage rate for prejudgment interest varies between the states, thus necessitating an analysis of which state's rules govern.  *Accord De Puy Inc. v. Biomedical Eng'g Trust*, 216 F. Supp. 2d 358, 379-82 (D.N.J. 2001) *aff'd sub nom. Pappas v. DePuy Orthopaedics, Inc.*, 33 F. App'x 35 (3d Cir. 2002).

New Jersey views prejudgment interest as "substantive," and thus would apply New York's prejudgment interest rules, or as "procedural," and would apply its own prejudgment interest rule. *De Puy Inc. v. Biomedical Eng'g Trust*, 216 F. Supp. 2d 358, 379-82 (D.N.J. 2001) *aff'd sub nom. Pappas v. DePuy Orthopaedics, Inc.*, 33 F. App'x 35 (3d Cir. 2002) (citing *Draper*, 580 F.2d at 97). In *North Bergen Rex Transport, Inc. v. Trailer Leasing Co.*, 158 N.J. 561, 568 (1999), the New Jersey Supreme Court was faced with the question of whether New Jersey or Illinois prejudgment interest law applied to a dispute governed by Illinois law. Relying on a previous decision, the North Bergen Court stated that: "[t]his Court has also observed that it is not 'inappropriate to think of prejudgment interest as a matter of procedure in the context of lawmaking.'" *Id.* (quoting *Busik v. Levine*, 63 N.J. 351, 357 (1973)). Accordingly, the New Jersey Supreme Court, applied New Jersey prejudgment interest law in the Illinois contract dispute before it. *Id.* at 569. The same applies here—under *Klaxon*, I must follow New Jersey's choice of law rules, which in turn dictate that I apply New Jersey law on the issue of prejudgment interest, even though the underlying dispute is governed by New York law. *Accord De Puy Inc.*, 216 F. Supp. 2d at 382.

"New Jersey state law distinguishes between postjudgment interest, which is governed by New Jersey Court Rule 4:42–11(a); prejudgment interest in tort cases, which is governed by Court Rule 4:42–11(b); and prejudgment interest in contract cases, which is governed by equitable principles." *Gleason v. Northwest Mortgage, Inc.*, 253 F. App'x 198, 204 (3d Cir. 2007) (citing, *inter alia*, *County of Essex v. First Union Nat'l Bank*, 186 N.J. 46, 61 (2006)). That said, "reference to the postjudgment interest rules [found in subsection (a)] may serve as an appropriate benchmark in contract cases;" however, "the

determination must ultimately be based on the equities of the case." *Id.* (citing *DialAmerica Marketing, Inc. v. KeySpan Energy Corp.*, 374 N.J. Super. 502, 509-10, (App. Div. 2005)).  Indeed, the New Jersey Supreme Court has affirmed a trial court's use of "R. 4:42–11 as a guide" in a contract case.  *Litton Indus., Inc. v. IMO Indus., Inc.*, 200 N.J. 372, 390-91 (2009).  Rule 4:42-11 provides, in pertinent part

> (a) Post Judgment Interest
> * * *
> (ii) For judgments not exceeding the monetary limit of the Special Civil Part at the time of entry, regardless of the court in which the action was filed: commencing January 2, 1986 and for each calendar year thereafter, the annual rate of interest shall equal the average rate of return, to the nearest whole or one-half percent, for the corresponding preceding fiscal year terminating on June 30, of the State of New Jersey Cash Management Fund (State accounts) as reported by the Division of Investment in the Department of the Treasury.
>
> (iii) For judgments exceeding the monetary limit of the Special Civil Part at the time of entry: in the manner provided for in subparagraph (a)(ii) of this Rule until September 1, 1996; thereafter, at the rate provided in subparagraph (a)(ii) plus 2% per annum.
>
> (b) Tort Actions
> [T]he court shall, in tort actions, ... include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest.... Prejudgment interest shall be calculated in the same amount and manner provided for by paragraph (a) of this rule except that for all periods prior to January 1, 1988 interest shall be calculated at 12% per annum . . . .

R. 4:42-11.

Courts in this district, applying New Jersey law, award prejudgment interest for breach of contract where, as here, the plaintiff "was deprived of funds without receiving that which was promised in return." *Miller v. Butler*, 1:12-CV-01004 RBK/JS, 2014 WL 585409, at *8 (D.N.J. Feb. 14, 2014) (citing *Devine v. Advanced Computer Concepts,*

*Inc.*, Civ. No. 08-875, 2009 WL 78158, at *2 (D.N.J. Jan.9, 2009)).  Indeed, prejudgment

interest should neither be imposed as a punitive measure, *New Jersey Mfrs. Ins. Co. v.

Nat'l Cas. Co.*, 393 N.J. Super. 340, 354 (App. Div. 2007), nor should it be withheld due

to the unsuccessful party's "honest disputation over legal liability," *Rova Farms*, 65 N.J.

at 506; *see also Unihealth v. U.S. Healthcare, Inc.*, 14 F. Supp. 2d 623, 642 (D.N.J. 1998)

("The purpose of awarding prejudgment interest is to compensate the claimant for the

loss of income the money owed would have earned if payment had not been delayed.");

*Musto v. Vidas,* 754 A.2d 586, 598-99 (N.J. Super. Ct. App. Div. 2000) ("The primary

consideration in awarding prejudgment interest is that the defendant has had the use, and

the plaintiff has not of the amount in question; and the interest factor simply covers the

value of the sum awarded for the prejudgment period during which the defendant had the

benefit of monies to which the plaintiff is found to have been earlier entitled.").

Accordingly, I conclude that Munich is entitled to prejudgment interest.

Having determined that prejudgment interest is appropriate under R. 4:42-11, I

must determine which rate applies, as well as the date from which prejudgment interest

should be calculated.  As to the first issue, Munich argues that where, as here, a judgment

that exceeds the monetary limit of the Special Civil Part, which is $15,000, *see* R. 6:1-

1(c), the rate of interest is equal to the average rate of return of the State of New Jersey

Cash Management Fund (State Accounts) *plus* two percent per year.  R. 4:42-11(a)(iii);

*see Feil v. Great-West Life & Annuity Ins. Co.*, 460 F. Supp. 2d 646, 649 (D.N.J. 2006)

(applying R. 4:42-11(a)(iii) in insurance contract dispute); *Miller v. Butler*, 2014 WL

585409.  Munich further argues that imposition of the additional 2% interest rate

contemplated by R. 4:41-11(a)(iii) is appropriate because ANICO has relied on several

different bases for its refusal to pay claims under the Retrocession Agreements, including some that were raised for the first time in the present litigation, notwithstanding Munich's contractual right under Article X to be paid "on demand."

It is true that the Retrocession Agreements contemplate that Munich shall be paid by ANICO on demand; however, Munich's argument that this language entitles it to prejudgment interest from the billing date of claims ceded to ANICO is overly simplistic. Indeed, Munich's position ignores that this litigation, and ANICO's refusal to pay ceded claims, arises from a history of poor claims management on Munich's part, including untimely claims reporting, inconsistent reporting based on retention calculations, and claims erroneously addressed to Castlewood. For this reason, I determine that Munich is not entitled to the 2% increase in the prejudgment rate, but only the annual rate set forth in R. 4:41-11(a)(iii).[97] *Accord Munich Reinsurance*, 2012 WL 1018799, at *6.

I turn next to the date on which prejudgment interest starts to accrue, a matter over which I exercise discretion. *County of Essex v. First Union,* 186 N.J. 46, 61-62 (2006) (trial court, in its discretion, determines the date on which prejudgment interest starts to accrue in contract cases). Again, equitable principles guide the court on this issue. *Id.* As noted, the parties disagree on the appropriate prejudgment interest accrual date. Munich asserts that the accrual date is the date that Munich billed ANICO through IOA Re for each claim, or, alternatively, the date that IOA Re received the bill. ANICO

---

[97]     Additionally, I note that the size of the judgment in this case is significant, and *DialAmerica Marketing* and *Litton Industries* suggest that the higher rate of subsection (a)(iii) should not be imposed on large contract awards as a matter course. Moreover, other than relying on its—undeveloped—interpretation of the Retrocession Agreements, Munich has not pointed to any principled basis for applying the enhanced rate here; Munich has not shown why this case is the unusual case in which the enhanced rate should apply.

asserts that the accrual date is September 28, 2012, the date of the Court's decision on retention, or, alternatively, the filing of the lawsuit December 22, 2009.   Munich's position of using earlier dates for computing prejudgment interest is again based on the notion that Munich is entitled to payment "on demand" for claims submitted to ANICO under the Retrocession Agreements.

New Jersey law generally requires interest to be paid from the time payment of the underlying principal becomes due.  *Munich Reins. Am., Inc. v. Tower Ins. Co. of New York*, Civ. No. 09-2598(FLW), 2012 WL 1018799, at *4 (D.N.J. Mar. 26, 2012) (citing New Jersey cases). That said, in determining the prejudgment interest accrual date, equitable principles control.  Pressler & Verniero, Current N.J. Court Rules, cmt. 3.1 on R. 4:42-11 (2012) (citing *County of Essex v. First Union*, 186 N.J. at 61-62).

For the same reason that I determined that it would be inequitable to award Munich the 2% increase in rate, due to its poor history of claims handling, I also determine that it would be inequitable to award Munich prejudgment interest from the date it billed claims.  Furthermore, neither Munich nor ANICO have directed this Court to the meaning of ANICO's "on demand" payment obligation in connection with Munich's own reporting obligations.  Certainly, for a claim to be payable on demand, Munich must not only comply with reporting a claim to ANICO, but ANICO, or in this case, IOA Re, must be provided a reasonable amount of time to review the billed claim to ensure it has been properly reported and that IOA Re has sufficient information on which to make a payment.  In other words, it would appear that even if Munich demanded payment immediately with its billing, some amount of time would pass between the date billed and the date that ANICO paid the bill, thus undermining Munich's position that

interest should run from the date that Munich created its bill.  Lastly, even assuming *arguendo* that "on demand" could be construed in the manner in which Munich suggests, there is a lack of proof in this case with regard to ANICO/IOA Re receiving notice of the claim billings.  Although, as noted, ANICO does not ultimately dispute the total amount due on each claim, throughout this litigation, it has contested that the dates on the billed claims accurately reflect if and when IOA Re received these bills, and Munich did not offer proofs to show when IOA Re did or should have received any bills.  Accordingly, for these additional reasons, I find that it would be inequitable for prejudgment interest to begin to run from the date of the billed claims.  *Accord Munich Reinsurance*, 2012 WL 1018799, at *4-*5.

Instead, weighing the parties' actions throughout their relationship under the Retrocession Agreement and this litigation, I find it appropriate to use the date Munich filed its Complaint, December 22, 2009, as the beginning date from which prejudgment interest will run.[98]  *Accord Miller v. Butler*, 2014 WL 585409; *see also Devine v. Advanced Computer Concepts Inc.*, No. Civ. 08-875GEB, 2009 WL 78158, *4 (D.N.J. Jan. 9, 2009) (using date of service of process as start date for prejudgment interest); *Liss v. Federal Ins. Co.*, 2009 WL 231992 (N.J. App. Div. 2009) (per curiam) (treating settlement date as date of accrual); *cf. N.J. Power & Light Co. v. Mabee*, 41 N.J. 439, 441 (1964) ("[T]he sundry rules for measuring damages are subordinate to the ultimate aim of making good the injury done or loss suffered and hence [t]he answer rests in good sense rather than in a mechanical application of a single formula." (internal quotation marks

---

[98]     I am further guided by R. 4:41-11(b), which, although pertaining to tort actions, provides that prejudgment interest should be calculated "from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later."

omitted) (quoting *525 Main Street Corp. v. Eagle Roofing Co., Inc.*, 34 N.J. 251, 255 (1961)).

In sum, I conclude that Munich is entitled to prejudgment interest on all claims that had been properly ceded to ANICO under the Retrocession Agreements, as I have interpreted them in this litigation, at the annual rate set forth in R. 4:41-11(a)(iii), but without the 2% increase in rate envisioned by R. 4:41-11(a)(iii).  Prejudgment interest shall begin on the date Munich filed its Complaint in the instant matter, December 22, 2009, for all claims billed as of that date, and on the date of receipt by IOA Re for any additional claims remitted to ANICO after Munich's filing of the Complaint.[99]

**CONCLUSION**

For the for the reasons stated in this Opinion, the Court determines that ANICO is not entitled to rescission of the Retrocession Agreements.  Instead, the Court concludes, based on the above found facts, that ANICO breached its payment obligations under the Retrocession Agreements for claims that were properly ceded to ANICO via IOA Re before the expiration of the Sunset Provision deadlines.  These claims include claims that arise from underlying primary policies of workers' compensation written by both Everest and Everest Re, but they do not include claims arising from injuries sustained by a roofing contractor or subcontractor.  Further, it also does not include those claims that were first noticed on Munich's August Spreadsheet, and not otherwise noticed in advance of the Sunset Provision deadline, as that document did not satisfy the requirements of Article XVI of the Retrocession Agreements.

---

[99]    In line with my reasoning above, I find it equitable to rely on the date that IOA Re receives the billing notice, rather than the date Munich prepares or mails such notice.

Munich has billed ANICO for claims that were properly ceded under the Retrocession Agreements, as I have so interpreted, but on which ANICO has failed to pay. Munich is entitled to damages in the form of payment of any and all outstanding bills on properly ceded claims, as identified in the Appendix of this Opinion. Munich is also entitled to prejudgment interest on the amounts billed for these claims beginning on the date of the billing, but no earlier than December 22, 2009, the date Munich filed its Complaint in the present action, at the annual rate identified in R. 4:41-11(a)(ii). In light of this, the parties are directed to provide the Court with a proposed a sum certain of damages based upon (i) the claims identified in the Appendix, (ii) including the amount of prejudgment interest as detailed below, and (iii) offset by any adjusted premium amounts.

Additionally, the Court declares that ANICO may not withhold future payment based on the defenses presented in this litigation for those claims that have been properly ceded to ANICO, as identified in this Opinion, but for which Munich has yet to submit any bill for payment.

An Order will be entered consistent with this Opinion.


Date: February 27, 2014                    /s/  Freda L. Wolfson
                                           FREDA L. WOLFSON, U.S.D.J.

**APPENDIX**

|  | Claim | Munich Claim Number | Amount Billed Net of Payment by ANICO | Notes |
|---|---|---|---|---|
| 1 | WELCH, Edmond | 6098145 | $187,500.00 | As of 8/23/13 |
| 2 | OWENS, Johnson | 6124309 | $187,506.36 | As of 8/23/13 |
| 3 | SANCHEZ, Jose | 6109126 | $250,000.00 | As of 8/23/13 |
| 4 | KRONER, George | 6102272 | $250,000.00 | As of 8/23/13 |
| 5 | McMANUS, Raymond | 6125230 | ($19,506.84) | As of 8/23/13 |
| 6 | CHAVEZ, Sylvia | 6144422 | $316,204.21 | As of 8/23/13 |
| 7 | CUMMINGS, Michael | 6110205 | $412,460.89 | As of 8/23/13 |
| 8 | MIMS, Alan | 6139831 | $237,879.12 | As of 8/23/13 |
| 9 | OLIVER, Christopher | 6112221 | $135,680.00 | As of 8/23/13 |
| 10 | BEST, John | 6142918 | $8,745.81 | As of 8/23/13 |
| 11 | MITTLEBERGER, David | 6142930 | $314,383.55 | As of 8/23/13 |
| 12 | SAAVEDRA, Martin | 6133577 | $56,944.50 | As of 8/23/13 |
| 13 | TISON, George | 6140171 | $39,668.35 | As of 8/23/13 |
| 14 | WILLIAMS, Melvin | 6129003 | $107,961.63 | As of 8/23/13 |
| 15 | LOPEZ, Karen | 6135970 | $227,799.59 | As of 8/23/13 |
| 16 | KOZLOWSKI, Joseph | 6142745 | $250,000.00 | As of 8/23/13 |
| 17 | ORELLANO, Fausto | 6129315 | $343,469.90 | As of 8/23/13 |
| 18 | SEXTON, Lisa | 6135960 | $174,707.41 | As of 8/23/13 |
| 19 | FIELDS, Russell | 6140752 | $299,890.91 | As of 8/23/13 |
| 20 | MARION, Lavern | 6109956 | $250,332.43 | As of 8/23/13 |
| 21 | MAGANA, Juan | 6102276 | $31,394.41 | As of 8/23/13 |
| 22 | BARTOSZEWIC, Waldemar | 6150020 | $414,752.36 | As of 8/23/13 |
| 23 | KENNEMORE, David | 6213189 | $19,905.14 | As of 8/23/13 |
| 24 | SOSA, Lidia | 6150266 | $181,811.86 | As of 8/23/13 |
| 25 | JIMENEZ, Ricardo | 6125915 | $500,000.00 | As of 8/23/13 |
| 26 | KELLY, Paul | 6135728 | $60,048.34 | As of 8/23/13 |
| 27 | BUFORD, Derrick | 6169131 | $8,233.95 | As of 8/23/13 |
| 28 | MOTA, Felix | 6110497 | $500,000.00 | As of 8/23/13 |
| 29 | SIS, Gonzalo | 6159351 | $0.00 | No Bill Due |
| 30 | ROSETTE, A. | 6223129 |  | Not Billed |
| 31 | STREETER, R. | 6220894 |  | Not Billed |
| 32 | BABS, M. | 6219483 |  | Not Billed |
| 33 | JARAMILLO, S. | 6219138 |  | Not Billed |
| 34 | SCRUGGS, N. | 6214137 |  | Not Billed |
| 35 | SALVADOR, C. | 6203088 |  | Not Billed |
| 36 | GALLARDO, M. | 6200302 |  | Not Billed |
| 37 | ORTEGA, E. | 6161338 |  | Not Billed |
| 38 | HALL, W. | 6106084 |  | Not Billed |

| | Claim | Munich Claim Number | Amount Billed Net of Payment by ANICO | Notes |
|---|---|---|---|---|
| 39 | FRANCE, Patricia | 6197830 | | Not Billed |
| 40 | VALENCIA, M. | 6200308 | | Not Billed |
| 41 | ROMANO, T. | 6150024 | | Not Billed |
| 42 | HAYDEN, J. | 6135971 | | Not Billed |
| 43 | KNOPP, Laurie | 6201573 | | Not Billed |
| 44 | PARTON, Georgene | 6207518 | | Not Billed |
| 45 | MAPLES, Albert | 6129006 | | Not Billed |
| 46 | GONZALES, Ramon | 6140257 | | Not Billed |
| 47 | LEA, Donna | 6139784 | | Not Billed |
| 48 | CALVERT, Steven | 6150261 | | Not Billed |
| 49 | CHRISTIE, Glenn | 6156350 | | Not Billed |
| 50 | SHORT, Mark | 6183074 | | Not Billed |
| 51 | MERRILL, P. | 6190662 | | Not Billed |
| 52 | HALL, J. | 6136033 | | Not Billed |
| 53 | SOTO, R. | 6138818 | | Not Billed |
| 54 | GILBERT, Andrew | 6187443 | | Not Billed |
| 55 | MEDINA, L. | 6201435 | | Not Billed |
| 56 | COVINGTON, E. | 6195263 | | Not Billed |
| 57 | SCHWARTZ, M. | 6201430 | | Not Billed |
| 58 | LUGO, Rosalina | 6138807 | | Not Billed |
| 59 | RIVAS, Daniel | 6207513 | | Not Billed |
| 60 | SOLES, Ronald | 6127566 | | Not Billed |
| 61 | HARRISON, Dylane | 6196870 | | Not Billed |
| 62 | ESQUIVEL, Ernesto | 6142814 | | Not Billed |
| 63 | GARCIA, Alonzo | 6203083 | | Not Billed |
| 64 | JACKSON, Rodney | 6150016 | | Not Billed |
| 65 | EARLEY, Lucas | 6153310 | | Not Billed |
| 66 | ROJAS, Elizabeth | 6179981 | | Not Billed |
| 67 | CUNNINGHAM, Teresa | 6203082 | | Not Billed |
| 68 | TODRIFF, Debbe | 6221306 | | Not Billed |